**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAPITOL DIALYSIS, LLC**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**BEVERLY ENTERPRISES - DISTRICT OF COLUMBIA, INC. et al.,**<br><br>          **Defendants.** | Civil Action No. 1:07cv1073 (PLF) |

**MEMORANDUM OF LAW OF DEFENDANTS
BEVERLY ENTERPRISES–DISTRICT OF COLUMBIA, INC. AND BEVERLY
HEALTH & REHABILITATION SERVICES, INC. IN SUPPORT OF THEIR MOTION
TO DISMISS THE COMPLAINT**

Defendants Beverly Enterprises–District of Columbia, Inc. and Beverly Health and Rehabilitation Services, Inc. (collectively "Beverly"), respectfully submit this memorandum of law in support of their motion to dismiss the complaint of Capitol Dialysis, LLC ("Capitol") under Federal Rule of Civil Procedure 12(b)(6).  Capitol's claims should be dismissed with prejudice because the Complaint fails to state a claim upon which relief can be granted.

**INTRODUCTION**

This is a dispute over a commercial lease, but one would never know that from reading the Complaint, which—in contradiction to the express language of the lease—repeatedly refers the parties' supposed "joint venture" to provide dialysis services to Capitol's patients.  For more than a decade, Beverly has operated a nursing home in northeast Washington, D.C.  In 2001, the parties entered into a written lease agreement ("Lease") whereby Beverly leased a portion of its premises to Capitol for use as a dialysis center.  Since then, Capitol has provided dialysis

services to some of the nursing home residents who require it. In 2007, Beverly received government approval to close the nursing home. Beverly has not terminated the Lease or threatened Capitol with eviction. Instead, Capitol's central contention in this lawsuit is that, for the duration of the lease, Beverly was obligated to continue to operate the nursing home and to "ensure the economic viability of [Capitol's] venture by providing access to [Beverly's] patients for, at minimum, twenty years." Cmplt. ¶ 18.

Notably, the Lease does not require Beverly, as landlord, to continue operating a nursing home on the premises, nor does it obligate Beverly to provide Capitol with any patients at all, much less a steady stream of patients. In fact, Capitol is unable to point to any express provision of the Lease that Beverly arguably breached when it decided to close the nursing home. In an effort to fill this void, Capitol alleges that the Lease did not create a "classic landlord-tenant relationship," Cmplt. ¶ 18, but rather a "joint venture" and a "partnership" replete with implied contractual duties as well as fiduciary duties. Capitol now seeks to enforce these purported extra-contractual duties by asserting claims for breach of contract, breach of the implied covenant of good faith, breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation.

Capitol's five claims suffer from a common flaw: Each relies on the erroneous premise that Beverly had a duty to continue operating its nursing home or, in the alternative, to alert Capitol before notifying anyone else if a decision were made to close the facility. Beverly had no contractual duties along these lines, however, because Capitol acknowledged in the Lease that it was not relying on any promises or representations from Beverly other than those expressly set forth in the Lease. Also, Beverly had no fiduciary duties to Capitol because the Lease expressly provides that the parties did not intend to create a partnership or a joint venture, and the

Complaint does not allege any other type of relationship that would give rise to fiduciary duties. Because Beverly had no contractual or fiduciary duty to give Capitol advance notice of the decision to close the nursing home, Beverly's failure to provide such notice cannot form the basis for a fraudulent or negligent misrepresentation claim. Accordingly, Capitol's Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

We briefly summarize below the pertinent facts in the Complaint, which for purposes of this motion only, are assumed to be true. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

### A.    The Written Lease Agreement

Plaintiff Capitol is a limited liability company owned by two practicing nephrologists and American Renal Associates, Inc. Cmplt. ¶ 9. Capitol provides dialysis services to renal patients living in Washington, DC. Id. On or about December 28, 2001, the parties entered into the Lease, pursuant to which Capitol leased a 1,200 square foot space in Beverly's nursing home facility. Cmplt. ¶ 17. The Lease provides for "an initial five (5) year term . . . [that] shall automatically renew for three (3) additional five (5) year terms" and does not contain an express termination provision. Cmplt. ¶¶ 19, 20. A true and correct copy of the Lease is attached hereto as Exhibit A.[1]

---

[1]    The Court can properly consider the Lease without converting Beverly's Rule 12 motion into a motion for summary judgment because the Lease is "referred to in the complaint, and [is] central to the plaintiffs' claims." Cephas v. MVM, Inc., 403 F. Supp. 2d 17, 20 (D.D.C. 2005) (quoting Krooth & Altman v. N. Am. Life Assurance Co., 134 F. Supp. 2d 96, 99 (D.D.C. 2001); Sharpe v. National Football League Players Ass'n, 941 F. Supp. 8, 10 n.1 (D.D.C. 1996) (considering contents of a collective bargaining agreement in connection with Rule 12 motion).

