## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**CAPITOL DIALYSIS LLC**                )
                                        )
                **Plaintiff,**          )
                                        )
        **v.**                          )     **Civil Action No. 07-1073 (PLF)**
                                        )
**BEVERLY ENTERPRISES -**               )
**DISTRICT OF COLUMBIA, INC.**          )
**et al.,**                             )
                                        )
                **Defendants.**         )
_____     )

### FIRST AMENDED COMPLAINT

Plaintiff, Capitol Dialysis LLC ("Capitol"), by and through undersigned counsel, Crowell & Moring, hereby files its First Amended Complaint against the above-named Defendants, Beverly Enterprises – District of Columbia, Inc. a/k/a Beverly Health and Rehabilitation Services, Inc. d/b/a Northwest Health Care Center and Beverly Health and Rehabilitation Services, Inc. d/b/a Northwest Health Care Center (collectively, "Northwest"), and alleges and states as follows:

### NATURE OF THE ACTION

1.      This action arises out of Northwest's breach of its contractual and fiduciary obligations to Capitol resulting in damages exceeding $2 million. In 2001, Northwest and Capitol entered an agreement whereby Capitol provided in-house dialysis services to Northwest's nursing home residents for a twenty year term. There is no termination provision in the agreement. The parties' relationship was

so intertwined that Northwest held a seat on Capitol's Governing Body and thus, a voice in Capitol's governance.

2.    Northwest contracted with Capitol to attract nursing home residents to its nursing home facility.  Northwest's patients benefited as they no longer had to be transported from the nursing home to various ambulatory dialysis centers located throughout the District of Columbia.

3.    In 2006, Northwest decided to close the nursing home facility; yet concealed this decision from Capitol.  Northwest informed the District of Columbia regulators that it planned to close its nursing facility knowing that the District of Columbia regulators would prohibit Northwest from admitting any additional patients to its facility.  The District of Columbia regulators issued such an order and Northwest stopped admitting new patients after February 2007.

4.    Northwest fully understood that this action would have a catastrophic effect on Capitol's business.  Yet, Northwest did not notify Capitol of its decision to close the facility and cease admitting new patients until it was a *fait accompli*. Accordingly, Capitol had no ability to timely and efficiently transition its operations and workforce into a new facility, housing a commensurate number of dialysis patients.  It will take at least a year until Capitol is fully operating in a new facility, treating the same number of patients as it treated at Northwest.

5.    As a result of Northwest's breach of its contractual and fiduciary duties, Capitol is losing and will continue to lose substantial sums.  Moreover, Capitol will be paying higher rent to the new facility for the 15 years remaining

under the Northwest lease. Northwest's breach of its duties will result in damages to Capitol exceeding $2 million.

## THE PARTIES

6.    Plaintiff Capitol Dialysis LLC is a District of Columbia limited liability company with its principal place of business at 140 Q Street, NE, Washington, DC 20002.

7.    Defendant Beverly Enterprises – District of Columbia, Inc. a/k/a Beverly Health and Rehabilitation Services, Inc. d/b/a Northwest Health Care Center is a California corporation with a place of business at 3333 Wisconsin Avenue, NW, Washington, DC 20016.

8.    Defendant Beverly Health and Rehabilitation Services, Inc. d/b/a Northwest Health Care Center is a California corporation with a place of business at 3333 Wisconsin Avenue, NW, Washington, DC 20016.

## JURISDICTION

9.    This Court has jurisdiction pursuant to D.C. CODE ANN. § 11-921(a)(6). This court has jurisdiction over Defendant Northwest pursuant to D.C. CODE ANN. § 13-423.

## STATEMENT OF FACTS

**A.    Capitol and Northwest**

10.    Capitol is a provider of high quality dialysis services to renal patients living in Washington, D.C. It is a joint venture owned by Jay Ocuin, M.D. and Anthony Bivins, M.D. (practicing nephrologists in Washington, D.C.) and American

Renal Associates, Inc. of Beverly, Massachusetts.  Capitol is committed to providing high quality dialysis services and building long-term relationships with patients, staff, local providers, and other members of the Washington, D.C. renal community, including local nursing facilities.

