**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAPITOL DIALYSIS, LLC**<br><br>                    **Plaintiff,**<br><br>**v.**<br><br>**BEVERLY ENTERPRISES-DISTRICT OF COLUMBIA, INC. et al.,**<br><br>                    **Defendants.** | Civil Action No. 1:07cv1073 (PLF) |

**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Beverly Enterprises–District of Columbia, Inc. and Beverly Health and Rehabilitation Services, Inc. (collectively "Beverly"), hereby move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for the entry of an Order dismissing with prejudice the First Amended Complaint of Plaintiff Capitol Dialysis, LLC ("Capitol").  In support of its motion, Beverly now states as follows:

1.      Count I is a breach of contract claim based on the parties' commercial lease.  This claim should be dismissed because: (a) the Complaint does not allege that Beverly breached any contractual duties under the lease; (b) the implied contractual duties described by Capitol are foreclosed by the plain language of the parties' Health Care Services Agreement; and (c) the contract claim otherwise is barred by the statute of frauds.

2.      Count II alleges that Beverly breached the implied covenant of good faith and fair dealing.  This claim should be dismissed because it is not predicated on Beverly's breach of an express term of the lease, and it is duplicative of Capitol's other claims.

3.     Count III, Capitol's claim for breach of fiduciary duty, should be dismissed because the Complaint does not allege any facts that would give rise to a fiduciary relationship between the parties.

4.     In Counts IV and V, Capitol alleges that Beverly fraudulently or negligently failed to disclose certain proprietary business information.  These claims must be dismissed because Beverly had no contractual or fiduciary duty to disclose this information.

For the foregoing reasons, which are set forth in more detail in the accompanying memorandum of law, Beverly's motion to dismiss should be granted, and the Complaint should be dismissed with prejudice.

Oral Hearing Requested.


Respectfully submitted,


        /s/ Andrew A. Nicely
Gary A. Winters (D.C. Bar No. 439376)
Andrew A. Nicely (D.C. Bar No. 458805)
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, N.W.
Washington, D.C.  20006
(202) 263-3000
anicely@mayerbrown.com

*Counsel for defendants Beverly Enterprises - District of Columbia, Inc. and Beverly Health Rehabilitation Services, Inc.*

Dated:  September 10, 2007

**CERTIFICATE OF SERVICE**

I, Andrew A. Nicely, hereby certify that, on this 10th day of September, 2007, I caused a true and correct copy of the Defendant's Motion to Dismiss and accompanying memorandum of law to be served through the Court's ECF system upon:

> Jeffrey L. Poston, Esq.
> Crowell & Moring, LLP
> 1001 Pennsylvania Avenue, N.W.
> Suite 200
> Washington, D.C. 20004
>
> *Counsel for plaintiff*

                                        /s/ Andrew A. Nicely
                                        Andrew A. Nicely

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CAPITOL DIALYSIS, LLC

          Plaintiff,

v.

BEVERLY ENTERPRISES - DISTRICT OF
COLUMBIA, INC. et al.,

          Defendants.

Civil Action No. 1:07cv1073 (PLF)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Beverly Enterprises–District of Columbia, Inc. and Beverly Health and
Rehabilitation Services, Inc. (collectively "Beverly"), respectfully submit this memorandum of
law in support of their motion to dismiss the first amended complaint of Capitol Dialysis, LLC
("Capitol") under Federal Rule of Civil Procedure 12(b)(6).  Capitol's claims should be
dismissed with prejudice because the Amended Complaint fails to state a claim upon which
relief can be granted.

## INTRODUCTION

Capitol claims that it is entitled to more than $2,000,000 in damages because its
landlord, Beverly, decided to cease operating a nursing home in the same facility where
Capitol operates a dialysis center.  In its original complaint, Capitol alleged that Beverly's
business decision violated the terms of the parties' purported "joint venture" and "partnership."
Beverly moved to dismiss the complaint under Rule 12(b)(6), pointing out that all of Capitol's
claims were foreclosed by the plain language of the parties' lease.  Rather than attempt to

defend the sufficiency of its claims, Capitol elected to amend its complaint.  Although the new complaint omits the untenable joint venture and partnership references, it does not remedy any of the other flaws in Capitol's original complaint.  Accordingly, this case should be dismissed with prejudice.

For more than a decade, Beverly has operated a nursing home in northeast Washington, D.C.  In 2001, the parties signed a written lease ("Lease") whereby Beverly leased a portion of its premises to Capitol for use as a dialysis center.  Since then, Capitol has provided dialysis services to some of the nursing home residents who require it.  In 2004, the parties signed a Health Care Services Agreement ("Dialysis Agreement") to memorialize the terms and conditions under which Capitol would be permitted to provide dialysis services to Beverly's residents.  In 2007, Beverly received government approval to close the nursing home.  Beverly, for its part, has not breached any provision of the Lease or the Dialysis Agreement.  Instead, Capitol's central contention in this lawsuit is that, for the duration of the Lease, Beverly was obligated to continue to operate the nursing home and "to provide Capitol with a patient base" for a period of twenty years.  First Amended Complaint ("Cmplt.") ¶ 52.

Neither the Lease nor the Dialysis Agreement obligates Beverly to continue operating a nursing home on the premises, nor does either contract require Beverly to provide Capitol with any patients at all, much less a steady stream of patients.  In fact, Capitol is unable to point to any express contractual duty that Beverly arguably breached when it decided to close the nursing home.  In an effort to fill this void, Capitol claims that it had an arrangement with Beverly "to attract nursing home residents to [Beverly's] nursing home facility" and "to provide on-site dialysis services exclusively to [Beverly's] nursing home residents."  Cmplt. ¶¶ 2, 16.  While the Amended Complaint is replete with allegations that Beverly breached

contractual and fiduciary duties, none of the claims are grounded in the express language of the Lease or the Dialysis Agreement.  Rather, Capitol seeks to enforce these purported extra-contractual duties by asserting claims for breach of unwritten contractual duties, breach of the implied covenant of good faith, breach of fiduciary duty, fraudulent misrepresentation, and negligent misrepresentation.

Capitol's five claims suffer from a common flaw: Each relies on the erroneous premise that Beverly had a duty to continue operating its nursing home or, in the alternative, to alert Capitol before notifying anyone else if a decision were made to close the facility.  Beverly had no contractual duties along these lines, however, because Capitol acknowledged in both the Lease and the Dialysis Agreement that it was not relying on any promises or representations from Beverly other than those set forth in writing.  Also, Beverly had no fiduciary duties to Capitol because the Lease and the Dialysis Agreement expressly provide that the parties did not intend to create a partnership or a joint venture.  Because Beverly had no contractual or fiduciary duty to give Capitol advance notice of the decision to close the nursing home, Beverly's failure to provide such notice cannot form the basis for a fraudulent or negligent misrepresentation claim.  Accordingly, Capitol's Complaint should be dismissed in its entirety, with prejudice.

## BACKGROUND

We briefly summarize below the pertinent facts in the Complaint, which for purposes of this motion only, are assumed to be true.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

### A.     The Lease Agreement

Plaintiff Capitol is a limited liability company owned by two practicing nephrologists and American Renal Associates, Inc.  Cmplt. ¶ 10.  Capitol provides dialysis services to renal

patients living in Washington, DC.  Id.  On or about December 28, 2001, the parties entered

into the Lease, pursuant to which Capitol leased a 1,200 square foot space in Beverly's nursing

home facility.  Cmplt. ¶ 15.  The Lease provides for "an initial five (5) year term . . . [that]

shall automatically renew for three (3) additional five (5) year terms" and does not contain an

express termination provision.  Cmplt. ¶¶ 19, 20.  A true and correct copy of the Lease is

attached hereto as Exhibit 1.[1]

> Section 19.3 of the Lease provides as follows:
>
>> No Partnership.  Nothing contained in this Lease shall be deemed or
>> construed to create a partnership or joint venture between Landlord and
>> Tenant, or create any other relationship between the parties hereto other
>> than that of landlord and tenant.
>
> Section 19.4 of the Lease provides in pertinent part:
>
>> No Representations by Landlord.  Neither Landlord nor any agent,
>> representative or employee of Landlord has made any representation or
>> promise with respect to the Premises or the Facility except as herein
>> expressly set forth, and no rights, privileges, easements or licenses are
>> granted to or acquired by Tenant except as herein expressly set forth.

### B.    The Dialysis Agreement

In 2004, the parties entered into the Dialysis Agreement, a true and correct copy of

which is attached as Exhibit 2.  The agreement calls for Capitol to "provide, on a non-exclusive

basis, outpatient dialysis services to residents of [Beverly's] Facility with end-stage renal

disease…."  See Dialysis Agmt., Ex. A, § 1(a); see also Cmplt. ¶ 16 (alleging that Capitol

contracted with Beverly to provide dialysis services).  The Dialysis Agreement does not

---

[1]    The Court can properly consider the Lease and the Dialysis Agreement without
converting Beverly's Rule 12 motion into a motion for summary judgment because the
agreements are "referred to in the complaint, and are central to the plaintiffs' claims."  Cephas
v. MVM, Inc., 403 F. Supp. 2d 17, 20 (D.D.C. 2005) (quoting Krooth & Altman v. N. Am.
Life Assurance Co., 134 F. Supp. 2d 96, 99 (D.D.C. 2001); Sharpe v. National Football League
Players Ass'n, 941 F. Supp. 8, 10 n.1 (D.D.C. 1996) (considering contents of a collective
bargaining agreement in connection with Rule 12 motion).

require Beverly to provide Capitol with a minimum number of patients, nor does it mandate

that all nursing home residents be directed to Capitol's facility.  Section 1 of the Agreement

provides for an initial term of one year, with an automatic renewal for successive terms of one

year until terminated.