Section 19.3 of the Lease provides as follows:

> No Partnership.   Nothing contained in this Lease shall be deemed or
> construed to create a partnership or joint venture between Landlord and
> Tenant, or create any other relationship between the parties hereto other
> than that of landlord and Tenant.

Section 19.4 of the Lease provides in pertinent part:

> No Representations by Landlord.   Neither Landlord nor any agent,
> representative or employee of Landlord has made any representation or
> promise with respect to the Premises or the Facility except as herein
> expressly set forth, and no rights, privileges, easements or licenses are
> granted to or acquired by Tenant except as herein expressly set forth.

**B.     Capitol's Governing Body**

The Complaint alleges that for an unspecified time period, Beverly's Executive Director, James J. Gerrity, served on Capitol's Governing Body and later was succeeded in this position by Joyce Jones, another Beverly employee.  Cmplt. ¶ 25.[2]  Capitol's Governing Body held quarterly meetings, an unspecified number of which allegedly were attended by either Gerrity or Jones.  Id. ¶ 26.  By virtue of having a director serving on Capitol's Governing Body, Beverly purportedly had "full access to Capitol's operational information and its future expectations with respect to its relationship" with Beverly.  Id. ¶ 27.

**C.     The Planned Closure of Beverly's Nursing Home**

The Complaint alleges that Beverly decided in late 2006 to close down its nursing home facility and sell the premises.  Cmplt. ¶ 33.  During this time, Capitol's Governing Body held meetings, but Ms. Jones, who is alleged to have participated in these meetings, did not inform Capitol of Beverly's decision to close the facility and sell the building.  Id. ¶¶ 33, 34.  Beverly

---

[2]     The Governing Body of a Medicare and Medicaid facility is responsible for the "governance and operation of the facility."  42 C.F.R. § 405.2136.  Among other things, it "adopts and enforces rules and regulations relative to its own governance and to the health care and safety of patients, to the protection of the patients' personal and property rights, and to the general operations of the facility."  Id.

informed District of Columbia regulators of its intent to close the nursing facility and allegedly anticipated that the regulators would forbid Beverly from admitting new patients after February 2007.  Id. ¶ 36.  In March 2007, the regulators issued such an order.  Id. ¶ 36.  Beverly allegedly did not inform Capitol of its decision to close the nursing home until March 2007.  Id. ¶ 37.

## ARGUMENT

Dismissal is warranted where, as here, the plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  A plaintiff's obligation to set forth the grounds for its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  Id. at 1964-65.  "Factual allegations must be enough to raise a right to relief above the speculative level…."  Id. at 1965.  Furthermore, the Court is not required to indulge inferences that are unsupported by the facts alleged, nor must it accept legal conclusions cast in the form of factual allegations.  See Henthorn v. Dep't of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994).  As we now show, Capitol has failed to state a claim upon which relief can be granted, and each of its claims must be dismissed.

## I.    COUNT I MUST BE DISMISSED BECAUSE IT DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT.

Capitol alleges that Beverly breached the Lease by announcing that it would close the nursing facility and by failing to provide notice of its decision to sell the leased premises.  Cmplt. ¶¶ 48, 50.  Tellingly, Capitol fails to cite any provision in the Lease that requires Beverly to continue to operate a nursing facility on the leased premises or to provide advance notice to Capitol in the event of a decision to close the facility.  To state a colorable claim for breach of contract, the plaintiff must allege the existence of an enforceable contractual duty, as well as a breach of that duty and damages.  Cf. Braude & Margulies, P.C. v. Fireman's Fund Ins. Co., 468

F. Supp. 2d 190, 197 (D.D.C. 2007) (dismissing contract claim that failed to plead an enforceable obligation).  Capitol's breach of contract claim fails for two independent reasons. First, the alleged duties that Beverly supposedly breached do not appear anywhere in the Lease, and cannot be read into the Lease by implication.  Second, the unwritten obligations that Capitol purports to enforce are barred by the statute of frauds.