11.    Northwest is a duly licensed, 355-bed skilled nursing facility.  It is owned and operated by Beverly Healthcare, Inc., ("Beverly"), one of the largest operators of nursing facilities in the United States.

12.    Beverly has operated Northwest since 1981.  From 1981 until 2000, an average of fifteen patients per month required dialysis services at Northwest.

**B.    Northwest's Desire and Need for Capitol's Services**

13.    Prior to 2001, Northwest operated a traditional nursing home without specialty dialysis services provided on its premises.  During this time period, Northwest housed many residents who required dialysis services.  Those patients needed to be transported to out-patient dialysis centers located throughout the District of Columbia for their dialysis treatment.  The District of Columbia, Northwest and the dialysis patients themselves bore the cost for this transportation.

14.    In 2001, Northwest and Capitol met to discuss the possibility of Capitol operating a dialysis center on Northwest's premises.  The parties agreed that locating a dialysis center in Northwest's facility would benefit all parties by attracting more residents to Northwest.  In addition, the patients would receive higher quality treatment without the inconvenience and expense of traveling to

4

outpatient dialysis centers throughout the city. Accordingly, the parties agreed to contract and provide dialysis services to Northwest's residents.

## C.    The Agreement Between Northwest and Capitol

15.    On or about December 28, 2001, Capitol and Northwest entered into the agreement to lease a 1,200 square foot area on the south end of the main floor of Northwest's nursing facility (the "Premises") upon which Capitol would provide dialysis services to Northwest's residents (the "Agreement").

16.    This is not a classic landlord-tenant relationship where a landlord in the commercial real estate business picks a commercial tenant from an unrelated industry to lease space. Rather, Northwest is in the nursing home business and contracted with Capitol to provide on-site dialysis services exclusively to its nursing home residents.

17.    The Agreement expressly required that Capitol's "six dialysis stations" be located within the Premises. Indeed, Northwest restricted Capitol's use of the Premises to medical use, "including, without limitation, use as a kidney dialysis station. . .."

18.    The Agreement also explicitly set forth that Capitol's dialysis stations would be used solely to treat Northwest's nursing home residents. Indeed, the Agreement established the "Rent Commencement Date" as "the date the first Northwest's patient is dialysized on the Premises. . .."

19.    The Lease provides for a twenty year term – "an initial five (5) year term, commencing upon the execution of this Lease Agreement (the "Execution Date") and shall automatically renew for three (3) additional five (5) year terms."

20.    The Agreement lacks a termination provision, rendering it a 20 year unbreakable obligation.

21.    Nor does the Agreement contain an integration clause, superseding prior, contemporaneous or subsequent agreements or any subsequent course of conduct.

22.    Pursuant to the Lease, Capitol pays Northwest One Thousand Fifty Dollars ($1,050.00) monthly for rental of the Premises.

**D.    Pursuant to the Agreement and DC law, Capitol Obtains The Necessary License From The D.C. Government**

23.    The Agreement also required Capitol to obtain all licenses from the D.C. government necessary to "occupy the Premises and conduct its business for the purposes herein stated."

24.    The most important license for Capitol to obtain was a Certificate of Need ("CON") from the District of Columbia government.  A CON is a condition precedent to obtaining a license to operate a healthcare facility.  The CON review process is costly insofar as it involves multiple detailed submissions and, in this case, testimony before the regulators from representatives of both Capitol and Northwest.

25.     Northwest's Executive Director, James G. Gerrity, testified before the D.C. State Health Planning and Development Agency ("SHPDA"), in support of issuing the CON to Capitol to provide dialysis services to Northwest's residents.

26.     Mr. Gerrity testified about the burden on Northwest's residents when they are transported offsite to receive dialysis.  He also attested that issuance of the CON would attract more dialysis patients to Northwest as "hospitals and other referral services became aware of Northwest's ability to provide dialysis on-site."

27.     Mr. Gerrity further testified how Northwest "would like to be able to tell the families that come to us seeking a home for an elderly loved one, that their mother or father can receive the highest quality dialysis care, on-site at Northwest."

28.     Based on these and other representations, SHPDA issued the CON to Capitol to treat "only" Northwest's residents on-site.

**E.    Capitol Incurs Substantial Expenses In Establishing The Dialysis Operation**

29.     Northwest fully understood that Capitol would incur substantial expenses to establish the six dialysis stations within the Premises.