>    Paragraph 11 of Exhibit B to the Dialysis Agreement provides as follows:
>
> > Independent Contractor.  In carrying out its duties hereunder, Contractor
> > [i.e., Capitol] shall be an independent contractor with respect to the
> > Facility [i.e., Beverly's nursing home], and shall not be subject to any
> > right of control, or any control in fact, by Facility over the methods by
> > which Contractor carries out its duties.  Neither this Agreement nor the
> > exercise of any of the authority granted to Facility hereunder shall be
> > deemed to create any partnership, joint venture, association or other
> > relationship between Facility and Contractor other than that of an
> > independent contractor relationship.
>
>    Section 4(a) of the Agreement provides as follows:
>
> > Without Cause.  Either party may terminate this Agreement without cause
> > by providing at least sixty (60) days prior written notice to the other party.

**C.     Capitol's Governing Body**

The Complaint alleges that for an unspecified time period, Beverly's Executive

Director, James J. Gerrity, served on Capitol's Governing Body and later was succeeded in this

position by Joyce Jones, another Beverly employee.  Cmplt. ¶ 33.[2]  Capitol's Governing Body

allegedly held quarterly meetings, an unspecified number of which supposedly were attended

by either Gerrity or Jones.  Id. ¶ 34.  By virtue of having a director serving on Capitol's

Governing Body, Beverly purportedly had "full access to Capitol's operational information and

its future expectations with respect to its relationship" with Beverly.  Id. ¶ 35.

---

[2]     The Governing Body of a Medicare and Medicaid facility is responsible for the
"governance and operation of the facility."  42 C.F.R. § 405.2136.  Among other things, it
"adopts and enforces rules and regulations relative to its own governance and to the health care
and safety of patients, to the protection of the patients' personal and property rights, and to the
general operations of the facility."  Id.

### D.    The Planned Closure of Beverly's Nursing Home

The Complaint alleges that Beverly decided in late 2006 to close down its nursing home facility and sell the premises.  Cmplt. ¶ 41.  During this time, Capitol's Governing Body held meetings, but Ms. Jones, who is alleged to have attended these meetings, did not inform Capitol of Beverly's decision to close the facility.  Id. ¶¶ 41-43.  Beverly informed District of Columbia regulators of its intent to close the nursing facility and allegedly anticipated that the regulators would forbid Beverly from admitting new patients after February 2007.  Id. ¶ 44.  In March 2007, the regulators issued such an order.  Id. ¶ 44.  Beverly allegedly did not inform Capitol of its decision to close the nursing home until March 2007.  Id. ¶ 45.

### ARGUMENT

Dismissal is warranted where, as here, the plaintiff fails to plead "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  A plaintiff's obligation to set forth the grounds for its entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  Id. at 1964-65.  "Factual allegations must be enough to raise a right to relief above the speculative level…."  Id. at 1965.  Furthermore, the Court is not required to indulge inferences that are unsupported by the facts alleged, nor must it accept legal conclusions cast in the form of factual allegations.  See Henthorn v. Dep't of Navy, 29 F.3d 682, 684 (D.C. Cir. 1994).  As we now show, Capitol has failed to state a claim upon which relief can be granted, and each of its claims must be dismissed.

### I.    COUNT I MUST BE DISMISSED BECAUSE IT DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT.

Capitol alleges that Beverly breached the Lease by announcing that it would close the nursing facility and by failing to provide notice of its decision to sell the leased premises.

Cmplt. ¶ 58.  Tellingly, Capitol fails to cite any provision in the Lease that requires Beverly to continue to operate a nursing facility on the leased premises or to provide advance notice to Capitol in the event of a decision to close the facility.  To state a colorable claim for breach of contract, the plaintiff must allege the existence of an enforceable contractual duty, as well as a breach of that duty and damages.  Cf. Braude & Margulies, P.C. v. Fireman's Fund Ins. Co., 468 F. Supp. 2d 190, 197 (D.D.C. 2007) (dismissing contract claim that failed to plead an enforceable obligation).  Capitol's breach of contract claim fails for three independent reasons.  First, the alleged duties that Beverly supposedly breached do not appear anywhere in the Lease, and cannot be read into the Lease by implication.  Second, the plain language of the Dialysis Agreement demonstrates that Beverly did not have an obligation to provide Capitol with a patient base for the duration of the Lease.  Finally, the unwritten obligations that Capitol purports to enforce are barred by the statute of frauds.

    **A.**    **The Lease Does Not Require Beverly To Operate The Nursing Home For 20 Years, Nor Does It Require Beverly To Notify Capitol Before Taking Steps To Close The Facility.**

Beverly's duties as landlord are set out with particularity in the Lease.  Section 2 provides that Beverly's obligations are to: (1) handle any necessary structural maintenance at the premises, (2) permit Capitol to "peacefully and quietly hold and enjoy the Premises," (3) insure the property against fire and other standard perils, and (4) minimize disruptions while making changes and improvements to the facility.  See Lease § 6 (Ex. 1).  The Lease does not impose any additional duties on Beverly.  To the contrary, the Lease recognizes the *absence* of additional duties in Section 19.4, which states that "Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth…."  See Lease § 19.4.

The Complaint nevertheless alleges that Beverly's purported obligation to "provide Capitol with a patient base for the twenty year term of the agreement" was a "stated purpose and intent" of the Lease.  Cmplt. ¶ 52.  This allegation is belied by the express provisions of the Lease, which impose no such obligation on Beverly.  While the Lease clearly contemplates that Capitol's use of the leased premises would be limited to "office and medical use, including, without limitation, use as kidney dialysis stations" it does not impose an obligation on Beverly to provide Capitol with patients.  See Lease §§ 5, 6.  The Complaint alleges that there is no integration clause in the Lease, see Cmplt. ¶ 21, but Capitol plainly is mistaken about that.  Section 19.4 of the Lease unambiguously states that the only representations and promises relied on by the parties are those "expressly set forth" in the Lease.  See Lease § 19.4.

Capitol's attempt to rewrite the Lease is foreclosed by settled law.  The District of Columbia "adheres to the 'objective law' of contracts, whereby the written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered the contract, unless the written language is not susceptible of a clear and definite undertaking, or unless there is fraud, duress or mutual mistake."  Isaac v. First Nat'l Bank of Md., 647 A.2d 1159, 1162 (D.C. 1994).  In light of this rule, courts consistently reject attempts by contracting parties to contradict, add to, vary, or subtract from the terms of the written contract that they made.  See Stamenich v. Markovic, 462 A.2d 452, 456 (D.C. 1983) (observing that it would have been a "simple matter" for the parties to include an assignment provision in their contract if they had intended one, and "[t]heir failure to do so makes clear that an assignment of the lease was not within the scope of the contract"); DSP Venture Group, Inc. v. Allen, 830 A.2d 850, 852 (D.C. 2003) (rejecting unilateral mistake defense and enforcing contract as written, commenting that

"[w]hatever [defendant] intended, the sales contract he signed did not contain a seven-day closing requirement").

A claim that there are implied contract terms is particularly suspect when, as here, the purported unwritten terms involve important matters that the parties would not have overlooked when memorializing their agreement. See Chas. H. Tompkins Co. v. Lumbermans Mut. Cas. Co., 732 F. Supp. 1368, 1375-76 (E.D. Va. 1990) ("Reasonably, courts expect contracting parties to address in express terms the most substantial duties and liabilities that go to the very heart of their bargain. Prudence dictates that such matters not be left to the vagaries of implication."). For instance, in Duke v. American Univ., 675 A.2d 26 (D.C. 1996), a university signed a written agreement under which several neighborhood associations pledged to support the university's application to build new facilities in a residential neighborhood. Later, the university decided to build in a commercially-zoned area where it would not need a permit. The neighborhood groups brought suit, claiming that the contract obligated the university to build in the residential area. The trial court rejected this claim and the Court of Appeals affirmed, explaining:

> [T]he surrender by the university of its right to locate its law school on commercial property would have been a matter of great importance. Yet the agreement does not mention it. We agree with the trial court that the 1989 contract did not include such a provision by implication.

675 A.2d at 27.

The same conclusion applies with equal force here. If Beverly had surrendered its right to close its nursing home, or had taken on an obligation to supply Capitol with dialysis patients for the next twenty years, there would have been some mention of those duties in the Lease. The absence of such terms, and the integration clause in Section 19.4, preclude Capitol from rewriting the Lease to include them.