> **A.    The Lease Does Not Require Beverly To Operate The Nursing Home For 20 Years, Nor Does It Require Beverly To Notify Capitol Before Taking Steps To Close The Facility.**

Beverly's duties as landlord are set out with particularity in the Lease.  Section 2 provides that Beverly's obligations are to: (1) handle any necessary structural maintenance at the premises, (2) permit Capitol to "peacefully and quietly hold and enjoy the Premises," (3) insure the property against fire and other standard perils, and (4) minimize disruptions while making changes and improvements to the facility.  See Lease § 6 (Ex. A).  The Lease does not impose any additional duties on Beverly.  To the contrary, the Lease recognizes the ***absence*** of additional duties in Section 19.4, which states that "Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth…."  See Lease § 19.4.

The Complaint nevertheless alleges that Beverly's purported obligation to "provide Capitol with a patient base for the twenty year term of the agreement" was a "clearly implied in fact term[]" of the Lease.  Cmplt. ¶¶ 44, 45.  Capitol's attempt to rewrite the Lease is foreclosed by settled law.  The District of Columbia "adheres to the 'objective law' of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is

fraud, duress or mutual mistake."  Isaac v. First Nat'l Bank of Md., 647 A.2d 1159, 1162 (D.C. 1994).  In light of this rule, courts consistently reject attempts by contracting parties to contradict, add to, vary, or subtract from the terms of the written contract that they made.  See Stamenich v. Markovic, 462 A.2d 452, 456 (D.C. 1983) (observing that it would have been a "simple matter" for the parties to include an assignment provision in their contract if they had intended one, and "[t]heir failure to do so makes clear that an assignment of the lease was not within the scope of the contract"); DSP Venture Group, Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003) (rejecting unilateral mistake defense and enforcing contract as written, commenting that "[w]hatever [defendant] intended, the sales contract he signed did not contain a seven-day closing requirement").

A claim that there are implied contract terms is particularly suspect when, as here, the purported unwritten terms involve important matters that the parties would not have overlooked when memorializing their agreement.  See Chas. H. Tompkins Co. v. Lumbermans Mut. Cas. Co., 732 F. Supp. 1368, 1375-76 (E.D. Va. 1990) ("Reasonably, courts expect contracting parties to address in express terms the most substantial duties and liabilities that go to the very heart of their bargain.  Prudence dictates that such matters not be left to the vagaries of implication.").  For instance, in Duke v. American Univ., 675 A.2d 26 (D.C. 1996), a university signed a written agreement under which several neighborhood associations pledged to support the university's application to build new facilities in a residential neighborhood.  Later, the university decided to build in a commercially-zoned area where it would not need a permit.  The neighborhood groups brought suit, claiming that the contract obligated the university to build in the residential area.  The trial court rejected this claim and the Court of Appeals affirmed, explaining:

> [T]he surrender by the university of its right to locate its law school on
> commercial property would have been a matter of great importance. Yet
> the agreement does not mention it. We agree with the trial court that the
> 1989 contract did not include such a provision by implication.

675 A.2d at 27.

The same conclusion applies with equal force here. If Beverly had surrendered its right to close its nursing home, or had taken on an obligation to supply Capitol with dialysis patients for the next twenty years, there would have been some mention of those duties in the Lease. The absence of such terms, and the integration clause in Section 19.4, preclude Capitol from rewriting the Lease to include them.

### B.     Count I Is Barred By The Statute Of Frauds.

Even if Capitol were given free reign to insert new duties into the Lease, Count I nevertheless would be subject to dismissal under the statute of frauds. In the District of Columbia, a contract that cannot fully be performed within one year is unenforceable if it is not reduced to writing. See D.C. Code Ann. § 28-3502; accord Tauber v. Jacobsen, 293 A.2d 861, 866 (D.C. 1972) (holding that statute of frauds rendered unwritten contract unenforceable despite the fact that plaintiff may have relied on it to its detriment). It is well settled that litigants cannot circumvent the statute of frauds by engrafting implied duties onto an existing written agreement. See Chas. H. Tompkins Co., 732 F. Supp. at 1377 (dismissing contract claim where plaintiff attempted to avoid the statute of frauds by "stretching" a written agreement to include an implied duty that was required to be in writing). Here, the Complaint alleges that Beverly had an implied duty to "provide Capitol with a patient base" for twenty years. See Cmplt. ¶¶ 44, 45. Because this alleged obligation is not in writing, it is unenforceable under Section 28-3502 of the District of Columbia Code. Count I therefore should be dismissed with prejudice.