30.     For example, dialysis centers require special plumbing, expensive equipment and trained clinicians.  This construction required under slab plumbing, extensive electrical work, and reverse osmosis water purification.

31.     In addition, Capitol invested in other equipment for the facility, including computer equipment, office equipment, furniture and fixtures, and Capital made substantial leasehold improvements to the facility.  Capitol's improvements to the facility cost approximately $309,000.00.

32.    In addition, Capitol entered into long term contracts with a medical director and a management company to provide services to the new dialysis center located on the Premises.

**F.    To Cement Further the Relationship, Northwest Receives A Seat on Capitol's Governing Body**

33.    Because the parties would be working to provide healthcare services to Northwest residents, they decided to operate as transparently and as closely as possible.  In this vein, Northwest accepted a seat on Capitol's Governing Body. Northwest's Executive Director, James J. Gerrity, was Northwest's Governing Body member and was later succeeded in this position by Joyce Jones.

34.    Capitol's Governing Body holds quarterly meetings and oversees the clinical and operational activities of Capitol.  Northwest was routinely notified of the Governing Body's meetings and attended these meetings.

35.    With a seat on this Governing Body, Northwest had full access to Capitol's operational information and its future expectations with respect to its relationship with Northwest.

36.    Providing Northwest with a seat on Capitol's Governing Body permitted Capitol and Northwest to communicate directly and openly about the direction of their joint venture and the needs of their patients.

**G.      Northwest and its Residents Reap Immediate Benefits from the Capitol Partnership**

37.      Capitol's on-site presence allowed Northwest to advertise enhanced services for prospective patients and it became a preferred location for local physicians to refer patients to in the area.

38.      Moreover, Capitol's presence allowed Northwest to meet the needs of its patients requiring renal dialysis by improving the quality of care, increasing flexibility, focusing on patient needs, and emphasizing physician involvement in the provision of renal dialysis service in a single location.

39.      For example, prior to Capitol's arrival, most of Northwest's residents were transported to their dialysis center in a van paid for by the Medicaid program and the patients themselves.  The significant transportation time for these patients caused an undue amount of stress and inconvenience to the dialysis patients. Opening the Capitol on-site dialysis center at Northwest eliminated this travel time and significantly decreased the additional burdens placed upon the patients undergoing dialysis, as Mr. Gerrity testified at the CON hearing.

40.      Upon Capitol's establishment of its in-house dialysis facility, both Northwest's daily census of dialysis patients and its occupancy rate substantially increased.  Indeed, the number of monthly patients requiring dialysis services grew from 15 prior to 2001 to approximately 36 per month from 2003 through 2007.

**H.**     **Northwest Breaches Its Contractual and Fiduciary Obligations**

41.     Upon information and belief, in 2006, at least six months prior to informing Capitol, Northwest decided to close down its facility and to sell the building.

42.     During this time period, Capitol convened Governing Body meetings.

43.     Yet, neither Northwest, nor its representative on Capitol's Governing Body, disclosed to Capitol that Northwest had decided to close the facility and sell the building during these meetings or at any other time.

44.     Northwest approached the District of Columbia regulators and informed them that it intended to close its nursing facility.  Upon information and belief, Northwest expected the District of Columbia regulators to issue an order forbidding any new patients or residents from being admitted to Northwest after February 2007.  Upon information and belief, Northwest did not admit any new patients to its facility after December 2006.  In March 2007, the District of Columbia regulators issued an order forbidding Northwest from admitting any new patients to its facility.

45.     Had Northwest disclosed this information to Capitol in a timely fashion, Capitol searched for a new facility and transitioned its workforce and equipment in an orderly and economically efficient manner.  Because Northwest did not disclose its decision to close and cease admitting patients until March 2007, Capitol had no ability to avoid substantial damages.

## I.    <u>Capitol Will Sustain Substantial Damages</u>

46.    Since Northwest stopped accepting new patients after December 2006, Capitol's revenue and profits have decreased by approximately twenty percent per month.  Those losses will increase and within months all of Northwest's patients will be transferred to other facilities.  Capitol, however, will not yet be operational in a new facility.  This will result in monthly losses of at least $105,000.00.