**B.      The Dialysis Agreement Forecloses Capitol's Attempt To Redefine The Parties' Relationship Based On Their Subsequent Course Of Conduct.**

Unable to anchor its claims on the plain language of the Lease, Capitol alleges that Beverly's "prior representations and its subsequent course of conduct" obligated it to continue operating the nursing home for the 20-year term of the Lease. Cmplt. ¶ 57. According to the Complaint, Capitol agreed to "provide on-site dialysis services **exclusively** to [Beverly's] nursing home residents."  Cmplt. ¶ 16 (emphasis added); see also id. ¶ 18.  In exchange, Beverly purportedly assumed a "20 year unbreakable obligation" to provide Capitol with patients to treat.  Cmplt. ¶ 20; see also id. ¶ 1.[3]

The four corners of the Dialysis Agreement squarely foreclose Capitol's attempt to assemble an implied contract from representations predating the Lease and from the parties' course of conduct postdating the Lease.  The Dialysis Agreement, which was signed in 2004, defines the terms and conditions under which Capitol would be permitted to provide dialysis services to Beverly's nursing home residents.  Contrary to the allegations in the Complaint, the Dialysis Agreement expressly states that Capitol was to provide outpatient dialysis services "on a **non-exclusive** basis."  Dialysis Agmt. Ex. A, § 1(a).  In other words, Capitol could provide dialysis services to patients who were not residents in Beverly's nursing home, and Beverly's residents could go elsewhere for treatment if they wished.  Nothing in the Dialysis Agreement requires Beverly to provide a particular volume of patients, or even one patient.

The Dialysis Agreement also affirmatively shows that Beverly did not have a "20 year unbreakable obligation" to provide Capitol with access to potential patients.  To the contrary, the Agreement allows "[e]ither party [to] terminate this Agreement **without cause** by providing

---

[3]      The original complaint described Beverly's promise as a covenant to "ensure the economic viability of [Capitol's] venture by providing access to [Beverly's] patients for, at minimum, twenty years."  Original Cmplt. ¶ 18.

at least sixty (60) days prior written notice to the other party." <u>See</u> Dialysis Agmt. § 4(a) (emphasis added).  If Capitol truly believed that Beverly had a duty to provide dialysis patients for the duration of the Lease—based on the negotiations leading up to the 2001 Lease, something in the Lease itself, or the parties' course of conduct under the Lease—Capitol expressly relinquished that right when it signed the Dialysis Agreement in 2004.  Indeed, Section 6 unambiguously states that "This Agreement . . . contains the sole and entire agreement between the parties regarding the subject matter hereof and supercedes any and all prior written or oral agreements between the parties."  Dialysis Agmt. § 6.

In sum, Count I fails to state a claim because the Complaint does not allege that Beverly breached any duty owed to Capitol under the Lease or the Dialysis Agreement.  The Lease gave Capitol the right to occupy and use the premises for a maximum of twenty years, while the Dialysis Agreement set forth the terms under which Capitol was permitted to provide dialysis services to Beverly's residents.  The Complaint does not allege that Beverly breached the Lease by interfering with Capitol's right to occupy the leased premises, and the Dialysis Agreement makes plain that Beverly was within its rights to terminate the contract at any time without cause.  Simply put, Capitol has not and cannot allege a breach of either agreement.

### C.     Count I Is Barred By The Statute Of Frauds.

Even if Capitol were given free reign to insert new duties into the Lease or the Dialysis Agreement, Count I nevertheless would be subject to dismissal under the statute of frauds.  In the District of Columbia, a contract that cannot fully be performed within one year is unenforceable if it is not reduced to writing.  <u>See</u> D.C. Code Ann. § 28-3502; <u>accord</u> <u>Tauber v. Jacobsen</u>, 293 A.2d 861, 866 (D.C. 1972) (holding that statute of frauds rendered unwritten contract unenforceable despite the fact that plaintiff may have relied on it to its detriment).  It

11

is well settled that litigants cannot circumvent the statute of frauds by engrafting implied duties onto an existing written agreement. <u>See</u> <u>Chas. H. Tompkins Co.</u>, 732 F. Supp. at 1377 (dismissing contract claim where plaintiff attempted to avoid the statute of frauds by "stretching" a written agreement to include an implied duty that was required to be in writing). Here, the Complaint alleges that Beverly had an implied duty to "provide Capitol with a patient base" for twenty years. <u>See</u> Cmplt. ¶ 52. Because this alleged obligation is not in writing, it is unenforceable under Section 28-3502 of the District of Columbia Code. Count I therefore should be dismissed with prejudice.

## II.    COUNT II FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Capitol alleges in Count II that Beverly breached the implied covenant of good faith and fair dealing by failing to promptly notify Capitol of the decision to close the nursing home. Under District of Columbia law, an implied duty of good faith and fair dealing is part of every contract. <u>See</u> <u>Hais v. Smith</u>, 547 A.2d 986, 987-88 (D.C. 1988). There are, however, two important constraints on this principle. First, the implied covenant cannot be invoked absent an allegation that an express term of the contract has been breached. Second, a claim based on the implied covenant will not lie if the underlying allegations are duplicative of those asserted in support of another established claim. Here, both limitations require dismissal of Count II.

Capitol's good faith and fair dealing claim fails as a matter of law because the Complaint does not allege that Beverly violated any express provision of the Lease or the Dialysis Agreement. <u>See</u> <u>Television Capital Corp. of Mobile v. Paxson Commc'ns Corp.</u>, 894 A.2d 461, 468 (D.C. 2006) (applying Florida law and rejecting implied covenant claim where the plaintiff did not allege that any express terms of the agreement were breached) (cited with approval in <u>WMATA v. Quik Serve Foods, Inc.</u>, 2006 WL 1147933 (D.D.C. Apr. 28, 2006));

accord <u>Metro. Life Ins. Co. v. RJR Nabisco, Inc.</u>, 716 F. Supp. 1504, 1517 (S.D.N.Y. 1989) (explaining that the implied covenant of good faith "ensures that parties to a contract perform the substantive, bargained-for terms of their agreement"). Because neither the Lease nor the Dialysis Agreement requires Beverly to notify Capitol before taking the necessary regulatory steps to close the nursing home, Beverly's alleged failure to do so cannot form the basis for a claim under the implied covenant of good faith and fair dealing.

    As discussed above in Section I, the District of Columbia's "objective" law of contracts prevents Capitol from rewriting the parties' agreements to include implied terms. The implied covenant of good faith and fair dealing does not create an exception to this rule. In <u>Duke v. American University</u>, for example, the Court of Appeals held that the implied covenant could not be used to restrain the university from making business decisions that were not expressly prohibited by the express terms of the contract. <u>See</u> 675 A.2d at 28; <u>see also</u> <u>Metro Commc'n Co. v. Ameritech Mobile Commc'ns, Inc.</u>, 984 F.2d 739, 743 (6th Cir. 1993) ("[T]he implied covenant of good faith is a construction aid that helps a court determine the intent of the parties; it cannot be used to add terms to the contract when there is no evidence that the parties intended that those terms be included."); <u>Metro. Life Ins. Co.</u>, 716 F. Supp. at 1519 ("While the Court stands ready to employ an implied covenant of good faith to ensure that such bargained-for rights are performed and upheld, it will not, however, permit an implied covenant to shoehorn into an [agreement] additional terms plaintiffs now wish had been included.").

    Capitol is not attempting merely to leaven the parties' contracts with terms that were not agreed upon—something that the implied covenant of good faith and fair dealing does not permit even where the agreement is silent on the point in question. Instead, Capitol proposes to delete the termination at-will provision from the Dialysis Agreement and replace it with

language creating a "20 year unbreakable obligation" to provide Capitol with patients to treat. Cmplt. ¶ 20. That is something that the implied covenant assuredly does not allow. Television Capital Corp. of Mobile, 894 A.2d at 468 (observing that the implied covenant "should not be invoked to override the express terms of the agreement between the parties") (internal citation omitted); accord WMATA v. Quik Serve Foods, Inc., 2006 WL 1147933 (D.D.C. Apr. 28, 2006) (citing Television Capital Corp. with approval).

Count II fails for the independent reason that a claim for breach of an implied duty of good faith cannot be maintained "where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.'" Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002) (citing Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91-92 (3d Cir. 2000)); accord Quik Serve Foods, Inc., 2006 WL 1147933, at *5 ("[B]reach of the implied covenant is not an independent cause of action when the allegations are identical to other claims for relief under established cause[s] of action."). Capitol alleges in Count II that Beverly breached the implied covenant by failing to provide timely notice that the nursing home would be closed. See Cmplt. ¶¶ 62, 63. Precisely the same allegation is made in support of the breach of contract claim in Count I (see Cmplt. ¶ 58), the fiduciary duty claim in Count III (see Cmplt. ¶ 71), the fraudulent misrepresentation claim in Count IV (see Cmplt. ¶ 79), and the negligent misrepresentation claim in Count V (see Cmplt. ¶¶ 86-88). Because the allegations in support of the implied covenant claim are identical to those pleaded in support of Capitol's other claims, Count II should be dismissed with prejudice.

## III. COUNT III FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AND SHOULD BE DISMISSED.

The crux of Count III is that Beverly "had a fiduciary duty to disclose fully any information that could adversely impact Capitol," and that Beverly breached this duty by

failing to promptly inform Capitol that it intended to close the nursing home.  See Cmplt. ¶¶ 70, 71.  As this Court has recognized, "[f]or a fiduciary duty to exist between parties, there must be a special relationship of trust or confidence."  Prunte v. Universal Music Group, 484 F. Supp. 2d 32, 43 (D.D.C. 2007) (dismissing fiduciary duty claim).  Ordinary commercial agreements do not create fiduciary duties between the contracting parties.  Indeed, the District of Columbia Circuit has specifically "reject[ed] the argument … that a fiduciary relationship exists between landlord and tenant."  Sekulow v. 11th & F St. Valet, Inc., 162 F.2d 19, 22 (D.C. Cir. 1947) (affirming dismissal).