## II.    COUNT II FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Capitol alleges in Count II that Beverly breached the implied covenant of good faith and fair dealing by failing to promptly notify Capitol of the decision to close the nursing home. Under District of Columbia law, an implied duty of good faith and fair dealing is part of every contract.  See Hais v. Smith, 547 A.2d 986, 987-88 (D.C. 1988).  There are, however, two important constraints on this principle.  First, the implied covenant cannot be invoked absent an allegation that an express term of the contract has been breached.  Second, a claim based on the implied covenant will not lie if the underlying allegations are duplicative of those asserted in support of another established claim.  Here, both limitations require dismissal of Count II.

Capitol's good faith and fair dealing claim fails as a matter of law because the Complaint does not allege that Beverly violated any express provision of the Lease.  See Television Capital Corp. of Mobile v. Paxson Commc'ns Corp., 894 A.2d 461, 468 (D.C. 2006) (applying Florida law and rejecting implied covenant claim where the plaintiff did not allege that any express terms of the agreement were breached) (cited with approval in WMATA v. Quik Serve Foods, Inc., 2006 WL 1147933 (D.D.C. Apr. 28, 2006)); accord Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989) (explaining that the implied covenant of good faith "ensures that parties to a contract perform the substantive, bargained-for terms of their agreement").  Because the Lease does not require Beverly to notify Capitol before taking the necessary regulatory steps to close the nursing home, Beverly's alleged failure to do so cannot form the basis for a claim under the implied covenant of good faith and fair dealing.

As discussed above in Section I, the District of Columbia's "objective" law of contracts prevents Capitol from rewriting the Lease to include implied terms.  The implied covenant of good faith and fair dealing does not create an exception to this rule.  In Duke v. American

9

University, for example, the Court of Appeals held that the implied covenant could not be used to restrain the university from making business decisions that were not expressly prohibited by the express terms of the parties' contract.  See 675 A.2d at 28; see also Metro Commc'n Co. v. Ameritech Mobile Commc'ns, Inc., 984 F.2d 739, 743 (6th Cir. 1993) ("[T]he implied covenant of good faith is a construction aid that helps a court determine the intent of the parties; it cannot be used to add terms to the contract when there is no evidence that the parties intended that those terms be included."); Metro. Life Ins. Co., 716 F. Supp. at 1519 ("While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained-for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an [agreement] additional terms plaintiffs now wish had been included.").

        Count II fails for the independent reason that a claim for breach of an implied duty of good faith cannot be maintained "where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'"  Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002) (citing Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 (3d Cir. 2000)); accord Quik Serve Foods, Inc., 2006 WL 1147933, at *5 ("[B]reach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under established cause[s] of action.").  Capitol alleges in Count II that Beverly breached the implied covenant by failing to provide timely notice that the nursing home would be closed.  See Cmplt. ¶¶ 54, 55.  Precisely the same allegation is made in support of the breach of contract claim in Count I (see Cmplt. ¶¶ 49, 50), the fiduciary duty claim in Count III (see Cmplt. ¶ 63), the fraudulent misrepresentation claim in Count IV (see Cmplt. ¶ 70), and the negligent misrepresentation claim in Count V (see Cmplt. ¶¶ 77-79).  Because the allegations in

support of the implied covenant claim are identical to those pleaded in support of Capitol's other claims, Count II should be dismissed with prejudice.

### III.    COUNT III FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AND SHOULD BE DISMISSED.

The crux of Count III is that Beverly "had a fiduciary duty to disclose fully any information that could adversely impact Capitol," and that Beverly breached this duty by failing to promptly inform Capitol that it intended to close the nursing home.  See Cmplt. ¶¶ 61, 62.  As this Court has recognized, "[f]or a fiduciary duty to exist between parties, there must be a special relationship of trust or confidence."  Prunte v. Universal Music Group, 484 F. Supp. 2d 32, 43 (D.D.C. 2007) (dismissing fiduciary duty claim).  Ordinary commercial agreements do not create fiduciary duties between the contracting parties.  Indeed, the District of Columbia Circuit has specifically "reject[ed] the argument … that a fiduciary relationship exists between landlord and tenant."  Sekulow v. 11th & F St. Valet, Inc., 162 F.2d 19, 22 (D.C. Cir. 1947) (affirming dismissal).

Beverly and Capitol did not have a "special relationship of trust or confidence."  Prunte, 484 F. Supp. 2d at 43.  Instead, Beverly was Capitol's landlord under a commercial lease that the parties negotiated at arms length.  As a matter of law, leases do not give rise to fiduciary duties, see Sekulow, 162 F.2d at 22, and the Lease at issue in this case is no exception.  In fact, Capitol expressly acknowledged in the Lease that "[n]othing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create ***any other relationship between the parties hereto other than that of landlord and Tenant*.***"  See Lease § 19.3 (Exh. A) (emphasis added).  Thus, Beverly did not take on the role of a fiduciary when it became Capitol's landlord.