47.    As a result of Northwest's breach of its contractual and fiduciary obligations and the closing of its nursing facility, Capitol has had to sign a new lease for a new location located in a different part of the District.  Capitol's rent at the new location is approximately $2,400.00 more per month than the rent at Northwest's facility.  This difference will amount to approximately $432,000.00 more in rental payments through the remaining 15 year term of the Northwest lease.

48.    As a result of Northwest's breach, Capitol will have to incur "build-out" costs for its new dialysis center at its new location including, but not limited to, moving expenses, purchase of new equipment, and efforts to obtain a new CON from the District of Columbia to operate the new center.

49.    Pursuant to the Lease, Capitol is entitled to its reasonable attorneys' fees and court costs from Northwest incurred in this matter.

## CAUSES OF ACTION

### COUNT I
### (Breach Of Contract)

50.     Capitol re-alleges and incorporates each of its allegations set forth in Paragraphs 1 through 49 of this Complaint as if fully stated herein.

51.     The parties entered into the Agreement whereby Northwest leased space to provide dialysis services to Northwest's residents for a term of twenty years. The Agreement does not include a termination provision.

52.     The Agreement's stated purpose and intent was for Capitol to provide dialysis services to Northwest's nursing home residents and for Northwest to provide Capitol with a patient base for the twenty year term.

53.     Northwest's Executive Director testified before the D.C. Government regarding the need to issue Capitol a CON so that it could provide dialysis services to Northwest's residents.

54.     Subsequent to the execution of the Agreement, Northwest directed its residents requiring dialysis treatment to Capitol for treatment.

55.     Thereafter, Northwest solicited patients requiring dialysis services to the nursing home for Capitol to treat.

56.     Capitol has at all times materially fulfilled its obligations under this agreement.

57.     Based on the Agreement, Northwest's prior representations and its subsequent course of conduct, Northwest had an obligation to permit Capitol to occupy the Premises and treat Northwest's patients for the full 20-year term.

58.     Northwest materially breached its obligations by ceasing to admit new patients, closing the Nursing home and effectively terminating the Agreement.

59.     As a direct and proximate result of Northwest's breach, Capitol has suffered damages in excess of $2,000,000.00, the exact amount to be precisely determined at trial.

## COUNT II
## (Breach Of Implied Covenant Of Good Faith And Fair Dealing)

60.     Capitol re-alleges and incorporates each of its allegations set forth in Paragraphs 1 through 49 of this Complaint as if fully stated herein.

61.     District of Columbia law implies a covenant of good faith and fair dealing in all contracts between parties entered into in the District of Columbia.

62.     Northwest breached its contractual duties pursuant to failing to notify Capitol of its decision to cease admitting new patients and to close the facility.

63.     Specifically, Northwest knew months before it notified Capitol that it intended to close the Facility and cease admitting new patients.  Yet, Northwest did not inform Capitol of its decision until it was too late for Capitol to mitigate effectively its damages.

64.     Northwest's concealment of these material facts contravenes the spirit and intent of the agreement between Northwest and Capitol and injured the right of Capitol to receive the fruits of the agreement.

65.     Northwest's duty of good faith and fair dealing arises from the Agreement and is independent of its fiduciary duties arising from its seat on Capitol's Governing Body.

66.    As a result of Northwest's breach of its duty of good faith and fair dealing, Capitol is entitled to damages exceeding $2,000,000, plus interest, the exact amount to be determined at trial.

## COUNT III
### (Breach of Fiduciary Duty)

67.    Capitol re-alleges and incorporates each of its allegations set forth in paragraphs 1 through 49 of this Complaint as if fully stated herein.

68.    Northwest held a seat on Capitol's Governing Body.

69.    As a result, Northwest participated in Capitol's governance and was fully acquainted with the factors affecting Capitol's operating and profitability.

70.    As a member of Capitol's Governing Body, Northwest had a fiduciary duty to disclose fully any information that could adversely impact Capitol.  This is an independent duty arising from Northwest's position on Capitol's Governing Board independent from Northwest's duties arising from the Agreement.

71.    Upon information and belief, Northwest knew, at minimum, six months before announcing to Capitol, that it intended to close the facility, cease admitting new patients and sell the building.  Yet, Northwest failed to inform Capitol of these decisions, knowing it would adversely affect Capitol.