Beverly and Capitol did not have a "special relationship of trust or confidence." Prunte, 484 F. Supp. 2d at 43.  Instead, Capitol was Beverly's tenant under a commercial lease that the parties negotiated at arms length, and Capitol was an independent contractor to Beverly under the Dialysis Agreement, which also was negotiated at arms length.  As a matter of law, leases do not give rise to fiduciary duties, see Sekulow, 162 F.2d at 22, and the Lease at issue in this case is no exception.  In fact, Capitol expressly acknowledged in the Lease that "[n]othing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create **any other relationship between the parties hereto other than that of landlord and Tenant**."  See Lease § 19.3 (Exh. A) (emphasis added). The same is true with respect to agreements that create an independent contractor relationship. See Gateway Tech., Inc. v. MCI Telecommunications Corp., 64 F.3d 993, 1000 (5th Cir. 1995) (rejecting fiduciary duty claim where agreement stated that "[e]ach party shall act as an independent contractor and not as agent for, partner of, or joint venturer with the other party"). Thus, neither the Lease nor the Dialysis Agreement transformed Beverly into a fiduciary.

Capitol attempts to create the veneer of a fiduciary relationship by alleging that a Beverly employee served as a member of Capitol's Governing Body.  See Cmplt. ¶¶ 33, 68, 70.  But this allegation, even if proven, would not transform the parties' arms-length relationship into a fiduciary relationship.  To the contrary, "there is no support for the argument that sharing a common director will create a fiduciary duty between two corporations."  Banco Urquijo, S.A. v. Signet Bank/Maryland, 861 F. Supp. 1220, 1249-50 (M.D. Pa. 1994); accord Alta Vista State Bank v. Kobliska, 897 F.2d 930, 934 (8th Cir. 1990) (rejecting the notion that two companies owed fiduciary duties to each other by virtue of having a common agent).  Stated differently, corporations do not assume fiduciary duties vicariously based on the activities of their employees, in the same way that they may become vicariously liable for the negligence of employees acting in the scope of their employment.  Because Beverly did not have a fiduciary relationship with Capitol, Count III does not state a claim for breach of fiduciary duty and should be dismissed under Rule 12(b)(6).[4]

## IV.    THE MISREPRESENTATION CLAIMS SET FORTH IN COUNTS IV AND V SHOULD BE DISMISSED BECAUSE BEVERLY HAD NO DUTY TO PROVIDE CAPITOL WITH ADVANCE NOTICE THAT THE NURSING HOME WOULD BE CLOSED.

Count IV alleges that Beverly committed the tort of fraudulent misrepresentation when it failed to give Capitol advance notice that the nursing home would be closed.  See Cmplt. ¶

---

[4]    Joyce Jones was the Beverly employee who allegedly attended meetings of Capitol's Governing Body in 2007.  Cmplt. ¶ 33.  Assuming that Ms. Jones was aware of Beverly's intention to close the nursing home, she did not have a fiduciary duty to disclose that information to Capitol.  Instead, because the information was confidential and non-public, Ms. Jones' duty of loyalty to **Beverly** prevented her from disseminating it.  See Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1265 (D.D.C. 1997) (holding that employee breached the duty of loyalty by disclosing his employer's confidential business information).  It should be emphasized that, except for purposes of this motion, Beverly disputes that, at any time prior to February 2007, Joyce Jones attended any Governing Board meetings or even knew that Capitol had placed her on the Governing Board.

79. Count V is a negligent misrepresentation claim based on the same alleged nondisclosure. See id. ¶¶ 86-88. Capitol cannot state a claim under either theory. To make out a claim for fraudulent misrepresentation, a plaintiff must allege "(1) a false representation, (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon the representation." Hercules & Co. v. Shama Rest. Corp., 613 A.2d 916, 923 (D.C. 1992); see also Rothenberg v. Aero Mayflower Transit Co., 495 F. Supp. 399, 406 (D.D.C. 1980). The elements of negligent misrepresentation for the most part are the same, except that scienter is not required. See Redmond v. State Farm Ins. Co., 728 A.2d 1202, 1207 (D.C. 1999). When the misrepresentation claim is based on a failure to speak, the plaintiff also must allege that the defendant had a duty to disclose the facts in question. Here, Beverly had no such duty, and Counts IV and V therefore should be dismissed.

"There is, of course, no question that mere silence does not constitute fraud unless there is a duty to speak." Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 517 (D.C. 1948); accord Rothenberg, 495 F. Supp. at 406 (explaining that a misrepresentation claim can be based on a "failure to disclose a material fact when a duty to disclose that fact has arisen"). A duty to speak arises in two circumstances. First, a defendant that has a fiduciary relationship with the plaintiff may have an obligation to disclose material information under certain circumstances. See Kapiloff, 59 A.2d at 517-18. Second, a defendant that elects to speak on a subject may have a duty to disclose additional facts if those facts are necessary to ensure that the initial disclosure is not misleading. See id. In this case, Beverly did not have either type of duty. For the reasons set forth in Section III above, Beverly did not have a fiduciary relationship with Capitol. Furthermore, the Complaint does not allege that Beverly made any affirmative statements about how long the nursing home would remain in operation, and as a result,

Beverly had no duty to disclose that it had applied for government approval to close the facility. In short, the Complaint does not allege any facts that, if proven, would impose upon Beverly a duty to provide Capitol with advance notice that the nursing home would be closed down. Therefore, Counts IV and V should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss the Complaint should be granted, and all of Capitol's claims should be dismissed with prejudice.

## <u>ORAL HEARING REQUESTED</u>

Pursuant to Local Civil Rule 7(f), Beverly respectfully requests an oral hearing on this motion.

Respectfully Submitted,

_____/s/ Andrew A. Nicely_____
Gary A. Winters (D.C. Bar No. 439376)
Andrew A. Nicely (D.C. Bar No. 458805)
MAYER, BROWN, LLP
1909 K Street, N.W.
Washington, D.C.  20006
(202) 263-3000
anicely@mayerbrown.com

*Counsel for defendants Beverly Enterprises-District of Columbia, Inc. and Beverly Health Rehabilitation Services, Inc.*

September 10, 2007

# LEASE AGREEMENT

This Lease Agreement ("Lease") made this day by and between Beverly Healthcare, Inc., d/b/a Northwest Health Care Center ("Northwest" or "Landlord") and Capitol Dialysis, LLC (hereinafter "Capitol Dialysis" or "Tenant") for the lease of space at 3333 Wisconsin Avenue, N.W. (hereinafter "the Facility").

WITNESSETH, that for and in consideration of the rent hereafter reserved, and the covenants contained herein, the parties hereby agree as follows:

1. **Leased Premises:** The six dialysis stations will be located in a 1200 square foot area on the south end of the main floor of the Facility (the "Premises"). A copy of the floor plan for the six dialysis stations is attached as Exhibit A hereto.

2. **Access:** Tenant shall have access to the Facility and to the Premises (24) hours per day, seven (7) days per week.

3. **Lease Term:** The lease shall have an initial five (5) year term, commencing upon the execution of this Lease Agreement (the "Execution Date") and shall automatically renew for three (3) additional five (5) year terms.

4. **Rent:** Upon the date the first Northwest patient is dialyzed on the Premises (the "Rent Commencement Date"), Tenant shall pay to Landlord the first month's rent in the amount of One Thousand Fifty Dollars ($1,050). Thereafter, rental payments in the amount of $1,050 shall be made on or before the fifth (5th) day of each month. The rental payments required in this Lease are all-inclusive and Tenant shall not be responsible for any additional payments for items such as taxes and assessments, operating expenses, utilities, maintenance and repair, landscaping or any other overhead expenses. Payment for such ancillary items shall be the sole responsibility of the Landlord. Rental payments shall be made payable to Northwest Health Care Center and delivered to the Facility on or before the fifth (5th) day of each month.

5. **Use:** The Premises shall be used and occupied by the Tenant only for office and medical use, including, without limitation, use as kidney dialysis stations under the business name of Capitol Dialysis, LLC or the name of any successor or assign, and for no other use. Tenant shall not use, or permit the use of, all or any part of the Premises for any disorderly, illegal or hazardous purpose. Tenant shall not use, or permit the use of, all or any part of the Premises for any purpose that interferes with the use of any other portion of the Facility, nor which in Landlord's reasonable opinion, impairs, or might impair, the reputation or value of the Facility. Tenant shall not use utility services in excess of amounts reasonably determined by Landlord to be within the normal range of demand for the designated use of the

Premises. Tenant shall keep the Premises in a neat and clean condition with reasonable wear and tear excluded.

**6. Services Furnished By Landlord:** Landlord shall provide the following services:

**6.1 Structural Maintenance.** Landlord shall maintain, in good condition and repair all common areas, exterior parking lot, sidewalks, paving, roof, foundation, exterior walls, as well as the underground pipes and conduits located beyond the boundaries of the Premises, and Landlord shall make all repairs thereto becoming necessary, all at Landlord's expense. In the event, however, that any such repairs are necessitated by reasons of any action or omission by Tenant, its employees, agents, licensees, or contractors, Tenant agrees to promptly, upon demand, reimburse Landlord for the full costs thereof.