Capitol attempts to create the veneer of a fiduciary relationship by alleging that a Beverly employee served as a member of Capitol's Governing Body.  See Cmplt. ¶¶ 25, 59, 61.  But this allegation, even if proven, would not transform the parties' landlord-tenant relationship into a fiduciary relationship.  To the contrary, "there is no support for the argument that sharing a common director will create a fiduciary duty between two corporations."  Banco Urquijo, S.A. v. Signet Bank/Maryland, 861 F. Supp. 1220, 1249-50 (M.D. Pa. 1994); accord Alta Vista State Bank v. Kobliska, 897 F.2d 930, 934 (8th Cir. 1990) (rejecting the notion that two companies owed fiduciary duties to each other by virtue of having a common agent).  Stated differently, corporations do not assume fiduciary duties vicariously based on the activities of their employees, in the same way that they may become vicariously liable for the negligence of employees acting in the scope of their employment.  Because Beverly did not have a fiduciary relationship with Capitol, Count III does not state a claim for breach of fiduciary duty and should be dismissed under Rule 12(b)(6).[3]

## IV.   THE MISREPRESENTATION CLAIMS SET FORTH IN COUNTS IV AND V SHOULD BE DISMISSED BECAUSE BEVERLY HAD NO DUTY TO PROVIDE CAPITOL WITH ADVANCE NOTICE THAT THE NURSING HOME WOULD BE CLOSED.

Count IV alleges that Beverly committed the tort of fraudulent misrepresentation when it failed to give Capitol advance notice that the nursing home would be closed.  See Cmplt. ¶ 70.

---

[3]     Joyce Jones was the Beverly employee who allegedly attended meetings of Capitol's Governing Body in 2007.  Cmplt. ¶ 25.  Assuming that Ms. Jones was aware of Beverly's intention to close the nursing home, she did not have a fiduciary duty to disclose that information to Capitol.  Instead, because the information was confidential and non-public, Ms. Jones' duty of loyalty to **Beverly** prevented her from disseminating it.  See Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1265 (D.D.C. 1997) (holding that employee breached the duty of loyalty by disclosing his employer's confidential business information).  It should be emphasized that, except for purposes of this motion, Beverly disputes that, at any time prior to February 2007, Joyce Jones attended any Governing Board meetings or even knew that Capitol had placed her on the Governing Board.

12

Count V is a negligent misrepresentation claim based on the same alleged nondisclosure.  See id. ¶¶ 77-79.  Capitol cannot state a claim under either theory.  To make out a claim for fraudulent misrepresentation, a plaintiff must allege "(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation."  Hercules & Co. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992); see also Rothenberg v. Aero Mayflower Transit Co., 495 F. Supp. 399, 406 (D.D.C. 1980).  The elements of negligent misrepresentation for the most part are the same, except that scienter is not required.  See Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1207 (D.C. 1999).  When the misrepresentation claim is based on a failure to speak, the plaintiff also must allege that the defendant had a duty to disclose the facts in question.  Here, Beverly had no such duty, and Counts IV and V therefore should be dismissed.

"There is, of course, no question that mere silence does not constitute fraud unless there is a duty to speak."  Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 517 (D.C. 1948); accord Rothenberg, 495 F. Supp. at 406 (explaining that a misrepresentation claim can be based on a "failure to disclose a material fact when a duty to disclose that fact has arisen").  A duty to speak arises in two circumstances.  First, a defendant that has a fiduciary relationship with the plaintiff may have an obligation to disclose material information under certain circumstances.  See Kapiloff, 59 A.2d at 517-18.  Second, a defendant that elects to speak on a subject may have a duty to disclose additional facts if those facts are necessary to ensure that the initial disclosure is not misleading.  See id.  In this case, Beverly did not have either type of duty.  For the reasons set forth in Section III above, Beverly did not have a fiduciary relationship with Capitol.  Furthermore, the Complaint does not allege that Beverly made any affirmative statements about how long the nursing home would remain in operation, and as a result, Beverly had no duty to

disclose that it had applied for government approval to close the facility.  In short, the Complaint does not allege any facts that, if proven, would impose upon Beverly a duty to provide Capitol with advance notice that the nursing home would be closed down.  Therefore, Counts IV and V should be dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Complaint should be granted, and all of Capitol's claims should be dismissed with prejudice.