72.    Rather, Northwest announced its decision as a *fait accompli* and immediately ceased admitting new patients.  Northwest knew that without sufficient notice of the decision to close the facility, Capitol could not efficiently and fully transition without incurring substantial losses.

73.    As a result, Northwest breached its fiduciary duty and its duty as a member of Capitol's Governing Body.

74.    As a result of these breaches, Capitol has incurred damages of at least $2,000,000, the exact amount to be determined at trial.

## COUNT IV
### (Fraudulent Misrepresentation)

75.    Capitol re-alleges and incorporates each of its allegations set forth in paragraph 1 through 49 of this Complaint as if fully stated herein.

76.    Northwest held a seat Capitol's Governing Body creating a fiduciary duty to Capitol.

77.    Upon information and belief, Northwest knew at least six months prior to informing Capitol that it intended to close its facility.  As Capitol's business partner and a member of Capitol's Governing Body, Northwest had an obligation to disclose its decision to close the facility.

78.    Northwest knew that its decision to shut down its nursing facility would materially, adversely and substantially affect Capitol.

79.    Yet, Northwest chose to fraudulently conceal its decision to shut down its facility.  Northwest's silence constituted a representation that the relationship remained unchanged.  This representation was false.

80.    Northwest knew that by continuing to supply patients to Capitol after deciding to close the facility, it would lull Capitol into believing that nothing had changed in this business relationship.

81.    Northwest's ongoing misrepresentation and concealment from Capitol about the closing of its facility was intentional, willful, fraudulent, with intent to deceive and in conscious disregard for the rights of Capitol.

82.    Capitol justifiably and reasonably relied upon Northwest's intentional and fraudulent omissions and concealments.

83.    As a result of this fraudulent misrepresentation and concealment of material facts, Capitol has incurred substantial damages of at least $2,000,000, the exact amount to be determined at trial.

## COUNT V
## (Negligent Misrepresentation)

84.    Capitol re-alleges and incorporates each of its allegations set forth in paragraphs 1 through 49 of this Complaint as if fully stated herein.

85.    Northwest held a seat on Capitol's Governing Board creating a fiduciary duty to Capitol.

86.    Upon information and belief, Northwest knew at least six months prior to informing Capitol that it intended to close its facility.  As Capitol's business partner and a member of Capitol's Governing Body, Northwest had an obligation to disclose its decision to close the facility.

87.    Northwest knew or should have known that its decision to shut down its nursing facility would materially, adversely and substantially affect Capitol.

88.    Yet, Northwest chose to conceal its plans to shut down its facility until the decision had already been reached and partially implemented.

89.     Northwest knew or should have know that it was making a false representation by failing to disclose to Capitol that it was closing its facility.

90.     Northwest knew or should have known that by continuing to supply patients to Capitol after deciding to close the facility would lull Capitol into believing that nothing had changed in this business relationship.

91.     Capitol justifiably and reasonably relied upon Northwest's negligent omissions and concealments concerning the parties' agreement and business arrangement.

92.     As a result of this negligent misrepresentation of these material facts, Capitol has incurred substantial damages of at least $2 million, the exact amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Capitol Dialysis LLC respectfully prays that this Court:

a.     Enter judgment in favor of Capitol and against Northwest for damages incurred by Capitol as a consequence of Northwest's breach of its contractual and fiduciary duties and its fraudulent concealment, in an amount to be determined by the Court based upon evidence presented to it, such amount to be no less than $2 million plus interest;

b.     Award Capitol its reasonable attorneys' fees and costs incurred in bringing and maintaining this Complaint and action against Northwest; and

c.    Award Capitol such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff Capitol Dialysis LLC hereby demands a trial by jury on all issues so triable.


Dated:  August 22, 2007                   Respectfully submitted,


                                          /s/ Jeffrey L. Poston
                                          Jeffrey L. Poston, Esq. (D.C. Bar #426178)
                                          **CROWELL & MORING LLP**
                                          1001 Pennsylvania Ave., N.W.
                                          Washington, DC 20004
                                          (202) 624-2500
                                          (202) 624-5116 (fax)

                                          Counsel for Plaintiff Capitol Dialysis LLC