**6.2 Quiet Enjoyment.** Upon Tenant's paying the Rent and performing its other obligations hereunder, Landlord shall permit Tenant to peacefully and quietly hold and enjoy the Premises, subject to the provisions hereof and the terms of any mortgage, deed of trust or ground lease too which this Lease is subordinate.

**6.3 Insurance.** Landlord shall insure the Facility against damage by fire and standard extended coverage perils, and shall carry public liability insurance, all in such reasonable amounts with such reasonable deductibles as would be carried by a prudent owner of a similar facility in the area.

**6.4 Changes by Landlord.** Landlord may at any time make any changes, additions, improvements, repairs or replacements to the Facility that it considers desirable. Landlord shall use reasonable efforts to minimize interference with Tenant's normal activities, but no such interference shall constitute constructive eviction or give rise to any abatement of rent or liability of Landlord to Tenant. If any of such changes materially impacts Tenant's business, Landlord must obtain Tenant's approval, such approval not to be unreasonably withheld.

**7. Alterations:** Within 30 days from the date of execution of this Lease, Tenant shall provide Landlord with a scope of work letter ("Work Letter") that Tenant plans to construct in the Premises. Such work letter must be approved by Landlord prior to Tenant commencing any work. Except as provided in the Work Letter and except for non-structural alterations by Tenant which shall cost no more than $2,500 for Tenant to make, Tenant shall not make or permit to be made any alterations, additions, modifications or improvements to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld.

**8. Insurance:** Tenant shall obtain and maintain in force at Tenant's sole cost and expense 1) casualty insurance in an amount equal to full replacement

value, at the time of loss, of Tenant's personal property, leasehold improvements and trade fixtures located at the Premises from time to time as well as alterations and improvement made by Tenant; 2) liability insurance for the benefit of Landlord and any mortgagee as additional insured against claims for personal injury liability with a limit of not less than $3,000,000 in the event of personal injury including death to any number of persons or of damage to property arising out of any one occurrence, and any such insurance may be furnished under an umbrella policy with Landlord's prior written consent, which shall not be unreasonably withheld; 3) workers compensation insurance in the amount covering all employees of Tenant employed at or performing services on the Premises in accordance with District of Columbia laws; and 4) such other insurance as Landlord or any mortgagee may reasonably require.

9.    **Permits - Compliance With Laws**:  Tenant shall, at its own expense, promptly obtain from the appropriate governmental authorities and maintain in full force and effect during the Term of this Lease any and all permits, licenses and the like required to permit Tenant to occupy the Premises and conduct its business for the purposes herein stated.  Landlord shall cooperate with Tenant in obtaining its Certificate of Occupancy, and Landlord shall be responsible for obtaining any permits necessary to use or perform work in common areas of the Facility, except if such work is specific to the Tenant, and any base permits required to allow any tenant to occupy the Facility.  Tenant shall comply, and cause its agents, employees, contractors, and licensees to comply, with all state, federal, and municipal statutes, regulations, ordinances and rules applicable to Tenant's occupancy and use of the Premises and any use of the common areas of the Facility.

10.    **Assignment And Subletting**:  Tenant agrees that it will not transfer, assign, sublet or encumber the Premises, in whole or in part, without Landlord's prior written consent, which will, in the case of a transfer, assignment or subletting, be based upon, among other factors, the credit-worthiness, use, and reputation of the proposed assignee or sublessee.  Landlord agrees that it will not arbitrarily withhold its consent, and if such consent is given, Tenant shall not be relieved from any liability under this Lease.  Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to sublease or assign this Lease to any affiliate or successor to Tenant's entire business upon giving Landlord written notice and such affiliate or successor having equal or greater financial worth than Tenant and any existing guarantor.

11.  **Property Loss Or Damage**:

11.1    **Landlord's Responsibility**:  Subject to Paragraph 11.2 below, Tenant hereby expressly agrees that Landlord shall not be responsible in any manner for any damage or injury to the person or property of Tenant or any other person or business directly or indirectly caused by (i) dampness or water, whether due to a

break or leak in any part of the roof, heating, or plumbing within the Premises or in the Facility in which the Premises are located, no matter how caused; (ii) theft; (iii) fire or other casualty; (iv) any other cause whatsoever.

11.2  Landlord's Liability for Damages.  Landlord shall only be liable for actual damages or injury to person or property of Tenant or of any other person or business where (i) notice in writing of any defect which Landlord is obligated under the terms of this Lease to correct and which caused such damage or injury, has been given in sufficient time before the occurrence of such damage or injury to have enabled Landlord to correct such defect, and (ii) then only if such damage or injury is due to Landlord's negligence in performing its obligations hereunder.

12.  Tenant's Failure To Perform:  In the event that Tenant fails, after fifteen (15) days' written notice from Landlord (except in the case of an emergency in which case no such notice shall be required), to do any act or make any payment or perform any term or covenant on Tenant's part required under this Lease or otherwise fails to comply herewith, Landlord may (at its option, but without being required to do so) immediately, or at any time thereafter and without any further notice, and without relieving Tenant of any of its obligations hereunder, perform the same on the account that Tenant has failed to do so.  If Landlord makes any expenditures, or incurs any obligations for the payment of money in connection therewith, including, but not limited to, attorneys' fees in instituting prosecuting or defending any action or proceeding, such sums paid or obligations, incurred, with interest a the rate of twelve percent (12%) per annum from the date Landlord incurs such expense or cost, shall be deemed to create an additional rental obligation hereunder and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement to Tenant therefor.

13.  Surrender At End Of Term:  Except as otherwise provided, Tenant shall vacate the Premises at the expiration or other termination of this Lease and shall remove all goods and effects not belonging to Landlord, other than leasehold improvements made by or at the request of Tenant, and shall surrender possession of the Premises and all fixtures and systems thereof in good repair, reasonable wear, tear and damage by unavoidable casualty excepted.  If Tenant shall fail to perform any of the foregoing obligations, Landlord is hereby expressly authorized to do so on Tenant's behalf and at Tenant's sole cost and expense, and Landlord may sell such articles on the Premises as Landlord in its sole discretion deems saleable, and may dispose of others in any manner which it chooses.  Tenant shall pay and be liable for any and all costs and expenses incurred by Landlord hereunder.  The proceeds of any such sale shall be applied toward the expenses thus incurred as well as any other outstanding obligations of Tenant under this Lease an Tenant agrees to pay any remaining balance promptly.

**14. Notices:** All notices, demands and requests required under this Lease shall be in writing. All such notices shall be deemed to have been properly given if sent by United States registered or certified mail, return receipt requested, postage prepaid, or by reputable overnight courier service, addressed:

to the Landlord at:

>Northwest Health Care Center
>3333 Wisconsin Avenue, N.W.
>Washington, D.C. 20016
>Attn: Mr. Bryant Hall, Jr.

with a copy to:

>Beverly Enterprises
>Government Relations
>1250 H Street NW, Suite 555
>Washington, D.C. 20005
>Attn: David C. Beck

and to the Tenant at:

>Capitol Dialysis, LLC
>140 Q Street, N.E.
>Washington, D.C.
>Attn: Dr. Jay A. Ocuin

with a copy to:

>Crowell & Moring
>1001 Pennsylvania Avenue, N.W.    $C^{24}$ $2723$
>Washington, D.C. 20004
>Attn: Kathleen Stratton

Either party may designate a change of address by written notice other party.

**15. Captions:** All headings in this Lease are intended for convenience only and are not to be deemed or taken as a summary of the provisions to which they pertain or as construction thereof.

**16. Successors And Assigns:** The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of (i) Landlord and its heirs, distributees, executors, administrators, successors and assigns and (ii)

Tenant and its heirs, distributees, executors, administrators, successors and permitted assigns.

17. Governing Law: This Lease shall be governed by and construed in all respects in accordance with the laws of the District of Columbia.

18. Signage: Tenant covenants and agrees that it shall not inscribe, affix, or otherwise display signs, advertisements or notices in, on, upon, or behind any windows or on any door, partition, wall or other part of the interior or exterior of the Facility without the prior written consent of the Landlord, and then only in such place, size, color, number and style as approved by Landlord. If such consent is given by Landlord, the cost of installing, inscribing or affixing the approved material (as well as the cost of removing same at the termination or expiration of this Lease) shall be paid by Tenant, and Tenant agrees to pay same promptly and on demand.

19. Miscellaneous

19.1  Attorneys' Fees. If legal action is brought in a court of competent jurisdiction by either party hereto arising out of or concerning this Lease or the rights of any party hereto, the prevailing party in said action shall be awarded reasonable attorneys' fees and court costs from the non-prevailing party.

19.2  Parking. Any parking areas for the Facility shall be under the sole and exclusive control of Landlord, and shall be available for the general use in common by Tenant, its officers, agents, employees and visitors, subject to reasonable rules for he use thereof, including, but not limited to, reasonable rules designating areas for employee parking, controlling of ingress and egress, arrangement of parking spaces and general maintenance of the parking areas.

19.3  No Partnership. Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create any other relationship between the parties hereto other than that of landlord and Tenant.

19.4  No Representations by Landlord. Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth, and no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressly set forth. Tenant, by taking possession of the Premises, shall accept the same "as is," and such taking of possession shall be conclusive evidence that the Premises and the Facility are in good and satisfactory condition at the time of such taking of possession.