## ORAL HEARING REQUESTED

Pursuant to Local Civil Rule 7(f), Beverly respectfully requests an oral hearing on this motion.

Respectfully Submitted,

_____/s/ Andrew A. Nicely_____
Gary A. Winters (D.C. Bar No. 439376)
Andrew A. Nicely (D.C. Bar No. 458805)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006
(202) 263-3000
anicely@mayerbrown.com

*Counsel for defendants Beverly Enterprises-District of Columbia, Inc. and Beverly Health Rehabilitation Services, Inc.*

July 12, 2007

# LEASE AGREEMENT

This Lease Agreement ("Lease") made this day by and between Beverly Healthcare, Inc., d/b/a Northwest Health Care Center ("Northwest" or "Landlord") and Capitol Dialysis, LLC (hereinafter "Capitol Dialysis" or "Tenant") for the lease of space at 3333 Wisconsin Avenue, N.W. (hereinafter "the Facility").

WITNESSETH, that for and in consideration of the rent hereafter reserved, and the covenants contained herein, the parties hereby agree as follows:

1. **Leased Premises:** The six dialysis stations will be located in a 1200 square foot area on the south end of the main floor of the Facility (the "Premises"). A copy of the floor plan for the six dialysis stations is attached as Exhibit A hereto.

2. **Access:** Tenant shall have access to the Facility and to the Premises (24) hours per day, seven (7) days per week.

3. **Lease Term:** The lease shall have an initial five (5) year term, commencing upon the execution of this Lease Agreement (the "Execution Date") and shall automatically renew for three (3) additional five (5) year terms.

4. **Rent:** Upon the date the first Northwest patient is dialyzed on the Premises (the "Rent Commencement Date"), Tenant shall pay to Landlord the first month's rent in the amount of One Thousand Fifty Dollars ($1,050). Thereafter, rental payments in the amount of $1,050 shall be made on or before the fifth (5th) day of each month. The rental payments required in this Lease are all-inclusive and Tenant shall not be responsible for any additional payments for items such as taxes and assessments, operating expenses, utilities, maintenance and repair, landscaping or any other overhead expenses. Payment for such ancillary items shall be the sole responsibility of the Landlord. Rental payments shall be made payable to Northwest Health Care Center and delivered to the Facility on or before the fifth (5th) day of each month.

5. **Use:** The Premises shall be used and occupied by the Tenant only for office and medical use, including, without limitation, use as kidney dialysis stations under the business name of Capitol Dialysis, LLC or the name of any successor or assign, and for no other use. Tenant shall not use, or permit the use of, all or any part of the Premises for any disorderly, illegal or hazardous purpose. Tenant shall not use, or permit the use of, all or any part of the Premises for any purpose that interferes with the use of any other portion of the Facility, nor which in Landlord's reasonable opinion, impairs, or might impair, the reputation or value of the Facility. Tenant shall not use utility services in excess of amounts reasonably determined by Landlord to be within the normal range of demand for the designated use of the

Premises. Tenant shall keep the Premises in a neat and clean condition with reasonable wear and tear excluded.

6. **Services Furnished By Landlord:** Landlord shall provide the following services:

6.1 **Structural Maintenance.** Landlord shall maintain, in good condition and repair all common areas, exterior parking lot, sidewalks, paving, roof, foundation, exterior walls, as well as the underground pipes and conduits located beyond the boundaries of the Premises, and Landlord shall make all repairs thereto becoming necessary, all at Landlord's expense. In the event, however, that any such repairs are necessitated by reasons of any action or omission by Tenant, its employees, agents, licensees, or contractors, Tenant agrees to promptly, upon demand, reimburse Landlord for the full costs thereof.

6.2 **Quiet Enjoyment.** Upon Tenant's paying the Rent and performing its other obligations hereunder, Landlord shall permit Tenant to peacefully and quietly hold and enjoy the Premises, subject to the provisions hereof and the terms of any mortgage, deed of trust or ground lease too which this Lease is subordinate.

6.3 **Insurance.** Landlord shall insure the Facility against damage by fire and standard extended coverage perils, and shall carry public liability insurance, all in such reasonable amounts with such reasonable deductibles as would be carried by a prudent owner of a similar facility in the area.

6.4 **Changes by Landlord.** Landlord may at any time make any changes, additions, improvements, repairs or replacements to the Facility that it considers desirable. Landlord shall use reasonable efforts to minimize interference with Tenant's normal activities, but no such interference shall constitute constructive eviction or give rise to any abatement of rent or liability of Landlord to Tenant. If any of such changes materially impacts Tenant's business, Landlord must obtain Tenant's approval, such approval not to be unreasonably withheld.