19.5 Counterparts. This Lease may be executed in several counterparts, and all counterparts shall constitute one and the same instrument.

IN WITNESS WHEREOF, Landlord and Tenant have respectively signed and sealed this Lease as of ___12-1-02___ , 2002.

NORTHWEST HEALTH CARE
CENTER

By: _____

TITLE: _Regional Vice President_

1806077

CAPITOL DIALYSIS, LLC

By: _____

TITLE: ___C.O.O.___

_American Renal Associates, Inc._

## HEALTH CARE SERVICES AGREEMENT

*(Dialysis Services – Outpatient)*

This Health Care Services Agreement ("Agreement") is by and between Beverly Health and Rehabilitation Services Inc.[1], d/b/a Northwest Health Care Center[2] ("Facility"), and Capitol Dialysis, LLC ("Contractor"). Any notices or other communications required or permitted to be given pursuant to this Agreement shall be sent to the parties at the addresses set forth on the signature page to this Agreement.

**1. Term.** This Agreement shall commence on June 12, 2004 and shall expire at the close of business on June 11, 2005, unless earlier terminated as provided herein. Thereafter, this Agreement shall automatically renew for successive terms of one (1) year each unless either party gives written notice of non-renewal to the other party at least sixty (60) days prior to the expiration of the then-current term. In the event this Agreement is terminated prior to one year from the commencement date, the parties shall not enter into a substantially similar agreement until the expiration of at least one (1) year following the commencement date.

**2. Services and Compensation.** Contractor shall provide the services to Facility and its residents (the "Services"), and shall receive compensation for those Services, as set forth on Exhibit A attached hereto and incorporated herein by reference.

**3. Payment.** In the event Facility is required by the compensation provisions set forth in Exhibit A to pay Contractor directly for the Services, Facility shall pay Contractor within sixty (60) days of receipt by Facility of Contractor's accurate and complete invoice containing all documentation required by Facility, including a line item list of all Services provided by Contractor for each resident to include HCPCS or other applicable coding, service date(s), quantities and charges. Invoices submitted later than one hundred twenty (120) days following the date the Service was provided shall be deemed untimely, and Facility shall not be required to pay Contractor for such Services.

**4. Termination.** This Agreement may be terminated as follows:

a. *Without Cause.* Either party may terminate this Agreement without cause by providing at least sixty (60) days prior written notice to the other party.

b. *Breach.* Either party shall have the right to terminate this Agreement in the event of the other party's breach of this Agreement by providing at least thirty (30) days written notice to the other party. Any such notice shall specify the cause upon which it is based. The violating party shall have the thirty (30) day notice period in which to rectify the cause specified in the notice of termination, or, if such cause is not rectified to the satisfaction of the non-breaching party within such thirty (30) day period, this Agreement shall thereupon automatically terminate.

c. *Material Change.* To the extent that changes in laws, regulations, or the method or amount of reimbursement require the restructuring of the relationship between the parties established by this Agreement, the parties shall negotiate in good faith to amend this Agreement and otherwise restructure their relationship in order to effectuate their mutually agreed upon purposes. If the parties are unable to resolve the matter within thirty (30) days, either party may, at its option, immediately terminate this Agreement.

d. *Immediate Termination.* Facility may immediately terminate this Agreement upon the occurrence of any of the following events: (i) loss or suspension of any license of Contractor required for the provision of Services pursuant to this Agreement or the imposition of any sanction against Contractor under federal or state fraud and abuse laws and regulations or any other federal or state laws or regulations relating to Contractor's participation in the Medicare or state Medicaid programs; (ii) appointment of a receiver for Contractor's assets, an assignment by Contractor for the benefit of its creditors or any relief taken or suffered by Contractor under any bankruptcy or insolvency act; or (iii) any jeopardy to the health or safety of residents of the Facility.

---

[1] Name of corporate subsidiary
[2] Name of facility

e. *Automatic Termination.* This Agreement shall automatically terminate in the event either party is excluded from participation in any federally funded health care program, including Medicare or Medicaid, as of the effective date of such exclusion.

**5. General Terms and Conditions.** The General Terms and Conditions set forth on <u>Exhibit B</u> attached hereto are incorporated herein by reference as though fully set forth herein. Facility and Contractor shall comply with the General Terms and Conditions as part of this Agreement.

**6. Entire Agreement.** This Agreement, including the Exhibits attached hereto and referenced herein, contains the sole and entire agreement between the parties regarding the subject matter hereof and supersedes any and all prior written or oral agreements between the parties.

**IN WITNESS WHEREOF,** the parties by their duly authorized representatives have entered into this Agreement as of the ____ day of _____, 2004.

| | |
|---|---|
| **FACILITY:** | **CONTRACTOR:** |
| Beverly Health and Rehabilitation Services, Inc.[1] | Capitol Dialysis, LLC |
| d/b/a  Northwest Health Care Center[2] | |

By: _____            By: _____
Executive Director                              Name: Joseph A. Carlsci.

Accepted By: _____
Director of Operations                        Title: C.O.O.

Address for Notices:                            Address for Notices:
Northwest Health Care Center              Capitol Dialysis, LLC

3333 Wisconsin Avenue, NW               140 Q Street, NW

Washington, D.C. 20016                       Washington, D.C.

Facsimile: 202-244-7110                       Facsimile: _____

Copy to:
Beverly Health and Rehabilitation Services, Inc.
c/o Beverly Enterprises, Inc.
Law Department
One Thousand Beverly Way
Fort Smith, Arkansas  72919

---

[1] Name of corporate subsidiary
[2] Name of facility

**Exhibit A**

**Outpatient Dialysis Services and Compensation**

**1.  Services.**

a.  Contractor shall provide, on a non-exclusive basis, outpatient dialysis services to residents of the Facility with end-stage renal disease pursuant and subject to the order(s) of such resident's physician and in accordance with each resident's plan of care. Services shall include, without limitation:

i.  Chronic Acute hemodialysis treatments and the care and services customarily furnished or related to such treatments;

ii.  Complete and appropriate documentation of each Service received by residents as well as any reaction to a Service received;

iii.  Consulting with and updating Facility staff regarding the care, monitoring and treatment of residents receiving Services; and

iv.  Scheduling and documentation of services.

b.  The Services shall be provided at Contractor's outpatient facility (the "Dialysis Unit"), which is operated as a certified renal dialysis facility under the Medicare End Stage Renal Disease Program.  When a resident is transferred to Contractor for Services, Contractor shall provide Services promptly and in accordance with the medical needs of the residents.

c.  Contractor will furnish all equipment, supplies and medications necessary to provide the Services and is solely responsible for waste handling as well as sterilization and disinfection of such equipment.  Contractor shall maintain its equipment in good operating condition and repair and in accordance with manufacturer's recommendations and applicable law.

d.  Facility shall arrange for the transportation of residents receiving Services hereunder to and from the Dialysis Unit at no cost to Contractor.  When a resident is transferred to the Dialysis Unit for Services, the Facility shall:  (i) transmit resident information necessary for Contractor's delivery of Services and in accordance with applicable law; (ii) make resident records available to Contractor as necessary for the provision of Services and in accordance with applicable law; and (iii) provide Contractor with written orders for Services and/or prescriptions for treatment from residents' physicians or other person(s) authorized to place such orders on behalf of residents.

e.  The parties agree that emergencies involving residents receiving Services hereunder shall be handled as follows:

i.  Facility and Contractor agree that, in the event of a medical emergency, the party that has custody of the resident will provide or make arrangements for the provision of emergency care and will also contact the resident's attending physician and responsible party.  The party who has custody of the resident during a medical emergency will make sure proper documentation of the medical emergency is made.

ii.  In the event of a non-medical emergency, Facility and Contractor agree that the party who has custody of the resident will attempt to handle the problem.  If the problem affects the provision of Services to the resident, the party that has custody of the resident will contact the other party as well as the resident's attending physician and/or responsible party.  If the problem does not affect the provision of Services to the resident, then the party that has custody of the resident will contact the other party and inform them of the resolution of the problem.  The party that has custody of the resident will make sure that proper documentation of the non-medical emergency is made.

f.  Contractor shall provide Facility information on all aspects of the management of the care of residents related to the Services provided to such residents hereunder, including without limitation, directions on bleeding/hemorrhage, infection/bacteria, and care and disinfection of dialysis access site.

**2.  Compensation.**  Contractor shall invoice the resident, the resident's responsible party, Medicare, Medicaid, a managed care organization or any other third party reimbursement source (collectively referred to as the

"Appropriate Payor") for all Services provided to residents of the Facility at rates not to exceed Contractor's reasonable and customary charges for Services and in accordance with applicable requirements of federal and state laws and regulations. Contractor agrees to accept payments from such Appropriate Payors as payment in full for Services rendered under this Agreement. Contractor shall not bill Facility for Services provided hereunder to residents, and Facility shall have no obligation to compensate Contractor for such Services.

**Exhibit B**

**General Terms and Conditions**

**1.  Incorporation by Reference.**  These General Terms and Conditions are incorporated by reference into the Agreement to which they are attached.  Capitalized terms not defined herein shall have the meaning set forth in the Agreement.