7. **Alterations:** Within 30 days from the date of execution of this Lease, Tenant shall provide Landlord with a scope of work letter ("Work Letter") that Tenant plans to construct in the Premises. Such work letter must be approved by Landlord prior to Tenant commencing any work. Except as provided in the Work Letter and except for non-structural alterations by Tenant which shall cost no more than $2,500 for Tenant to make, Tenant shall not make or permit to be made any alterations, additions, modifications or improvements to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld.

8. **Insurance:** Tenant shall obtain and maintain in force at Tenant's sole cost and expense 1) casualty insurance in an amount equal to full replacement

value, at the time of loss, of Tenant's personal property, leasehold improvements and trade fixtures located at the Premises from time to time as well as alterations and improvement made by Tenant; 2) liability insurance for the benefit of Landlord and any mortgagee as additional insured against claims for personal injury liability with a limit of not less than $3,000,000 in the event of personal injury including death to any number of persons or of damage to property arising out of any one occurrence, and any such insurance may be furnished under an umbrella policy with Landlord's prior written consent, which shall not be unreasonably withheld; 3) workers compensation insurance in the amount covering all employees of Tenant employed at or performing services on the Premises in accordance with District of Columbia laws; and 4) such other insurance as Landlord or any mortgagee may reasonably require.

9.  **Permits – Compliance With Laws**:  Tenant shall, at its own expense, promptly obtain from the appropriate governmental authorities and maintain in full force and effect during the Term of this Lease any and all permits, licenses and the like required to permit Tenant to occupy the Premises and conduct its business for the purposes herein stated.  Landlord shall cooperate with Tenant in obtaining its Certificate of Occupancy, and Landlord shall be responsible for obtaining any permits necessary to use or perform work in common areas of the Facility, except if such work is specific to the Tenant, and any base permits required to allow any tenant to occupy the Facility.  Tenant shall comply, and cause its agents, employees, contractors, and licensees to comply,  with all state, federal, and municipal statutes, regulations, ordinances and rules applicable to Tenant's occupancy and use of the Premises and any use of the common areas of the Facility.

10.  **Assignment And Subletting**:  Tenant agrees that it will not transfer, assign, sublet or encumber the Premises, in whole or in part, without Landlord's prior written consent, which will, in the case of a transfer, assignment or subletting, be based upon, among other factors, the credit-worthiness, use, and reputation of the proposed assignee or sublessee.  Landlord agrees that it will not arbitrarily withhold its consent, and if such consent is given, Tenant shall not be relieved from any liability under this Lease.  Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to sublease or assign this Lease to any affiliate or successor to Tenant's entire business upon giving Landlord written notice and such affiliate or successor having equal or greater financial worth than Tenant and any existing guarantor.

11.  **Property Loss Or Damage**:

11.1  **Landlord's Responsibility**:  Subject to Paragraph 11.2 below, Tenant hereby expressly agrees that Landlord shall not be responsible in any manner for any damage or injury to the person or property of Tenant or any other person or business directly or indirectly caused by (i) dampness or water, whether due to a

break or leak in any part of the roof, heating, or plumbing within the Premises or in the Facility in which the Premises are located, no matter how caused; (ii) theft; (iii) fire or other casualty; (iv) any other cause whatsoever.

11.2 Landlord's Liability for Damages. Landlord shall only be liable for actual damages or injury to person or property of Tenant or of any other person or business where (i) notice in writing of any defect which Landlord is obligated under the terms of this Lease to correct and which caused such damage or injury, has been given in sufficient time before the occurrence of such damage or injury to have enabled Landlord to correct such defect, and (ii) then only if such damage or injury is due to Landlord's negligence in performing its obligations hereunder.

12. Tenant's Failure To Perform: In the event that Tenant fails, after fifteen (15) days' written notice from Landlord (except in the case of an emergency in which case no such notice shall be required), to do any act or make any payment or perform any term or covenant on Tenant's part required under this Lease or otherwise fails to comply herewith, Landlord may (at its option, but without being required to do so) immediately, or at any time thereafter and without any further notice, and without relieving Tenant of any of its obligations hereunder, perform the same on the account that Tenant has failed to do so. If Landlord makes any expenditures, or incurs any obligations for the payment of money in connection therewith, including, but not limited to, attorneys' fees in instituting prosecuting or defending any action or proceeding, such sums paid or obligations, incurred, with interest a the rate of twelve percent (12%) per annum from the date Landlord incurs such expense or cost, shall be deemed to create an additional rental obligation hereunder and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement to Tenant therefor.