**2.  Licenses, Permits and Accreditations.**  The Facility, in accordance with applicable law, is responsible for obtaining Services that meet professional standards and principles that apply to professionals providing such Services in the Facility and for the timeliness of the Services.  Accordingly, Contractor hereby represents and warrants to the Facility that Contractor and each of its employees, agents and subcontractors who perform Services on behalf of Contractor pursuant to this Agreement (the "Contractor Personnel"): (a) are, and will remain at all times throughout the term of this Agreement, authorized to participate in the Medicare and state Medicaid programs and shall comply with all conditions of participation or other requirements applicable to participation in such programs; (b) have, and will maintain at all times throughout the term of this Agreement, all the necessary qualifications, certifications, licenses and/or accreditations required by federal, state and local laws and regulations to provide the Services covered by this Agreement (collectively, "Contractor Licenses"); (c) will provide the Services in accordance with the professional standards and principles applicable to their profession; and (d) are not, and at no time have been, excluded from participation in any federally funded health care program, including Medicare or Medicaid, or sanctioned under any applicable state or federal fraud and abuse statutes. Contractor will provide Facility with a copy of the Contractor Licenses upon request.  Contractor shall provide prompt written notice to the Facility of any changes in the Contractor Licenses, including any temporary or permanent suspension or revocation of any Contractor License, or any sanction or proposed sanction or exclusion against Contractor, or any officer, director or owner of Contractor, in connection with participation in any federally funded health care program.

**3.  Compliance.**  Contractor shall provide, and shall ensure that the Contractor Personnel provide, the Services to Facility's residents in accordance with (a) all applicable requirements of federal, state or local laws, rules and/or regulations, including official interpretations of those requirements by the entities charged with implementing and enforcing them, including, without limitation, nondiscrimination on the basis of race, color, national origin, handicap, age, or other protected class; (c) accepted professional standards of practice; and (c) all Facility policies and procedures and any revisions thereto that are applicable to the provision of Services to Facility residents, copies of which shall be provided to Contractor.  Contractor shall participate, as reasonably requested, in quality monitoring programs established by Facility.

**4.  Corporate Compliance Program.**

a.  Contractor acknowledges Facility's Corporate Compliance Program and receipt of Facility's Code of Conduct, including its mechanism for reporting suspected fraud, abuse or other illegal or unethical activities (Hotline (800) 572-9981).  If Contractor has its own compliance program, Contractor represents and warrants that the Contractor Personnel who provide billing services or patient care services with respect to federal health care program beneficiaries at Facility shall read and understand Contractor's integrity brochure, which includes its standards of conduct, prior to commencement of Services under this Agreement.  To the extent that Contractor's standards of conduct and integrity program differ in any material respect affecting ethical conduct from the compliance information and requirements contained in the Facility's Code of Conduct, Contractor shall inform the Contractor Personnel of such additional information and requirements and that Facility has a mechanism for reporting misconduct.  Contractor agrees to obtain and retain a signed certification from each of the Contractor Personnel providing Services to the Facility that they have received, read and understand Contractor's integrity program, including its standards of conduct and any additional information provided by Contractor's Compliance Officer relating to Facility's Code of Conduct and agree to abide by such requirements therein.  Such certification shall be obtained prior to commencement of Services under this Agreement, shall be maintained by Contractor and shall be made available for review by Facility or Facility's agents upon reasonable request.

b.  If Contractor does not maintain a compliance program Contractor represents and warrants that each of the Contractor Personnel who provide billing services or patient care services with respect to federal health care program beneficiaries at Facility shall read and review Facility's Code of Conduct prior to commencement of Services under this Agreement.  Contractor agrees to obtain and retain a signed certification from each of the

Contractor Personnel providing Services to the Facility that they have received, read and understand Facility's Code of Conduct and agree to abide by the requirements of Facility's Corporate Compliance Program. Such certification shall be obtained prior to commencement of Services under this Agreement, shall be maintained by Contractor and shall be made available for review by Facility or Facility's agents upon reasonable request.

**5.    Patient Records.**  Facility and Contractor shall each prepare and maintain records concerning Facility's residents receiving Services under this Agreement, in accordance with applicable federal and state laws, regulations and program guidelines.  Contractor shall provide to Facility documentation of the Services provided to, and any other relevant information regarding Contractor's contact with, Facility residents hereunder.  If the Services are provided on the Facility premises, such documentation shall be made in the residents' medical record or chart, which shall be and remain the property of the Facility.  If the Services are provided off of the Facility premises, such documentation shall be on the forms and in the format required by Facility policies and procedures in accordance with applicable laws, regulations and program guidelines.  Contractor hereby agrees to maintain the confidentiality of all information and records relating to Facility's residents which it acquires in the course of performing the Services and to assure that such confidentiality is maintained by each of the Contractor Personnel providing Services pursuant to this Agreement.

**6.    HIPAA Compliance.**  For purposes of compliance with the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E (the "Privacy Rule"), *only if and to the extent that* Contractor is acting as a business associate (as defined by the Privacy Rule) of Facility, this Section shall apply.

a.    Capitalized terms used, but not otherwise defined in this Agreement, shall have the same meaning as those terms in the HIPAA regulations, and the following capitalized terms shall be given the following meanings:

i.    "Disclose" and "Disclosure" mean, with respect to Protected Health Information, the release, transfer, provision of access to, or divulging in any other manner of Protected Health Information outside Contractor's internal operations or to other than its employees.

ii.    "Protected Health Information" or "PHI" means information, including demographic information that (A) relates to the past, present or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual; (B) identifies the individual (or for which there is a reasonable basis for believing that the information can be used to identify the individual); and (C) is received by Contractor from or on behalf of Facility, or is created by Contractor for Facility, or is made accessible to Contractor by Facility.

iii.    "Use" or "Uses" mean, with respect to Protected Health Information, the sharing, employment, application, utilization, examination or analysis of such Protected Health Information within Contractor's internal operations.

b.    Insofar as Contractor has access to, has been provided with, or will be creating PHI of Facility's residents, Contractor agrees as follows:

i.    Contractor shall not Use or Disclose PHI other than as permitted or required by this Agreement or as required by law.

ii.    Contractor agrees to use appropriate safeguards to prevent the Use or Disclosure of PHI in any manner other than as provided for by this Agreement. Such safeguards shall include administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains, or transmits on behalf of Facility.

iii.    Contractor agrees to notify Facility of any Use or Disclosure of PHI not provided for by this Agreement of which it becomes aware. This reporting obligation includes, without limitation, the obligation to report any Security Incident, as that term is defined in 45 C.F.R. § 164.304.

iv.   Contractor agrees to make its internal practices, books and records relating to the Use and Disclosure of PHI available to the Secretary of the Department of Health and Human Services for purposes of determining Facility's compliance with HIPAA.

v.   If Contractor maintains PHI in a Designated Record Set, Contractor shall: (A) make PHI specified by Facility available to the individual(s) identified by Facility as being entitled to access and copy that PHI in order for Facility to comply with its obligations under HIPAA and (B) make any amendments to PHI as directed by Facility.

vi.   Contractor shall provide to Facility upon Facility's request (or to an Individual or Personal Representative, upon his/her request) an accounting of each Disclosure of PHI by Contractor or its employees, agents, representatives or subcontractors, which was made for purposes other than those listed in 45 C.F.R. § 164.528(a)(1). Any accounting provided by Contractor under this subsection shall include: (A) the date of the Disclosure; (B) the name, and address if known, of the entity or person who received the PHI; (C) a brief description of PHI disclosed; and (D) a brief statement of the purpose of the Disclosure. For each Disclosure that could require an accounting under this subsection, Contractor shall document the information specified in (A) through (D), above, and shall securely retain this documentation for six (6) years from the date of the Disclosure.

vii.   Upon termination or expiration of this Agreement, Contractor shall return or destroy, if feasible, all PHI. However, if neither return nor destruction of PHI is feasible, Contractor may retain PHI provided that Contractor: (A) continues to comply with the applicable provisions of this Section for so long as it retains PHI and (B) limits further Uses and Disclosures of PHI to those purposes that make the return or destruction of PHI infeasible.

viii.   Contractor agrees to ensure that each of its agents and subcontractors who receive PHI from Contractor hereunder and who are not a party to this Agreement agrees to the same restrictions and conditions in this Section with respect to such PHI.

c.   Contractor's obligations under this Section shall survive the expiration or termination of this Agreement to the extent required in order to comply with applicable law.

## 7.   Record Retention Requirements.

a.   All records created by Contractor in connection with the provision of Services pursuant to this Agreement, including patient records and records related to billing and payment, shall be retained by Facility and Contractor for a period of seven (7) years from the date the Service was provided or such greater time period as may be required by applicable law. Facility shall be permitted to inspect and/or duplicate any patient record, chart or other record of Contractor relating to the provision of Services hereunder by Contractor for any business purpose, including, without limitation, determining Contractor's compliance with the terms of this Agreement; ensuring safe, dependable and efficient patient care; satisfying Facility's obligations to any patient; or defending any allegation of malpractice or other liability against Facility.

b.   To the extent the value or cost of Services furnished under this Agreement is $10,000 or more over a twelve month period, then Contractor, for a period of four (4) years after the furnishing of such Services, shall retain and shall make available upon written request by the Secretary of the Department of Health and Human Services, the Comptroller General, or their authorized representatives, a copy of this Agreement and all books, documents and records that are necessary to certify the nature and extent of the costs incurred by Facility under this Agreement. Contractor further agrees that in the event Contractor carries out any of its duties under this Agreement through a permitted subcontract with a related organization with a value or cost of $10,000 or more over a twelve month period, such subcontract shall contain a provision requiring the related organization, for a period of four (4) years after the furnishing of such Services, to retain and to make available upon written request by the Secretary of the Department of Health and Human Services, the Comptroller General, or their authorized representatives, a copy of such subcontract and all books, documents and records of such organization that are necessary to verify the nature and extent of such costs. Contractor agrees to notify the Facility promptly of the nature and scope of any governmental request for access to books and records related to this Agreement and to provide to the Facility, or make available, copies of any books, records or documents proposed to be provided. Any disclosure under this paragraph shall not be construed as a waiver of any other legal rights to which such party may be entitled.

c.   This Section shall survive the expiration or termination of this Agreement.