13. Surrender At End Of Term: Except as otherwise provided, Tenant shall vacate the Premises at the expiration or other termination of this Lease and shall remove all goods and effects not belonging to Landlord, other than leasehold improvements made by or at the request of Tenant, and shall surrender possession of the Premises and all fixtures and systems thereof in good repair, reasonable wear, tear and damage by unavoidable casualty excepted. If Tenant shall fail to perform any of the foregoing obligations, Landlord is hereby expressly authorized to do so on Tenant's behalf and at Tenant's sole cost and expense, and Landlord may sell such articles on the Premises as Landlord in its sole discretion deems saleable, and may dispose of others in any manner which it chooses. Tenant shall pay and be liable for any and all costs and expenses incurred by Landlord hereunder. The proceeds of any such sale shall be applied toward the expenses thus incurred as well as any other outstanding obligations of Tenant under this Lease an Tenant agrees to pay any remaining balance promptly.

**14. Notices:** All notices, demands and requests required under this Lease shall be in writing. All such notices shall be deemed to have been properly given if sent by United States registered or certified mail, return receipt requested, postage prepaid, or by reputable overnight courier service, addressed:

to the Landlord at:

> Northwest Health Care Center
> 3333 Wisconsin Avenue, N.W.
> Washington, D.C. 20016
> Attn: Mr. Bryant Hall, Jr.

with a copy to:

> Beverly Enterprises
> Government Relations
> 1250 H Street NW, Suite 555
> Washington, D.C. 20005
> Attn: David C. Beck

and to the Tenant at:

> Capitol Dialysis, LLC
> 140 Q Street, N.E.
> Washington, D.C.
> Attn: Dr. Jay A. Ocuin

with a copy to:

> Crowell & Moring
> 1001 Pennsylvania Avenue, N.W.     $6^{.24} \, 2723$
> Washington, D.C. 20004
> Attn: Kathleen Stratton

Either party may designate a change of address by written notice other party.

**15. Captions:** All headings in this Lease are intended for convenience only and are not to be deemed or taken as a summary of the provisions to which they pertain or as construction thereof.

**16. Successors And Assigns:** The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of (i) Landlord and its heirs, distributees, executors, administrators, successors and assigns and (ii)

Tenant and its heirs, distributees, executors, administrators, successors and permitted assigns.

17. Governing Law: This Lease shall be governed by and construed in all respects in accordance with the laws of the District of Columbia.

18. Signage: Tenant covenants and agrees that it shall not inscribe, affix, or otherwise display signs, advertisements or notices in, on, upon, or behind any windows or on any door, partition, wall or other part of the interior or exterior of the Facility without the prior written consent of the Landlord, and then only in such place, size, color, number and style as approved by Landlord. If such consent is given by Landlord, the cost of installing, inscribing or affixing the approved material (as well as the cost of removing same at the termination or expiration of this Lease) shall be paid by Tenant, and Tenant agrees to pay same promptly and on demand.

19. Miscellaneous

19.1 Attorneys' Fees. If legal action is brought in a court of competent jurisdiction by either party hereto arising out of or concerning this Lease or the rights of any party hereto, the prevailing party in said action shall be awarded reasonable attorneys' fees and court costs from the non-prevailing party.

19.2 Parking. Any parking areas for the Facility shall be under the sole and exclusive control of Landlord, and shall be available for the general use in common by Tenant, its officers, agents, employees and visitors, subject to reasonable rules for he use thereof, including, but not limited to, reasonable rules designating areas for employee parking, controlling of ingress and egress, arrangement of parking spaces and general maintenance of the parking areas.

19.3 No Partnership. Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create any other relationship between the parties hereto other than that of landlord and Tenant.

19.4 No Representations by Landlord. Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth, and no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressly set forth. Tenant, by taking possession of the Premises, shall accept the same "as is," and such taking of possession shall be conclusive evidence that the Premises and the Facility are in good and satisfactory condition at the time of such taking of possession.

19.5 Counterparts. This Lease may be executed in several counterparts, and all counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed and sealed this Lease as of _12-1-02_ , 2002.

NORTHWEST HEALTH CARE CENTER

By: _____

TITLE: _Regional Vice President_

1806077

CAPITOL DIALYSIS, LLC

By: _____

TITLE: _C.O.O._

_American Renal Associates, Inc._