**8.  Background Checks; Substance Abuse.**

a.  Contractor, at its sole cost and expense, shall conduct criminal background checks on the Contractor Personnel that provide Services on behalf of the Facility.  Such background checks (i) shall cover the previous seven (7) years; (ii) shall be conducted in accordance with applicable state law; and (iii) must be based on information provided by the appropriate state or local law enforcement agency, if so required by applicable state law.  Contractor shall not assign to the Facility any Contractor Personnel who have been convicted of or have pled guilty to the following crimes: theft; sexually deviant behavior, assault and/or battery; abuse of the elderly, children or vulnerable individuals; health care fraud; or other criminal conviction related to the Services being provided to the Facility.

b.  Contractor, at its sole cost and expense, shall conduct substance abuse testing and testing pertaining to bloodborne pathogens on the Contractor Personnel that provide Services on behalf of the Facility.  Such substance abuse testing shall be conducted by an independent laboratory that is certified by the Department of Health and Human Services.  Contractor shall not assign to the Facility any Contractor Personnel who are determined, after appropriate testing, to be engaged in substance abuse.

**9.  Insurance.**  Contractor shall, at its sole cost and expense, procure, keep and maintain throughout the term of this Agreement, insurance coverage in the minimum amount of one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) annual aggregate, for professional liability, negligence, errors and omissions, and commercial general liability and applicable state statutory limits for workers compensation.  Said insurance policies shall cover all services Contractor, its directors, officers, employees, agents and/or contractors provide.  Contractor shall provide Facility with evidence of such insurance promptly upon request.  In the event Contractor procures a "claims made" policy to meet the insurance requirements herein, Contractor agrees to purchase "tail" coverage upon the termination of any such policy providing for an indefinite reporting period.

**10.  Indemnification.**  Each party shall indemnify, defend, and hold the other party harmless from and against any and all losses, claims, suits, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) of any nature or kind whatsoever arising out of or resulting from, directly or indirectly: (a) a party's breach of this Agreement, including, without limitation, breach of any representation, warranty, or covenant of such party in this Agreement; and (b) any alleged negligent or intentional acts or omissions of a party, its agents or employees, based upon, arising out of or attributable to the performance or non-performance of their respective obligations under this Agreement.  Upon notice, the other party shall resist and defend, at its own expense, any such claim or action.  Said indemnity is in addition to any other rights the indemnified party may have against the indemnifying party.  This Section shall survive the expiration or termination of this Agreement.

**11.  Independent Contractor.**  In carrying out its duties hereunder, Contractor shall be an independent contractor with respect to the Facility, and shall not be subject to any right of control, or any control in fact, by Facility over the methods by which Contractor carries out its duties.  Neither this Agreement nor the exercise of any of the authority granted to Facility hereunder shall be deemed to create any partnership, joint venture, association or other relationship between Facility and Contractor other than that of an independent contractor relationship.

**12.  Arbitration.**  Any dispute or controversy arising under this Agreement or any amendment hereof or the breach hereof shall be settled by arbitration in the county in which the Facility is located, in accordance with the rules of the American Health Lawyers Association Alternative Dispute Resolution Service and applying the laws of the State in which the Facility is located.  Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction.  During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall remain in full force and effect unless otherwise terminated as provided in this Agreement.  Notwithstanding anything to the contrary in this Section, any party may seek a temporary restraining order or other interim injunctive or provisional relief from a court of proper jurisdiction without first resorting to the arbitration procedures set forth in this Section.  If any such relief is obtained the arbitrator(s) shall address the continuance, modification or termination of such relief in the order and the parties agree to abide by the arbitrator's decision regarding such relief.  This Section shall survive the expiration or termination of this Agreement.

**13.  Cumulation of Remedies; No Waiver.**  The various rights, options, elections, powers, and remedies of the respective parties as provided in this Agreement are in addition to any others that said parties may be entitled to by law, shall be construed as cumulative, and no one of them is exclusive of any of the others, or of any right or priority

allowed by law. The failure of a party to exercise any of its rights or to give any notice with respect to any default by the other party or otherwise to insist upon the strict performance of the other party's obligations hereunder shall not be deemed a waiver of such party's right with respect thereto in the future.

**14. Attorney's Fees.** If Contractor or Facility brings any action to interpret or enforce this Agreement, or for damages for any alleged breach hereof, whether by arbitration or otherwise, the prevailing party in any such action shall be entitled to reasonable attorneys' fees and costs as awarded by the arbitrator in addition to all other recovery, damages and costs. This Section shall survive the expiration or termination of this Agreement.

**15. Governing Law; Statutory References.** This Agreement shall be governed by and construed in accordance with the laws of the State in which the Facility is located, without regard to the conflict of laws rules of such State. Any reference in this Agreement to any statute, regulation, ruling, or administrative order or decree shall include and be a reference to any successor statute, regulation ruling, or administrative order or decree.

**16. Force Majeure.** Neither party hereto shall be liable for any delay or failure in the performance of any obligation under this Agreement or for any loss or damage (including indirect or consequential damage) to the extent that such nonperformance, delay, loss or damage results from any contingency which is beyond the control of such party, provided such contingency is not caused by the fault or negligence of such party. A contingency for the purposes of this Agreement shall include Acts of God, fires, floods, earthquakes, explosions, storms, wars, hostilities, blockades, public disorders, quarantine restrictions, embargoes, strikes or other labor disturbances, and compliance with any law, order or control of, or insistence by any governmental or military authority.

**17. Confidentiality.** The parties hereto shall hold in confidence the information contained in this Agreement or other information about a party, and each of them hereby acknowledges and agrees that all information related to this Agreement or other information about a party, not otherwise known to the public, is confidential and proprietary and is not to be disclosed to third persons without the prior written consent of each of the parties except (a) to the extent necessary to comply with any law, rule or regulation, including, without limitation, any rule or regulation promulgated by the SEC, or the valid order of any governmental agency or any court of competent jurisdiction; (b) to its auditors and its attorneys as part of its normal reporting or review procedure; (c) to its insurance agent to the extent necessary to obtain appropriate insurance; or (d) as necessary to enforce its rights and perform its agreements and obligations under this Agreement. This Section shall survive the expiration or termination of this Agreement.

**18. Miscellaneous.** This Agreement may not be modified, amended or supplemented, nor may any term or condition be waived, except by an agreement in writing signed by both parties. Neither this Agreement nor any of the duties or obligations of Contractor hereunder shall be assigned or delegated by Contractor without prior written consent of Facility. Subject to the restrictions against transfer or assignment as herein set forth, the provisions of this Agreement shall inure to the benefit of, and shall be binding on, the heirs, assigns, successors, personal representatives, estates and legatees of each of the parties hereto. This Agreement shall constitute the entire agreement between the parties hereto with respect to the transactions contemplated hereby and shall supersede all prior or contemporaneous negotiations, understandings, and agreements. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein. If any provision of this Agreement is found to be invalid or unenforceable by any court or other lawful forum, such provision shall be ineffective only to the extent that it is in contravention of applicable laws without invalidating the remaining provisions of this Agreement, unless such invalidity or unenforceability would defeat an essential business purpose of this Agreement.

**19. Survival.** Except as otherwise expressly provided in this Agreement, all covenants, agreements, representations and warranties, express and implied, shall survive the execution of this Agreement.

**20. Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. Facsimile signatures shall be acceptable as originals. Any individual signing this Agreement on behalf of an entity hereby represents and warrants in his individual capacity that he has full authority to do so on behalf of such entity; provided, however, that Contractor acknowledges and agrees that this Agreement is not binding on the Facility until accepted by the Facility's Director of Operations as evidenced by his or her signature on the Agreement.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CAPITOL DIALYSIS, LLC**

        **Plaintiff,**

**v.**

**BEVERLY ENTERPRISES-DISTRICT OF
COLUMBIA, INC. et al.,**

        **Defendants.**

Civil Action No. 1:07cv1073 (PLF)

## [PROPOSED] ORDER

This matter came before the Court on Defendants Beverly Enterprises-District of Columbia, Inc. and Beverly Health and Rehabilitation Services, Inc.'s Motion to Dismiss the First Amended Complaint.  Upon review of the papers filed by the parties, and further upon argument of counsel, it is hereby

ORDERED that Defendants' motion to dismiss is GRANTED; and it is further

ORDERED that this case shall now stand dismissed with prejudice.

SO ORDERED.

Dated this _____ day of _____, 2007.

_____
UNITED STATES DISTRICT JUDGE