**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
CAPITOL DIALYSIS LLC                        )
                                            )
        Plaintiff,                          )
                                            )
        v.                                  )        Civil Action No. 07-1073 (PLF)
                                            )
BEVERLY ENTERPRISES -                       )
DISTRICT OF COLUMBIA, INC.                  )
et al.,                                     )
                                            )
        Defendants.                         )
———————————————————— )

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Plaintiff, Capitol Dialysis, LLC ("Capitol"), by and through counsel, respectfully submits its Opposition to the Motion to Dismiss the First Amended Complaint, filed by Defendants Beverly Enterprises – District of Columbia, Inc. d/b/a Northwest Health Care Center and Beverly Health and Rehabilitation Services, Inc. d/b/a Northwest Health Care Center's (collectively, "Beverly"). For the reasons set forth below, the Motion to Dismiss should be dismissed in all respects.

**<u>INTRODUCTION</u>**

Beverly seeks to avoid the consequences of its contractual and fiduciary breaches by mischaracterizing its relationship with Capitol and hiding behind a separate contract that is wholly inapplicable to this dispute. In its motion, Beverly, a nursing home, poses as a commercial landlord that owed Capitol no contractual or

fiduciary duties beyond leasing space to Capitol.  Beverly however, engaged Capitol to provide on-site dialysis services exclusively to its nursing home residents for a twenty-year term (the "On-Site Agreement").  The On-Site Agreement clearly required Capitol to locate six dialysis stations on-site and obtain all necessary licenses to provide dialysis treatment exclusively to Beverly's residents.  Indeed, Beverly testified before District of Columbia regulators in support of licensing Capitol to provide these on-site services exclusively to Beverly residents.  Beverly breached the On-Site Agreement by ceasing to admit new patients to its facility after only six years.

Beverly's prior representations and course of conduct are also enforceable as the On-Site Agreement lacks an integration clause.  Recognizing that the On-Site Agreement is not fully integrated, Beverly seeks to apply the termination and integration provisions of a separate contract, the "Health Care Services Agreement" (the "Out-Patient Agreement"), to nullify its prior representations and course of conduct.  Even the most cursory review of the Out-Patient Agreement, however, shows that it covers the transportation of Beverly's residents to Capitol's separate out-patient facility.  It has absolutely nothing to do with the dialysis treatments provided at Beverly pursuant to the On-Site Agreement.

Beverly also had a fiduciary duty to Capitol arising from its seat on Capitol's Governing Body.  As a director, Beverly participated in Capitol's governance and its future business planning.  Beverly breached its fiduciary duty and duty of

good faith and fair dealing by concealing from Capitol its decision to close the nursing home and cease admitting new patients.

Beverly's characterization of its relationship with Capitol as simply a landlord-tenant relationship is belied by the allegations in the Amended Complaint. Beverly's meritless motion should be denied and discovery should commence.

## FACTUAL BACKGROUND[1]

### A.    Capitol and Beverly

Capitol is a provider of high quality dialysis services to renal patients living in Washington, D.C. It is a joint venture owned by Jay Ocuin, M.D. and Anthony Bivins, M.D. (practicing nephrologists in Washington, D.C.) and American Renal Associates, Inc. of Beverly, Massachusetts. Amended Complaint ("Am. Compl.") at ¶ 10. Since 2001, Capitol has operated an Out-Patient dialysis facility at 140 Q Street, N.E., Washington, DC, that provides dialysis services to eligible patients.

Beverly is a duly licensed, 355-bed skilled nursing facility. It is owned and operated by Beverly Healthcare, Inc. ("Beverly Healthcare"), one of the largest operators of nursing facilities in the United States. Beverly Healthcare has operated Beverly since 1981. Am. Compl. at ¶ 11.

---

[1] Capitol will not recount all of the allegations at issue in this case. Capitol provides a brief summary of the facts and refers the Court to its Amended Complaint for a full recitation of the facts. *See* Am. Compl. at ¶¶ 10-49.

**B.** <u>**Beverly's Desire and Need for Capitol's Services**</u>

Prior to 2001, Beverly operated as a traditional nursing home without providing specialty dialysis services on its premises. During this time period, Beverly housed many residents who required dialysis services. Those patients were transported to out-patient dialysis centers located throughout the District of Columbia for their dialysis treatment. The District of Columbia, Beverly and the dialysis patients themselves bore the cost the transportation cost. <u>Id</u>. at ¶ 13. In 2001, Beverly and Capitol agreed that locating a dialysis center in Beverly's nursing home would benefit all parties by attracting more residents to Beverly. <u>Id</u>. at ¶ 14.

**C.** <u>**The On-Site Agreement Between Beverly and Capitol**</u>

On or about December 28, 2001, Capitol and Beverly entered into the On-Site Agreement to lease a 1,200 square foot area on the south end of the main floor of Beverly's nursing facility (the "Premises") so Capitol could provide dialysis services to Beverly's residents. On-Site Agreement at ¶ 1 (Ex. A). The On-Site Agreement expressly required that Capitol's "six dialysis stations" be located on the Premises. <u>Id</u>. Indeed, Beverly restricted Capitol's use of the Premises to medical use, "including, without limitation, use as a kidney dialysis station. . .." <u>Id</u>. at ¶ 5. The Agreement also set forth that Capitol could only treat Beverly's nursing home residents on-site. <u>Id</u>. The Agreement established the "Rent Commencement Date" as "the date the first [Beverly] patient is dialysized on the Premises. . .." <u>Id</u>. at ¶ 4.

The On-Site Agreement provides for a twenty-year term – "an initial five (5) year term, commencing upon the execution of this Lease Agreement (the "Execution Date") and shall automatically renew for three (3) additional five (5) year terms."

Id. at ¶ 3. The Agreement lacks a termination provision, rendering it a twenty-year unbreakable obligation.

Nor does the Agreement contain a full integration clause superseding prior or contemporaneous agreements. Rather, the limited Section 19.4 states that the On-Site Agreement contains all of Beverly's representations only with respect to the physical condition of the leased Premises and requires Capitol to possess the Premises "as is":

> No Representations by Landlord. Neither Landlord nor any other agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or Facility except as herein expressly set forth, and no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressed set forth. Tenant, by taking possession of the Premises, shall accept the same "as is," and such taking of possession shall be conclusive evidence that the Premises and the Facility are in good and satisfactory condition at the time of such taking of possession.

On-Site Agreement at ¶ 19.4 (emphasis provided). Finally, the On-Site Agreement does not contain a clause requiring a written document executed by the parties to effect future course of conduct amendments or modifications.

**D.    Pursuant to the On-Site Agreement and D.C. law, Capitol Obtains The Necessary License From The D.C. Government**

The On-Site Agreement also required Capitol to obtain all licenses from the D.C. government necessary to "occupy the Premises and conduct its business for the purposes herein stated" and required Beverly to "cooperate" with Capitol in obtaining such licenses. Id. at ¶ 9. The most important license for Capitol to obtain was a Certificate of Need ("CON") from the District of Columbia government. (Ex.

B).  A CON is necessary to operate a healthcare facility. The CON review process is costly insofar as it involves multiple detailed submissions and, in this case, testimony before the regulators from representatives of both Capitol and Beverly.

Beverly's Executive Director, James G. Gerrity, testified before the D.C. State Health Planning and Development Agency ("SHPDA"), in support of issuing the CON to Capitol to provide dialysis services exclusively to Beverly's residents.  Mr. Gerrity attested that issuance of the CON would attract more dialysis patients to Beverly as "hospitals and other referral services became aware of [Beverly]'s ability to provide dialysis on-site."  Am. Compl. at ¶¶ 25-26.   Mr. Gerrity further testified before the SHPDA concerning how Beverly "would like to be able to tell the families that come to us seeking a home for an elderly loved one, that their mother or father can receive the highest quality dialysis care, on-site at [Beverly]."  Based  on  these and other representations, SHPDA issued the CON to Capitol to treat "only" Beverly's residents on-site.  Id. at ¶¶ 27-28.

## E.    Capitol Incurs Substantial Expenses in Establishing the Dialysis Operation

Beverly fully understood that Capitol would incur substantial expenses in establishing the six dialysis stations on the Premises.  For example, dialysis centers require special plumbing, expensive equipment and trained clinicians.  This construction required under slab plumbing, extensive electrical work, and reverse osmosis water purification.  In addition, Capitol invested in other equipment for the facility, including computer equipment, office equipment, furniture and fixtures. Capitol's improvements to the facility cost approximately $309,000.00.  Id. at ¶¶ 30-

31.   In addition, Capitol entered into long-term contracts with a medical director and a management company to provide services to the new dialysis center located on the Premises.  Id. at ¶ 32.

### F.   To Cement Further the Relationship, Beverly Receives a Seat on Capitol's Governing Body

Because the parties would be working together to provide healthcare services to Beverly residents, they decided to operate as transparently and as closely as possible.  In this vein, Beverly accepted a seat on Capitol's Governing Body.  Beverly's Executive Director, James J. Gerrity, was Beverly's Governing Body member and was later succeeded in this position by Joyce Jones.  Id. at ¶ 33.

Capitol's Governing Body holds quarterly meetings and oversees the clinical and operational activities of Capitol.   Capitol notified Beverly of the Governing Body's meetings and Beverly attended these meetings.   With a seat on Capitol's Governing Body, Beverly had full access to Capitol's operational information and its future business expectations with Beverly.  Id. at ¶¶ 34-35.

### G.   Beverly and its Residents Reap Immediate Benefits from the Capitol Partnership

Capitol's on-site presence allowed Beverly to advertise enhanced services for prospective patients, and it became a preferred location for local physicians to refer new residents.  Moreover, Capitol's presence allowed Beverly to meet the needs of its patients requiring renal dialysis by improving the quality of care, increasing flexibility, focusing on patient needs and emphasizing physician involvement in the provision of renal dialysis service in a single location.  Once Capitol established its on-site dialysis facility, Beverly's daily census of dialysis patients and its occupancy

rate substantially increased. The number of monthly patients requiring dialysis services grew from 15 prior to 2001 to approximately 36 per month from 2003 through 2007.  Id. at ¶ 40.

## H.    Due to Overflow at Beverly, the Parties Enter Into the Out- Patient Agreement

The parties' venture proved so successful that Capitol could no longer service all of Beverly's residents requiring dialysis with its existing six on-site dialysis stations.  To accommodate the overflow, the parties entered into the Out-Patient Agreement to treat patients at Capitol's out-patient facility located at 140 Q Street, N.E. (Ex. C).   Exhibit A to the Out-Patient Agreement states that the services shall be provided at Capitol's "Out-Patient Facility …which is operated as a certified renal dialysis facility" under the Medicare program.  Id. at Exhibit A  at ¶ 1(a).  Exhibit A to the Out-Patient Agreement clearly indicates that treatment at this out-patient facility will require the transportation or transfer of a resident: "[w]hen a resident is transferred to the (outpatient facility) [Capitol] shall provide services promptly in accordance with the medical needs of the residents."  Id. at ¶ 1(b) (emphasis provided).   The Out-Patient Agreement also tasks Beverly with "arrang[ing] for the transportation of residents receiving Services hereunder to and from the Dialysis Unit at no cost to [Capitol]."  Id. at ¶ 1(d).

## I.    Beverly Breaches Its Contractual and Fiduciary Obligations

In 2006, at least six months prior to informing Capitol, Beverly decided to close down its facility, cease admitting new patients and sell the building.  During this time period, Capitol convened Governing Body meetings. Yet, neither Beverly,

8

nor its representative on Capitol's Governing Body, disclosed to Capitol that Beverly had decided to close the facility and sell the building. Beverly did not admit any new patients to its facility after December 2006. Am. Compl. at ¶ 44.

Had Beverly disclosed this information to Capitol in a timely fashion, Capitol could have located a new facility and transitioned its workforce and equipment in an orderly and economically efficient manner. Because Beverly did not disclose its decision to close its facility and cease admitting patients until March 2007, Capitol had no ability to avoid its substantial damages. Id. at ¶ 45.

## THE APPLICABLE LEGAL STANDARDS

In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept as true all material factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. *Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997). The allegations of the complaint should be construed broadly and liberally in the plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also* Wright & Miller, Federal Practice & Procedure § 1350, p.551 (2004). A complaint may not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *United States ex rel. New v. Rumsfeld*, 350 F.Supp.2d 80, 88-89 (D.D.C. 2004). A plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1974 (2007). A plaintiff's factual

allegations must be enough to assert a right to relief above the speculative level.  Id. at 1965.

Pursuant to Rule 12(b)(6), the Court may only consider:  (1) the allegations set forth in the complaint; (2) any documents attached as exhibits or incorporated by reference in the complaint or any contracts referenced in the pleading; and (3) matters about which the Court may take judicial notice.  *Kamen v. Int'l Broth. of Elec. Workers (IBEW) AFL-CIO*, 2007 WL 2319857, Civ. Action No. 06-1063, slip. op. at *3 (D.D.C. Aug. 15, 2007).  Any facts or documents that fall outside the four corners of the Amended Complaint, may not be considered at the motion to dismiss stage.  *Flynn v. Tiede-Zoeller, Inc.*, 412 F.Supp.2d 46, 58 (D.D.C. 2006).

In its Amended Complaint, Capitol sets forth eleven pages of specific allegations that clearly establish each of its five causes of action against Beverly. Accordingly, Capitol clearly satisfies the standards set forth by the Supreme Court in *Twombly*.

## ARGUMENT

## I.

## THE AMENDED COMPLAINT STATES A CLAIM FOR BREACH OF CONTRACT

Under District of Columbia law, a contract must be construed in its entirety, with each clause given its full effect and meaning.  A reviewing court must interpret a contract "as a whole, giving a reasonable, lawful, and effective meaning to all its terms."  *Independence Mgmt Co., Inc. v. Anderson & Summers, LLC*, 874 A.2d 862, 867 (D.C. 2005).  A court may not cast out or disregard terms of an agreement that

would alter its meaning or lead to an absurd result.  *See, e.g., U.S. ex rel K&R Ltd. Partnership v. Massachusetts Housing Finance Agency*, 456 F.Supp.2d 46, 61 (D.D.C. 2006) (courts may not provide an unreasonable, unfair or absurd interpretation to a contract, especially when such an interpretation would put one party at the mercy of the other).  Despite these well established principles, Beverly seeks to limit the Court's review of the On-Site Agreement by focusing on inapplicable terms, while ignoring the relevant provisions that give the Agreement its meaning.

Specifically, Beverly argues that the On-Site Agreement is merely a landlord-tenant lease that did not obligate Beverly to provide Capitol with access to its patients for the full twenty-year term.  Beverly summarily asserts that the "alleged duties that it supposedly breached do not appear anywhere in the lease and cannot be read into the lease by implication."  *See* Memorandum in Support of Motion to Dismiss the Amended Complaint ("Mem. In Supp.") at 7.  Beverly can only maintain this argument by selectively citing to the On-Site Agreement.

Indeed, Beverly's motion reads as though the On-Site Agreement is comprised of only two provisions – Sections 6[2] and 19.4.  Section 6 lists the boilerplate responsibilities of a landlord with respect to the condition of the Premises.  It does not, however, define the full scope of Beverly's responsibilities

---

[2] In its brief, Beverly refers to "Section 2" of the On-Site Agreement, which governs access to the Premises.  Mem. In Supp. at 7.  Presumably, Beverly meant Section 6, which tracks the quoted language in Beverly's brief.

beyond the physical condition of the Premises.  Section 19.4 simply provides that Capitol accepts the space "as is."

Beverly's pinched interpretation of the On-Site Agreement wilts upon a full review of the Agreement.  This is not a traditional commercial lease whereby a multipurpose office building leases out space to any qualified tenant.  Rather, the On-Site Agreement reflects Beverly's desire to provide on-site dialysis service to its residents.

The On-Site Agreement repeatedly refers to Beverly's obligations to provide Capitol access to its residents requiring dialysis treatment.  For example, paragraph 1 entitled "Leased Premises" clearly sets forth that the "six dialysis stations shall be located in the twelve hundred square foot area on the south end of the main floor of the Facility…." Exhibit A at ¶ 1.  Capitol's rent obligations did not commence until "the date the first [Beverly] patient is dialysized on the Premises …." Id. at ¶ 4.  The On-Site Agreement limited Capitol's use of the space to "medical purposes including kidney dialysis stations. . ." The Agreement also precluded Capitol from treating patients other than Beverly residents.  Id. at ¶ 5.  Moreover, the CON, based on Beverly's testimony, limited Capitol's services to Beverly's residents.  See Exhibit B.  Finally, the Agreement's term is for twenty years, and there is no right to terminate.  Id. at ¶ 3.  Read in its entirety and

in context, the On-Site Agreement can only be construed as leasing space to Capitol to provide dialysis services to Beverly residents for a twenty-year term.[3]

Yet, Beverly apparently interprets the On-Site Agreement to require Capitol to lease space for twenty years, spend hundreds of thousands of dollars to purchase and install dialysis stations and obtain costly licenses to operate solely as a dialysis center, while Beverly had no obligation to provide patients for Capitol to treat. This is a patently absurd interpretation that contravenes the most fundamental principles of contract interpretation. *See, e.g.*, *U.S. ex rel K&R Ltd. Partnership*, 456 F.Supp.2d at 46.

Nor do the cases that Beverly cites help its cause. Surprisingly, Beverly relies most heavily on a case, *Duke v. American University*, 675 A.2d 26 (D.C. 1996), that cuts against it. In *Duke*, several neighborhood associations agreed to support American University's application to erect new buildings in a residential neighborhood. American, however, instead opted to build off campus in a commercially zoned area. The neighborhood associations then sought to stretch the agreement to enjoin American from building in a commercially zoned area. Id. at 27-28. *Duke* is completely inapposite to the instant case.

---

[3] To the extent the Court finds that there is no express agreement for Capitol to provide dialysis services to Beverly patients for the twenty-year term, the standards for an implied-in-fact agreement are clearly met. The totality of the circumstances demonstrate that an implied-in-fact contract exists. *See, e.g., Jordan Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58, 62 (D.C. 2005) ("An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt.").

First, the respective agreements are not at all similar.  In *Duke*, the agreement focused solely upon the local residents supporting American's residential zoning request.[4]  Id. at 27.  Here, the On-Site Agreement not only obligated Beverly to support the CON process, but also required Capitol to establish a dialysis operation on-site to treat only Beverly patients.  Indeed, Beverly pledged to and did support Capitol's application to the D.C. government to provide dialysis services exclusively to Beverly's residents.  Upon issuance of the CON, Beverly did not do the equivalent of building at another site, by engaging a different dialysis company.  Rather, Beverly engaged Capitol to provide dialysis services to Beverly's residents for twenty years.  Moreover, Beverly engaged in a consistent course of conduct by supplying Capitol with a patient based for six years.[5]

## II.

## THERE IS NO INTEGRATION PROVISION PRECLUDING PRIOR REPRESENTATIONS OR SUBSEQUENT COURSE OF CONDUCT

Beverly's prior representations to Capitol and the D.C. regulators supporting Capitol's on-site treatment of its residents and the parties' course of conduct

---

[4] In addition, the contract at issue in *Duke* was fully integrated.  *Duke*, 675 A.2d at 28.  By contrast, the On-Site Agreement lacks an integration clause.  *See* Section II, *infra*.  Therefore, it is permissible for the Court to consider Beverly's prior representations and course of conduct.

[5] Beverly's actions in this matter would be the equivalent in *Duke* if American had commenced building on campus and then, at some later point, decided to build offsite.

constitute an enforceable agreement in the absence of an integration provision.[6] There is no applicable integration clause superseding prior representations or precluding the enforceability of a subsequent course of conduct. Beverly mistakenly argues that Section 19.4 of the On-Site Agreement constitutes a full integration provision. It does not. Rather, it is a very limited provision relating solely to the physical conditions of the Premises. In an attempt to foreclose any arguments pertaining to the subsequent course of conduct, Beverly relies upon a merger and integration provision in the Out-Patient Agreement, which has no applicability to the instant dispute.

A.    **Whether The On-Site Agreement Is Fully Integrated Is A Factual Matter Requiring Discovery**

When parties have executed a completely integrated written agreement, that agreement supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties. *Daisley v. Riggs Bank, N.A.*, 372 F.Supp.2d 61, 68 (D.D.C. 2005). "Determining whether an agreement is integrated requires examining 'the intent of the parties at the time they entered into the agreement.'" Id. (*quoting Piedmont Resolution, LLC v. Johnston, Rivlin, & Foley*, 999 F. Supp. 34, 50 (D.D.C. 1998)); *see also Klayman v. Judicial Watch, Inc.*, 2007 WL 1034937, Civ. Action No. 06-670 (slip op.), at *8 (D.D.C., April 3, 2007).[7]

---

[6] Beverly claims that the alleged integration clauses preclude a course of conduct claim. At best, those clauses affect prior representations, not subsequent course of conduct. *See* Section II(B), *infra*.

[7] The integration clause in *Klayman* provided, in part: "[t]his Agreement constitutes the entire agreement and understanding between and among the

(continued…)

Moreover, the presence or absence of a merger clause may be a significant factor in ascertaining the parties' intent. *Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 127 (D.C. 1992).

Consequently, the Court must determine whether the On-Site Agreement is completely integrated by focusing on the intent of the parties at the time they entered the agreement. *Good Food*, 608 A.2d at 126. This intent "must be sought where always intent must be sought, namely, in the *conduct* and *language* of the parties and the *surrounding circumstances*. The document alone will not suffice. What it was intended to cover cannot be known until we know what there was to cover." *Ozerol v. Howard Univ.*, 545 A.2d 638, 641 (D.C. 1988) (emphasis in original, quotations omitted).

As set forth below, the On-Site Agreement is not fully integrated. Therefore, Beverly may not escape the enforceability of its prior representations. To the extent, however, that the Court deems Section 19.4 unclear, Beverly's motion should be denied so that the parties can engage in discovery.

## B.   **Section 19.4 Relates Solely To The Condition Of The Premises**

The On-Site Agreement simply does not include a sweeping integration provision precluding enforcement of prior representations. Beverly claims that

---

(continued)

Parties with respect to the subject matter of this Agreement. Each of the Parties agrees and acknowledges that in deciding to enter into this Agreement he or it is not relying on any statements, representations, understandings or promises other than those contained herein." *Klayman*, 2007 WL 1034937, at *8.

Section 19.4 "unambiguously states that the only representations and promises made relied on by the parties are those 'expressly set forth' in the [On-Site Agreement]." Mem. in Supp at 8. Beverly conveniently ignores the limited scope of Section 19.4. Section 19.4 is clearly limited to representations regarding the physical condition of the Premises, and it specifically provides that Beverly has not made any representation or promise <u>with respect to the Premises or Facility</u> except as expressly set forth herein...." On-Site Agreement at ¶ 19.4. (emphasis provided). That Section 19.4 is limited to the physical condition of the property is confirmed by its second sentence whereby Capitol accepts the Premises "as is." <u>Id</u>. Accordingly, Section 19.4 does not constitute a merger or integration provision with respect to any representations or promises outside of those relating to the condition of the Premises or the Facility. As a result, Beverly's prior representations to Capitol and to the D.C. Government that it would provide patients for Capitol to dialyze can be considered by the Court.

Even if Section 19.4 did apply, it would not bar the enforceability of the parties' subsequent course of conduct because it only applies to prior "representation[s] or promise[s] with respect to the Premises or Facility." The parties' subsequent course of conduct reflects the agreement for Beverly to supply Capitol with residents to treat. Section 19.4 does not contain a provision requiring the parties to execute a document to effect a modification or agreement. Accordingly, the On-Site Agreement does not prohibit a modification or amendment based on course of conduct.

17

C.    **The Integration Provision In The Out-Patient Agreement Is Inapplicable**

Recognizing that Section 19.4 does not preclude any subsequent agreement based on course of conduct, Beverly desperately attempts to apply the merger provisions of the Out-Patient Agreement.  Mem. in Supp. at 10.[8]  Unlike the very limited Section 19.4, the integration provision in the Out-Patient Agreement states that the agreement "contains the sole and entire agreement between the parties regarding the subject matter hereof and supersedes the any and all prior written or oral agreements between parties."  Exhibit A to Out Patient Agreement (Exhibit C) at ¶ 6.[9]  Beverly's reliance on the Out-Patient Agreement, however, is misplaced.

As set forth above, the Out-Patient Agreement has no applicability to the instant dispute.  It exclusively governs the treatment of Beverly residents at Capitol's out-patient facility located at 140 Q Street, N.E.  Id. at 1(b); *see also* Ex. A at ¶ 5.  As discovery will show, the Out-Patient Agreement became necessary to accommodate the overflow of patients at the Beverly facility.  Because the D.C. government provided the CON only for six dialysis station, Beverly and Capitol

_____

[8] Beverly also argues that the non-exclusivity language in the Out-Patient Agreement shows that Capitol could treat anyone off the street in the Beverly facility, refuting Capitol's claim that it was dependent upon Beverly to supply it a patient base.  This is patently false as the CON and On-Site Agreement limited Capital to treating only Beverly's residents.  *See* Exhibit B.  Capitol also claims the termination provisions in the Out-Patient Agreement show that the On-Site Agreement was not unbreakable.  Again, this term does not apply to the On-Site Agreement.  In any event, Beverly never alleges that it invoked this termination provision.

[9] This provision is broader that Section 19.4 in the On-Site Agreement as it is not limited to the conditions of the facility and Premises.

could not increase the number of stations on-site to treat additional Beverly patients. As a result, they entered into this Agreement to provide off-site out-patient dialysis treatment at Capitol's Q Street location. The Out-Patient Agreement does not reference or incorporate the terms of the On-Site Agreement. Therefore, the Out-Patient Agreement's provisions simply cannot apply to this dispute.[10]

### III.

### <u>THE STATUTE OF FRAUDS DOES NOT APPLY</u>

Beverly relies upon its strained interpretation of the On-Site Agreement to argue that the statute of frauds requires dismissal of Capitol's breach of contract claim. The statute of frauds renders an unwritten contract unenforceable if it cannot be performed within one year. *See* D.C. Code Ann. § 28-3502. Beverly claims that the statute of frauds is applicable here because there is no written agreement for Beverly to provide Capitol with patients for the twenty-year term of the agreement. As set forth above, this selective interpretation of the On-Site Agreement cannot withstand scrutiny. The On-Site Agreement read in its entirety clearly establishes a twenty-year term for Capitol to provide dialysis services to Beverly's residents.

---

[10] The Out-Patient Agreement, like the On-Site Agreement, does not contain a clause requiring a document signed by both parties to effect an amendment or modification. Thus, even if the Out-Patient Agreement applied, if would not bar the enforceability of Beverly's subsequent course of conduct.

Even if Beverly's interpretation of the On-Site Agreement were correct, the statute of frauds would not apply as Capitol has alleged partial performance. Under D.C. law, a party may not assert a statute of frauds defense where partial performance has occurred. *Fitzgerald v. Hunter Concessions, Inc.*, 710 A.2d 863, 865 (D.C. 1998); *Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310, 313 n.3 (D.C. 1982) (holding that partial or complete performance under an oral contract may remove a case from the applicability of the statute of frauds and detrimental reliance upon an oral contract by one of the parties may also remove a case from the reach of the statute of frauds); *Amberger & Wohlfarth, Inc. v. District of Columbia*, 300 A.2d 460, 463 (D.C. 1973) (same).

The *Fitzgerald* case is particularly instructive. In *Fitzgerald*, the plaintiff alleged that he entered into an oral agreement with the defendant. The defendant filed a motion to dismiss arguing that the statute of frauds precluded enforcement of the alleged oral agreement. In his complaint, however, the plaintiff alleged that the defendant had consistently paid him for a five year period and that plaintiff had fully performed all of his obligations under the oral agreement. Accordingly, the court denied defendant's motion to dismiss finding that plaintiff had properly alleged partial performance negating the application of the statute of frauds. *Fitzgerald*, 710 A.2d at 865.

Like *Fitzgerald*, Capitol has made payments to Beverly for more than five years and has detrimentally relied upon Beverly's representations that it would

provide Capitol access to its residents for the twenty-year term.  Accordingly, the statute of frauds does not bar Capitol's claim against Beverly for breach of contract.

**IV.**

**THE COMPLAINT STATES A CLAIM
FOR BREACH OF FIDUCIARY DUTY BY BEVERLY**

The Amended Complaint alleges that Beverly breached its fiduciary duty by failing to disclose the fact that Beverly intended to close the facility.  Am. Compl. at ¶¶ 41-45.  As set forth in the Amended Complaint, Beverly's fiduciary duty originates from its seat on Capitol's Governing Body and its voice in Capitol's governance.  Id. at ¶¶ 42-45, 67-74.  Beverly ignores the actual origin of its fiduciary duty and seeks to convince the Court that Capitol tethers Beverly's fiduciary duty to the On-Site Agreement.

Specifically, Beverly asserts the legal truism that ordinary commercial agreements do not automatically create fiduciary duties between contracting parties.  Mem. In Supp. at 15.  Beverly proceeds to suggest that Capitol seeks to impose a fiduciary duty based upon the On-Site Agreement.  This is wholly fabricated.  Capitol has never alleged a fiduciary duty based on the On-Site Agreement.  Rather, Capitol ties the fiduciary duty to Beverly's role as a director of Capitol's Governing Body.  Am. Compl. at ¶¶ 42-42, 67-74.

Beverly raises yet another strawman by suggesting that Capitol's fiduciary duty claim is premised on the parties sharing an individual director.  Beverly likens this situation to cases where one company attempts to impute a fiduciary relationship to another company solely because the two companies share a common

21

individual director.  *See Banco Urquijo, S. A. v. Signet Bank/Maryland* 861 F. Supp. 1220, 1249-50 (M.D. Pa. 1994).  Once again, this is disingenuous.  Unlike the cases cited by Beverly, the board seat here is held by the company.  Like any board member, Beverly had a fiduciary duty to Capitol.  *Mayflower Hotel Stock, P.C. v. Mayflower Hotel Corp.*, (173 F.2d 416, 423 (D.C. Cir. 1949) ("A director is a fiduciary . . . [t]heir powers are powers in trust."); *Jamaica Nutrition Holdings Limited v. Jamaica Nutrition Holdings Limited*, 497 A.2d 118, 131 (D.C. 1985) ("Officers and directors of a corporation owe a fiduciary duty to the corporation and to its shareholders, which requires them to act in good faith in managing the affairs of the corporation.").  Beverly, as an organization, held a seat on Capitol's Governing Body, had access to Capitol's finances and was privy to Capitol's future business expectations.  Accordingly, Beverly had a fiduciary duty as a member of Capitol's Governing Body to disclose the adverse material information that Beverly was closing its facility.

## V.

## <u>CAPITOL PROPERLY ALLEGES THAT BEVERLY</u><br><u>BREACHED ITS DUTY OF GOOD FAITH AND FAIR DEALING</u>

A duty of good faith and fair dealing is implied into every contract subject to District of Columbia law.  *Hais v Smith*, 547 A.2d 986, 987-88 (D.C. 1988*)*.  The duty of good faith and fair dealing requires parties to a contract to uphold the spirit of the agreement and refrain from rendering imperfect performance or interfering with the performance of the other party.  <u>Id.</u> at 987.

Beverly breached its duty of good faith and fair dealing by failing to disclose its decision to close the facility and cease admitting new patients. As set forth in the Amended Complaint, Beverly concealed its decision from Capitol for at least six months. Am. Compl. at ¶¶ 41-43. Had Beverly disclosed this decision at the time it was made, Capitol would have had enough time to efficiently and economically transition to a new location, thereby minimizing it damages.

## A.    Capitol Asserts an Express Breach of the On-Site Agreement

Beverly raises several baseless arguments in an attempt to escape the consequences of its breach. First, Beverly claims that Capitol's good faith and fair dealing claim must be dismissed because the complaint does not allege that Beverly "violated any express provision of the lease or the dialysis agreement." Contrary to Beverly's claim, Capitol satisfies this prerequisite. Specifically, Capitol clearly alleges that Beverly breached its obligation under the On-Site Agreement to provide Capitol access to its residents for a twenty-year term. Id. at ¶¶ 1-5, 18-20, 51-59.

## B.    The Out-Patient Agreement Does Not Apply

Second, Beverly asserts that it had no contractual duty to provide notice under the at will termination provision in the Out-Patient Agreement. Beverly accuses Capitol of seeking to write this provision out of the Out-Patient Agreement. See Mem. in Supp. at 13-14. Again, neither the termination provision, nor any other provision, of the Out-Patient Agreement applies to this dispute. In any event, as discovery will show, Beverly has never raised the Out-Patient Agreement in connection with this dispute and has never alleged that it terminated the

Agreement.[11]  Accordingly, the at will termination provision in the Out-Patient Agreement has no impact whatsoever on Beverly's twenty-year unbreakable obligation under the On-Site Agreement.

## C.    Capitol's Good Faith and Fair Dealing Claim is Distinct From Its Other Claims

Third, Beverly asserts that a good faith and fair dealing claim must be dismissed if it duplicates another claim. Mem. In Supp. at 12-14. Beverly mistakenly argues that Capitol's good faith and fair dealing claim is identical to other asserted causes of action.  For example, Beverly contends that Capitol's claim for breach of good faith and fair dealing (Count II) is identical to its claim asserting breach of contract (Count I).  Count I, however, does not include the failure to notify Capitol of the decision to close the facility as part of the breach.  Accordingly, Counts I and II do not assert identical claims.

Next, Beverly alleges that the fiduciary duty claim (Count III) is identical to the breach of good faith and fair dealing claim set forth in Count II.  Again, Beverly is incorrect.  Count II arises from Beverly's contractual duties as a party to the On-Site Agreement, whereas Count III alleges a breach of fiduciary duty unrelated to the On-Site Agreement.  Beverly's fiduciary duty claim arises from its role as a

---

[11] Pursuant to Rule 12(b)(6), the Court may only consider the allegations set forth in the complaint, any documents attached as exhibits or incorporated by reference in the complaint or any contracts referenced in the pleading and matters about which the Court may take judicial notice. *Kamen*, 2007 WL 2319857 at *3.  Capitol never referenced the Out-Patient Agreement in its Amended Complaint.  Beverly unilaterally raised this irrelevant agreement in its motion to dismiss.  As it falls outside the four corners of the Amended Complaint, the Out-Patient Agreement may not be considered at the motion to dismiss stage. *Flynn*, 412 F.Supp.2d at 58.

director of Capitol's Governing Body.  Based on this independent duty, Beverly had an obligation to notify Capitol of its decision to close the nursing home and to cease admitting patients at the time the decision was made.[12]

Finally, Beverly has apparently misread Capitol's claims alleging fraudulent misrepresentations (Count IV) and negligent misrepresentation (Count V).  Both of these claims are based on Beverly's fiduciary duty arising from its seat on Capitol's Governing Body.  As set forth above, Beverly's fiduciary duty is independent of its contractual duties under the On-Site Agreement.  Accordingly, Counts IV and V are not identical to Count II.

## VI.

## THE COMPLAINT STATES A CLAIM FOR BOTH FRAUDULENT AND NEGLIGENT MISREPRESENTATION

Counts IV and V of the Amended Complaint assert claims for fraudulent misrepresentation and negligent misrepresentation.  To sustain a claim for fraudulent misrepresentation, a plaintiff must assert:

1.  A false representation;
2.  Made in reference to a material fact;
3.  With knowledge of its falsity;
4.  With intent to deceive;
5.  An action that is taken reliant upon that representation; and

---

[12] Beverly cites *Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc.*, 2006 WL 1147933 (D.D.C. April 28, 2006), for the proposition that a claim for the breach of the duty of good faith and fair dealing cannot be maintained when the allegations of bad faith are identical to a claim for relief under an established cause of action.  *See* Mem. In Supp. at 14.  This case is inapposite as the claims there all arose from the same source and were virtually identical to one another.  Id. at *2.  Thus, the court held that the party could not pursue its claim for breach of good faith and fair dealing.  Id. at *5.

6.    Which resulted in damages.

*C & E Servs., Inc. v. Ashland, Inc.*, 2007 WL 2206909, Civ. Action No. 03-1857, slip op. at *7 (D.D.C. Aug. 2, 2007).  The only difference between fraudulent and negligent misrepresentation is that the former requires intent while the latter merely requires a violation of a duty to exercise reasonable care.  Id. (discussing the elements of both fraudulent and negligent misrepresentation).  A false representation may be "either an affirmative misrepresentation or a failure to disclose a material fact when a duty to disclose that fact has arisen."  *Rothenberg v. Aero Mayflower Transit Co., Inc.*, 495 F.Supp. 399, 406 (D.D.C. 1980); *see also Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977) ("Nondisclosure or silence, as well as active misrepresentation, may constitute fraud.").

Capitol's misrepresentation claims arise from Beverly's concealment of its decision to close the facility.  As Beverly concedes in its motion, the duty to speak arises where a fiduciary relationship exists between two parties.  *See Calioff v. Abington Plaza Core* 59 A. 2d 516, 517 (D.C. 1948); *Rothenberg v. Aero Mayflower Transit Co.*, 495 Supp. 399, 409 (D.D.C 1980).  Capitol has clearly pled the existence of a fiduciary duty giving rise to a duty to disclose, and Beverly's motion should therefore be denied.

## **CONCLUSION**

There can be no doubt that Capitol has alleged a set of facts in support of its claims that would entitle it to relief and, as such, Beverly's Motion to Dismiss must be denied.

Dated:  September 24, 2007                     Respectfully submitted,


                                        /s/ Jeffrey L. Poston
                                        Jeffrey L. Poston
                                        Todd J. Cochran
                                        Crowell & Moring, LLP
                                        1001 Pennsylvania Avenue, N.W.
                                        11th Floor
                                        Washington, DC 20004
                                        (202) 624-2500
                                        (202) 628-5116 (fax)
                                        jposton@crowell.com

Received 04/17/2007 11:31AM in 03:58 on line [11] for KW002912 * Pg 2/8
AMERICAN RENAL

## LEASE AGREEMENT

This Lease Agreement ("Lease") made this day by and between Beverly Healthcare, Inc., d/b/a Northwest Health Care Center ("Northwest" or "Landlord") and Capitol Dialysis, LLC (hereinafter "Capitol Dialysis" or "Tenant") for the lease of space at 3333 Wisconsin Avenue, N.W. (hereinafter "the Facility").

WITNESSETH, that for and in consideration of the rent hereafter reserved, and the covenants contained herein, the parties hereby agree as follows:

1. **Leased Premises:** The six dialysis stations will be located in a 1200 square foot area on the south end of the main floor of the Facility (the "Premises"). A copy of the floor plan for the six dialysis stations is attached as Exhibit A hereto.

2. **Access:** Tenant shall have access to the Facility and to the Premises (24) hours per day, seven (7) days per week.

3. **Lease Term:** The lease shall have an initial five (5) year term, commencing upon the execution of this Lease Agreement (the "Execution Date") and shall automatically renew for three (3) additional five (5) year terms.

4. **Rent:** Upon the date the first Northwest patient is dialyzed on the Premises (the "Rent Commencement Date"), Tenant shall pay to Landlord the first month's rent in the amount of One Thousand Fifty Dollars ($1,050). Thereafter, rental payments in the amount of $1,050 shall be made on or before the fifth (5th) day of each month. The rental payments required in this Lease are all-inclusive and Tenant shall not be responsible for any additional payments for items such as taxes and assessments, operating expenses, utilities, maintenance and repair, landscaping or any other overhead expenses. Payment for such ancillary items shall be the sole responsibility of the Landlord. Rental payments shall be made payable to Northwest Health Care Center and delivered to the Facility on or before the fifth (5th) day of each month.

5. **Use:** The Premises shall be used and occupied by the Tenant only for office and medical use, including, without limitation, use as kidney dialysis stations under the business name of Capitol Dialysis, LLC or the name of any successor or assign, and for no other use. Tenant shall not use, or permit the use of, all or any part of the Premises for any disorderly, illegal or hazardous purpose. Tenant shall not use, or permit the use of, all or any part of the Premises for any purpose that interferes with the use of any other portion of the Facility, nor which in Landlord's reasonable opinion, impairs, or might impair, the reputation or value of the Facility. Tenant shall not use utility services in excess of amounts reasonably determined by Landlord to be within the normal range of demand for the designated use of the

Case 1:07-cv-01073-PLF    Document 5-2    Filed 07/12/2007    Page 2 of 7

02/28/07  12:48 FAX 303 341 7010    Received 04/17/2007 11:31AM in 03:38 on line [11] for KW002912 * Pg 3/8    NORTHWEST HEALTHCARE    @003/010

Premises.  Tenant shall keep the Premises in a neat and clean condition with reasonable wear and tear excluded.

6.  **Services Furnished By Landlord:**    Landlord shall provide the following services:

6.1  **Structural Maintenance.**  Landlord shall maintain, in good condition and repair all common areas, exterior parking lot, sidewalks, paving, roof, foundation, exterior walls, as well as the underground pipes and conduits located beyond the boundaries of the Premises, and Landlord shall make all repairs thereto becoming necessary, all at Landlord's expense.  In the event, however, that any such repairs are necessitated by reasons of any action or omission by Tenant, its employees, agents, licensees, or contractors, Tenant agrees to promptly, upon demand, reimburse Landlord for the full costs thereof.

6.2  **Quiet Enjoyment.**  Upon Tenant's paying the Rent and performing its other obligations hereunder, Landlord shall permit Tenant to peacefully and quietly hold and enjoy the Premises, subject to the provisions hereof and the terms of any mortgage, deed of trust or ground lease too which this Lease is subordinate.

6.3  **Insurance.**  Landlord shall insure the Facility against damage by fire and standard extended coverage perils, and shall carry public liability insurance, all in such reasonable amounts with such reasonable deductibles as would be carried by a prudent owner of a similar facility in the area.

6.4  **Changes by Landlord.**  Landlord may at any time make any changes, additions, improvements, repairs or replacements to the Facility that it considers desirable.  Landlord shall use reasonable efforts to minimize interference with Tenant's normal activities, but no such interference shall constitute constructive eviction or give rise to any abatement of rent or liability of Landlord to Tenant.  If any of such changes materially impacts Tenant's business, Landlord must obtain Tenant's approval, such approval not to be unreasonably withheld.

7.  **Alterations:**  Within 30 days from the date of execution of this Lease, Tenant shall provide Landlord with a scope of work letter ("Work Letter") that Tenant plans to construct in the Premises.  Such work letter must be approved by Landlord prior to Tenant commencing any work.  Except as provided in the Work Letter and except for non-structural alterations by Tenant which shall cost no more than $2,500 for Tenant to make, Tenant shall not make or permit to be made any alterations, additions, modifications or improvements to the Premises without the prior written consent of Landlord, which consent will not be unreasonably withheld.

8.  **Insurance:**  Tenant shall obtain and maintain in force at Tenant's sole cost and expense 1) casualty insurance in an amount equal to full replacement

Case 1:07-cv-01073-PLF    Document 5-2    Filed 07/12/2007    Page 3 of 7

02/28/07   12:45  FAX 202 244 7210   Received 04/17/2007 11:31AM in 03:38 on line [11] for KW002912 * Pg 4/8   NORTHERN TRUST                    ☐ 004/010

value, at the time of loss, of Tenant's personal property, leasehold improvements and trade fixtures located at the Premises from time to time as well as alterations and improvement made by Tenant; 2) liability insurance for the benefit of Landlord and any mortgagee as additional insured against claims for personal injury liability with a limit of not less than $3,000,000 in the event of personal injury including death to any number of persons or of damage to property arising out of any one occurrence, and any such insurance may be furnished under an umbrella policy with Landlord's prior written consent, which shall not be unreasonably withheld; 3) workers compensation insurance in the amount covering all employees of Tenant employed at or performing services on the Premises in accordance with District of Columbia laws; and 4) such other insurance as Landlord or any mortgagee may reasonably require.

9.    **Permits - Compliance With Laws:**  Tenant shall, at its own expense, promptly obtain from the appropriate governmental authorities and maintain in full force and effect during the Term of this Lease any and all permits, licenses and the like required to permit Tenant to occupy the Premises and conduct its business for the purposes herein stated.  Landlord shall cooperate with Tenant in obtaining its Certificate of Occupancy, and Landlord shall be responsible for obtaining any permits necessary to use or perform work in common areas of the Facility, except if such work is specific to the Tenant, and any base permits required to allow any tenant to occupy the Facility. Tenant shall comply, and cause its agents, employees, contractors, and licensees to comply,  with all state, federal, and municipal statutes, regulations, ordinances and rules applicable to Tenant's occupancy and use of the Premises and any use of the common areas of the Facility.

10.    **Assignment And Subletting:**  Tenant agrees that it will not transfer, assign, sublet or encumber the Premises, in whole or in part, without Landlord's prior written consent, which will, in the case of a transfer, assignment or subletting, be based upon, among other factors, the credit-worthiness, use, and reputation of the proposed assignee or sublessee.  Landlord agrees that it will not arbitrarily withhold its consent, and if such consent is given, Tenant shall not be relieved from any liability under this Lease.  Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to sublease or assign this Lease to any affiliate or successor to Tenant's entire business upon giving Landlord written notice and such affiliate or successor having equal or greater financial worth than Tenant and any existing guarantor.

11.    **Property Loss Or Damage:**

11.1    **Landlord's Responsibility.**  Subject to Paragraph 11.2 below, Tenant hereby expressly agrees that Landlord shall not be responsible in any manner for any damage or injury to the person or property of Tenant or any other person or business directly or indirectly caused by (i) dampness or water, whether due to a

Case 1:07-cv-01073-PLF     Document 14-2     Filed 09/24/2007     Page 4 of 7

Case 1:07-cv-01073-PLF     Document 5-2     Filed 07/12/2007     Page 4 of 7
02/26/07  12:43  Received 04/17/2007 11:31AM in 03:38 on line 6 for K002912 * Pg 5/8

break or leak in any part of the roof, heating, or plumbing within the Premises or in the Facility in which the Premises are located, no matter how caused; (ii) theft; (iii) fire or other casualty; (iv) any other cause whatsoever.

11.2   Landlord's Liability for Damages.   Landlord shall only be liable for actual damages or injury to person or property of Tenant or of any other person or business where (i) notice in writing of any defect which Landlord is obligated under the terms of this Lease to correct and which caused such damage or injury, has been given in sufficient time before the occurrence of such damage or injury to have enabled Landlord to correct such defect, and (ii) then only if such damage or injury is due to Landlord's negligence in performing its obligations hereunder.

12.   Tenant's Failure To Perform:   In the event that Tenant fails, after fifteen (15) days' written notice from Landlord (except in the case of an emergency in which case no such notice shall be required), to do any act or make any payment or perform any term or covenant on Tenant's part required under this Lease or otherwise fails to comply herewith, Landlord may (at its option, but without being required to do so) immediately, or at any time thereafter and without any further notice, and without relieving Tenant of any of its obligations hereunder, perform the same on the account that Tenant has failed to do so.   If Landlord makes any expenditures, or incurs any obligations for the payment of money in connection therewith, including, but not limited to, attorneys' fees in instituting prosecuting or defending any action or proceeding, such sums paid or obligations, incurred, with interest a the rate of twelve percent (12%) per annum from the date Landlord incurs such expense or cost, shall be deemed to create an additional rental obligation hereunder and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement to Tenant therefor.

13.   Surrender At End Of Term:   Except as otherwise provided, Tenant shall vacate the Premises at the expiration or other termination of this Lease and shall remove all goods and effects not belonging to Landlord, other than leasehold improvements made by or at the request of Tenant, and shall surrender possession of the Premises and all fixtures and systems thereof in good repair, reasonable wear, tear and damage by unavoidable casualty excepted.   If Tenant shall fail to perform any of the foregoing obligations, Landlord is hereby expressly authorized to do so on Tenant's behalf and at Tenant's sole cost and expense, and Landlord may sell such articles on the Premises as Landlord in its sole discretion deems saleable, and may dispose of others in any manner which it chooses.   Tenant shall pay and be liable for any and all costs and expenses incurred by Landlord hereunder.   The proceeds of any such sale shall be applied toward the expenses thus incurred as well as any other outstanding obligations of Tenant under this Lease an Tenant agrees to pay any remaining balance promptly.

02/28/07  17:44  Received 04/17/2007 11:31AM in 03:38 on line [11] for KW002912 * Pg 6/8
12/11/02 11:46 FAX 976/750 4740      AMERICAN RENAL                                          ☑006/010

   14.  **Notices**:  All notices, demands and requests required under this Lease shall be in writing.  All such notices shall be deemed to have been properly given if sent by United States registered or certified mail, return receipt requested, postage prepaid, or by reputable overnight courier service, addressed:

to the Landlord at:

> Northwest Health Care Center
> 3333 Wisconsin Avenue, N.W.
> Washington, D.C. 20016
> Attn:  Mr. Bryant Hall, Jr.

with a copy to:

> Beverly Enterprises
> Government Relations
> 1250 H Street NW, Suite 555
> Washington, D.C. 20005
> Attn:  David C. Beck

and to the Tenant at:

> Capitol Dialysis, LLC
> 140 Q Street, N.E.
> Washington, D.C.
> Attn:  Dr. Jay A. Ocuin

with a copy to:

> Crowell & Moring
> 1001 Pennsylvania Avenue, N.W.      *G-24-2723*
> Washington, D.C. 20004
> Attn:  Kathleen Stratton

Either party may designate a change of address by written notice other party.

   15.  **Captions**:  All headings in this Lease are intended for convenience only and are not to be deemed or taken as a summary of the provisions to which they pertain or as construction thereof.

   16.  **Successors And Assigns**:  The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of (i) Landlord and its heirs, distributees, executors, administrators, successors and assigns and (ii)

Received 04/17/2007 11:31AM in 03:26 on line [11] for KW002912 * Pg 7/8
11/22/07 11.00 FAX 202 944 4310    NORTHWEST HEALTHCARE
AMERICAN RENAL

Tenant and its heirs, distributees, executors, administrators, successors and permitted assigns.

    17. **Governing Law**: This Lease shall be governed by and construed in all respects in accordance with the laws of the District of Columbia.

    18. **Signage**: Tenant covenants and agrees that it shall not inscribe, affix, or otherwise display signs, advertisements or notices in, on, upon, or behind any windows or on any door, partition, wall or other part of the interior or exterior of the Facility without the prior written consent of the Landlord, and then only in such place, size, color, number and style as approved by Landlord. If such consent is given by Landlord, the cost of installing, inscribing or affixing the approved material (as well as the cost of removing same at the termination or expiration of this Lease) shall be paid by Tenant, and Tenant agrees to pay same promptly and on demand.

    19. **Miscellaneous**

    19.1  <u>Attorneys' Fees</u>. If legal action is brought in a court of competent jurisdiction by either party hereto arising out of or concerning this Lease or the rights of any party hereto, the prevailing party in said action shall be awarded reasonable attorneys' fees and court costs from the non-prevailing party.

    19.2  <u>Parking</u>. Any parking areas for the Facility shall be under the sole and exclusive control of Landlord, and shall be available for the general use in common by Tenant, its officers, agents, employees and visitors, subject to reasonable rules for he use thereof, including, but not limited to, reasonable rules designating areas for employee parking, controlling of ingress and egress, arrangement of parking spaces and general maintenance of the parking areas.

    19.3  <u>No Partnership</u>. Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create any other relationship between the parties hereto other than that of landlord and Tenant.

    19.4  <u>No Representations by Landlord</u>. Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth, and no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressly set forth. Tenant, by taking possession of the Premises, shall accept the same "as is," and such taking of possession shall be conclusive evidence that the Premises and the Facility are in good and satisfactory condition at the time of such taking of possession.

Received 04/17/2007 11:31AM in 03:38.00 Line [1] for KH002912 * Pg 8/8
02/26/07  12:44 FAX 202 241 7110     NORTHWEST HEALTHCARE     @008
12/11/02  11:01 FAX 978 750 4740     AMERICAN RENAL          @008/010

 

**19.5** <u>Counterparts</u>. This Lease may be executed in several counterparts, and all counterparts shall constitute one and the same instrument.


**IN WITNESS WHEREOF,** Landlord and Tenant have respectively signed and sealed this Lease as of ___12-1~02___ , 200_1_.


**NORTHWEST HEALTH CARE**      **CAPITOL DIALYSIS, LLC**
  **CENTER**


By: _____        By: _____

TITLE: _Regional Vice President_    TITLE: _C.O.O._

1806077                            _American Renal Associates, Inc._

# GOVERNMENT OF THE DISTRICT OF COLUMBIA
## Department of Health

State Health Planning and
Development Agency



August 20, 2007

Kathleen M. Stratton, Esq.
Crowell & Moring
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Re:    **Proposal by Capitol Dialysis, LLC to Relocate Six Dialysis Stations —
Certificate of Need Registration No. 07-5-2**

Dear Ms. Stratton:

The D.C. State Health Planning and Development Agency (SHPDA) has approved your application for a Certificate of Need (CON) as referenced above. A statement of findings and the Certificate of Need are enclosed.

Please note that any person may request reconsideration of the review decision within 30 days of this decision. The SHPDA may grant a reconsideration request upon demonstration of "good cause", as defined in D.C. Official Code § 44-412 (b) and Certificate of Need Regulations, 22 DCMR Section 4312.

Thank you very much for your cooperation during the review period. If you have questions concerning this matter, please do not hesitate to contact me.

Sincerely,

Amha W. Selassie
Director

AS:tm

Enclosures

cc:    Robert Maruca
Sharon Lewis

825 North Capitol Street, N.E., 3rd Floor, Washington, D.C. 20002    (202) 442-5875

GOVERNMENT OF THE DISTRICT OF COLUMBIA
**Department of Health**

State Health Planning and
Development Agency



## DISTRICT OF COLUMBIA
## STATE HEALTH PLANNING AND DEVELOPMENT AGENCY
### Notice of Official Action
### Certificate of Need
### Number 07-5-2

Capitol Dialysis, LLC is hereby awarded this Certificate of Need in conformance with the District of Columbia Certificate of Need statute, D.C. Official Code § 44-401 et. seq. for the relocation of six dialysis stations from Northwest Health Care Center located at 3333 Wisconsin Ave., NW to the Washington Center for Aging Services located at 2601 18th Street, NE. The dialysis stations are approved to provide services only to patients that reside in the nursing facility.

This issuance is based on all specifications contained in the Certificate of Need application and related documents in the record. Deviations from the specifications are allowable pursuant to the statute. The capital expenditure associated with this project is $417,000. The State Health Planning and Development Agency herewith makes all findings applicable to this issuance as required by the statute.

This Certificate of Need is valid until August 20, 2008 unless: (1) its issuance is revoked following a public hearing held for reconsideration of this issuance in accordance with DC Official Code § 44-412, or further proceedings in accordance with DC Official Code § 44-403 or 44-414; (2) it is withdrawn in accordance with DC Official Code § 44-411; or (3) it is terminated because the State Health Planning and Development Agency has certified that operations may begin in accordance with DC Official Code § 44-409.

Unless this Certificate of Need has been revoked, withdrawn, or terminated, quarterly progress reports must be submitted to the State Health Planning and Development Agency on November 20, 2007, February 20, 2008, May 20, 2008 and August 20, 2008. The reports should also be submitted quarterly until the project is completed.

Notification of the proposed date for the initiation of operation of the facility or service approved herein should be provided to the State Health Planning and Development

---

825 North Capitol Street, N.E., 3rd Floor, Washington, D.C. 20002    (202) 442-5875

Agency no later than thirty days prior to the proposed date for the initiation of operation so that the review required by DC Official Code § 44-409 may be conducted.

Signed this 20th day of August 2007.

Sincerely,

Amha W. Selassie
Director

AS:tm

2

GOVERNMENT OF THE DISTRICT OF COLUMBIA
Department of Health

**State Health Planning and
Development Agency**



# DISTRICT OF COLUMBIA
## STATE HEALTH PLANNING AND DEVELOPMENT AGENCY
### CERTIFICATE OF NEED REVIEW
### FINDINGS IN THE MATTER OF:
### CAPITOL DIALYSIS, LLC
### CERTIFICATE OF NEED NO. 07-5-2

The findings contained in this document were developed in conformance with Certificate of Need (CON) review criteria required by D.C. Code § 44-409, and contained in regulations, 22 DCMR 4050 et. seq. These findings reflect my assessment of the information in the project record, and its consistency with the applicable considerations, standards and criteria for CON review. These findings are based on all specifications contained in the CON application and all related documents and testimony submitted to the record.

The findings take into account the recommendations of both the Project Review Committee (PRC) and the Statewide Health Coordinating Council (SHCC) in their respective deliberations on July 19, 2007 and August 16, 2007.

## A.    Overview of the Applicant and the Proposed Project:

The Applicant states that Capitol Dialysis currently operates six dialysis stations at Northwest Health Care Center, a skilled nursing facility located at 3333 Wisconsin Ave., NW. Capitol Dialysis was recently notified by the owners of Northwest that it intends to close the nursing facility. According to the Applicant, in order to continue to meet the high demand for dialysis services in nursing homes, Capitol Dialysis must now relocate the six dialysis stations currently operated at Northwest to another facility. Capitol

---

825 North Capitol Street, N.E., 3rd Floor, Washington, D.C. 20002   (202) 442-5875

Dialysis intends to relocate the six stations to the Washington Center for Aging Services located at 2601 18th Street, NE.

The Applicant maintains that Capitol Dialysis was established in 1999 to own and operate an outpatient facility that would provide high quality dialysis services to renal patients living in the District. Capitol Dialysis is a joint venture owned by Jay Ocuin, M.D. and Anthony Bivins, M.D. and American Renal Associates, Inc. (ARA) of Danvers, Massachusetts. Drs. Ocuin and Bivins have been practicing nephrologists in the District for over 25 years, and the Applicant maintains, are sensitive to the special needs of the renal patients in the area. The Applicant states that Capitol Dialysis is committed to providing high quality dialysis services and building long term relationships with patients, staff, local providers and other members of the renal community.

The Applicant reports that the Washington Center for Aging Services is a duly licensed skilled nursing facility and has a good reputation in the community for providing high quality care to its nursing home residents. Over the last three years, the Washington Center for Aging Services has had an average of ten to fifteen residents requiring dialysis services. The Applicant continues that given this relatively high demand for dialysis services among its own patient population, the Washington Center for Aging Services was very receptive to Capitol Dialysis's proposal to operate dialysis stations on site at the nursing home for its residents.

The capital expenditure associated with this project is $417,000, and the project is scheduled to be operational soon after certificate of need approval.

B.    **Review Findings and Conclusion**

1.    **Need for the Proposed Project:**

The Applicant maintains that upon the closure of Northwest Nursing Center, and the proposed closure of Grant Park nursing facility, there will be no nursing facility in the District which provides dialysis services to its residents. The Applicant states that the

proposal to establish six stations at the Washington Center for Aging Services is justified for the following reasons:

1. Under the existing healthcare delivery system in the District, nursing home residents in need of dialysis services are forced to travel long distances and endure several hours away from home, three days a week.

2. Nursing home residents who are on dialysis are among the most chronically ill, often suffering from multiple conditions in addition to their renal disease. Traveling outside the nursing facility for up to seven hours for each treatment day places these residents at additional clinical risk of injury and further medical complications.

3. The District of Columbia, the Washington Center for Aging Services and the dialysis patient's family are forced to incur considerable expense each year for transportation costs under the current system for dialysis patients residing in nursing homes.

4. The six stations proposed in this project will serve only the residents of the Washington Center for Aging Services and thus will have minimal, if any, impact on existing providers of dialysis services in the District.

5. These six stations can be established at the Washington Center for Aging Services at not cost to the District, and will not result in any increase in the cost of delivering dialysis services to the residents of the Washington Center for Aging Services. To the contrary the District's cost will significantly decrease with the elimination of transportation services and with the reduction in lengths of stay in the acute inpatient hospital setting for these patients.

The Applicant states that the proposed relocation of six dialysis stations from Northwest to the Washington Center for Aging Services is necessitated by the closure of

3

Northwest. Additionally, the Applicant maintains that the District continues to need on-site dialysis services for nursing home patients and that the services can best be met by the proposed relocation. Given that the proposal is for the relocation of existing stations, Capitol Dialysis envisions a minimum impact from this project on other dialysis facilities.

The Applicant states that no patient will dialyze at the Washington Center for Aging Services unless they are a resident at the nursing home. Capitol Dialysis asserts that it had utilization rate of 100% last year and expects that it will be able to continue to serve at this rate at the Washington Center for Aging Services without much difficulty. Once patients hear that the Washington Center for Aging Services has dialysis services on site, patients will want to live there.

After a careful review of the information, staff has determined, and I concur, that the Applicant has justified the proposed project. As the Northwest Center is closing the dialysis facility has no choice but to relocate. This project will help meet the need for nursing home dialysis services. According to data collected by the SHPDA from the Mid Atlantic Renal Coalition, Capitol Dialysis had an average utilization rate of 96% at the Northwest nursing home in 2004 and 2005. Based on this information, I am satisfied that Capitol Dialysis has demonstrated the need for the proposed relocation of six dialysis stations to the Washington Center for Aging Services.

2.    **Accessibility:**

The Applicant states that no patient will dialyze at the Washington Center for Aging Services unless they are a resident at the nursing home. The capacity of the facility is based on six stations, three shifts per day, and six days a week for a total of 36 patients. Capitol Dialysis' goal is to continue to meet the needs of patients requiring renal dialysis by improving the quality, increasing flexibility, focusing on patient care, and emphasizing physician involvement in the provision of renal dialysis services.

4

The Applicant maintains that given the health status of the individuals seeking access to renal dialysis services, and the existence of the federal End Stage Renal Disease Program which provides Medicare coverage to all persons with end stage renal disease, access to services is facilitated. Capitol Dialysis is committed to treating all patients regardless of race, ethnic background or ability to pay. Additionally, the Applicant notes that given the location of the facility within the Washington Center for Aging Services, the proposed six stations will be accessible to handicapped and disabled persons.

During the Project Review Committee consideration of the project, the SHPDA learned that the Applicant had discontinued the provision of dialysis services at the Norwest nursing facility. According to testimony from the Health Regulation Administration (HRA), services were discontinued without providing prior notice to the regulating agencies. It was not clear why the Applicant discontinued services and where the patients were receiving their care. Concern was also expressed that the discontinuation of services may jeopardize the Applicant's provider agreement with the Centers for Medicare and Medicaid Services.

The Applicant subsequently has informed the SHPDA that the patients are receiving dialysis services at different facilities and that no patient has gone without dialysis services. The Applicant has also stated that should a similar circumstance arise, it will work with the regulatory agencies to ensure an orderly transfer of patients. The Applicant further maintains that it is prepared to dialyze any of the residents at Northwest should their medical condition warrant it.

I am, therefore, satisfied that the Applicant is consistent with the criteria and standards for accessibility of services.

3.    **Quality:**

The Applicant has indicated that Capitol Dialysis will meet and exceed the quality standards that apply to staff- assisted dialysis services. Capitol Dialysis is currently

5

Medicare and Medicaid certified. The Applicant states that Capitol Dialysis has instituted a quality assurance program that incorporates the standards for delivery of quality dialysis treatment as established by the End Stage Renal Disease Network 5 and the Renal Physicians Association. Capitol Dialysis will coordinate its quality assurance program with Washington Center for Aging Services in order to achieve a consistent approach to quality assurance that meets the requirements of both entities.

The Applicant maintains that Capitol Dialysis and ARA have an organizational commitment to retention of current staff, which is why all current staff at Northwest will be transferred to the Washington Center for Aging Services. The staffing ratio proposed for the six stations is 1:3 staff to patient ratio, which is in compliance with national standards. The Capitol Dialysis's nurse manager and technical manager will coordinate the staffing process. The Applicant has indicated that Capitol Dialysis and the Washington Center for Aging Services have agreed to work together to provide joint education and training sessions on a quarterly basis directed to the clinical staffs of both entities. These sessions will include specific training in the care of the geriatric patient, and the impact of ESRD and dialysis treatment on the elderly. Capitol Dialysis will conduct testing on an annual basis to ensure the effectiveness of the training.

The Applicant reports that a quality improvement plan will be implemented that is built around the medical information system, Capitol Dialysis's own clinical policies and procedures, and the Washington Center for Aging Services' quality improvement process. All clinical policies and procedures will be reviewed and approved by medical directors Dr. Ocuin and Dr. Bivins and the governing body of Capitol Dialysis. The Applicant indicates that a multidisciplinary team comprised of the Center's Medical Directors, nurse manager, technical manager, social worker, and dietitian will meet at least once a month as members of the Total Quality Management Committee. This committee will also be responsible for overseeing and implementing the quality improvement program for the stations at Washington Center for Aging Services, including review of all pertinent logs for water quality.

6

The Applicant maintains that Capitol Dialysis is proposing to offer high quality dialysis services. In this regard, the stations at the Washington Center for Aging Services will be equipped with state of the art dialysis equipment, an information system that will coordinate all patient information, lab results and treatment data, and a highly qualified management team.

After a careful review of the application, I have determined that Capitol Dialysis is in conformance with the criteria and standards for quality of care.

4.    **Continuity**:

According to the Applicant, the establishment of six dialysis stations at the Washington Center for Aging Services will have a positive impact on the continuity of care provided to the dialysis patients residing there. Under the existing delivery system for dialysis services, the Washington Center for Aging Services has responsibility for the plan of care and the delivery of services to each patient. Having dialysis stations on-site as proposed in this application will allow the Washington Center for Aging Services to play a much more active role in the delivery of services to its dialysis patients. The Capitol Dialysis staff will interact with the Washington Center for Aging Services staff, allowing for much more frequent and open exchange of clinical information about the dialysis patient's condition. Medications and care will not be missed or delayed due to travel, all of which will result in an improvement in continuity and quality of care provided to each patient.

The Applicant reports that Capitol Dialysis has transfer agreements and coordination agreements with the Washington Hospital Center and Providence Hospital to assure continuity of care for the patients, and will renew those agreements at the new facility. The Washington Center for Aging Services already has in place transfer and coordination agreements with the Washington Hospital Center and Providence Hospital.

I have, therefore, determined that the Applicant is consistent with the criteria and standards for continuity of care.

7

5.    **Acceptability:**

The Applicant states that Capitol Dialysis provides quality health care services and has established the necessary procedures to ensure that consumers are satisfied with services provided. Capitol Dialysis has a procedure for regular consumer contribution that permits full and open discussion between staff/administration and consumers. Capitol Dialysis provides each patient within the first three weeks of treatment, a patient satisfaction questionnaire that solicits comments and/or grievances they may have about the services received. Additionally, any letter from a patient complaining about the medical care, billing issues or other services will be promptly answered in writing through the grievance procedure. The consumer grievance will be coordinated with the process by the Washington Center for Aging Services for its residents.

The Applicant has indicated that Capitol Dialysis maintains a Bill of Patient Rights, and seeks to ensure that these rights are upheld via a grievance process, where patients have the right to voice their issues of concern. Capitol Dialysis expects its staff to resolve routine patient/parent complaints at the point of service. All patient complaints will receive prompt and appropriate responses, when a complaint is not resolved to the customer's satisfaction or remains unresolved, staff will refer it to the medical directors.

According to the Applicant, notification of this project has been provided to the local Advisory Neighborhood Commission (ANC). The SHPDA, however, has not received correspondence from the ANC regarding this project.

Based on this information, I am satisfied that the Applicant is in conformance with the criteria and standards for acceptability of services.

6.    **Financial Feasibility:**

A review of the Applicant's financial statements shows that it has the funds to finance the project, and an analysis of its financial projections also shows that the project will

·8

generate more revenues than expenses. Capitol Dialysis will lease space from the Washington Center for Aging Services.

I am, therefore, satisfied that the Applicant is consistent with the criteria and standards for financial feasibility.

### C.    Compliance with Uncompensated Care Requirements:

The Applicant has reiterated its commitment to provide uncompensated services to needy patients at the Washington Center for Aging Services. I am, therefore, satisfied that the Applicant is consistent with the requirements.

### D.    Conclusion:

After careful review of the application, the staff report as well as the recommendations of the Project Review Committee (PRC) and the Statewide Health Coordinating Council (SHCC), I have determined that the Applicant has justified the proposed project. The relocation of the dialysis facility is necessitated by the closure of the Northwest Health Care Center. This project will help meet the need for nursing home dialysis services. According to data collected by the SHPDA from the Mid Atlantic Renal Coalition, Capitol Dialysis had an average utilization rate of 96% at the Northwest nursing home in 2004 and 2005. Moreover, Capitol Dialysis has demonstrated that it has the experience and track record to provide quality services. I have, therefore, concluded that Capitol Dialysis should be awarded a certificate of need to relocate six dialysis stations from Northwest Health care Center to the Washington Center for Aging Services located at 2601 18th Street, NE, at a cost not to exceed $417,000.

__August 20, 2007__
Date

Amha W. Selassie
Director

9

## HEALTH CARE SERVICES AGREEMENT

*(Dialysis Services – Outpatient)*

This Health Care Services Agreement ("Agreement") is by and between Beverly Health and Rehabilitation Services Inc.[1], d/b/a Northwest Health Care Center[2] ("Facility"), and Capitol Dialysis, LLC ("Contractor"). Any notices or other communications required or permitted to be given pursuant to this Agreement shall be sent to the parties at the addresses set forth on the signature page to this Agreement.

**1. Term.** This Agreement shall commence on June 12, 2004 and shall expire at the close of business on June 11, 2005, unless earlier terminated as provided herein. Thereafter, this Agreement shall automatically renew for successive terms of one (1) year each unless either party gives written notice of non-renewal to the other party at least sixty (60) days prior to the expiration of the then-current term. In the event this Agreement is terminated prior to one year from the commencement date, the parties shall not enter into a substantially similar agreement until the expiration of at least one (1) year following the commencement date.

**2. Services and Compensation.** Contractor shall provide the services to Facility and its residents (the "Services"), and shall receive compensation for those Services, as set forth on <u>Exhibit A</u> attached hereto and incorporated herein by reference.

**3. Payment.** In the event Facility is required by the compensation provisions set forth in <u>Exhibit A</u> to pay Contractor directly for the Services, Facility shall pay Contractor within sixty (60) days of receipt by Facility of Contractor's accurate and complete invoice containing all documentation required by Facility, including a line item list of all Services provided by Contractor for each resident to include HCPCS or other applicable coding, service date(s), quantities and charges. Invoices submitted later than one hundred twenty (120) days following the date the Service was provided shall be deemed untimely, and Facility shall not be required to pay Contractor for such Services.

**4. Termination.** This Agreement may be terminated as follows:

a. *Without Cause.* Either party may terminate this Agreement without cause by providing at least sixty (60) days prior written notice to the other party.

b. *Breach.* Either party shall have the right to terminate this Agreement in the event of the other party's breach of this Agreement by providing at least thirty (30) days written notice to the other party. Any such notice shall specify the cause upon which it is based. The violating party shall have the thirty (30) day notice period in which to rectify the cause specified in the notice of termination, or, if such cause is not rectified to the satisfaction of the non-breaching party within such thirty (30) day period, this Agreement shall thereupon automatically terminate.

c. *Material Change.* To the extent that changes in laws, regulations, or the method or amount of reimbursement require the restructuring of the relationship between the parties established by this Agreement, the parties shall negotiate in good faith to amend this Agreement and otherwise restructure their relationship in order to effectuate their mutually agreed upon purposes. If the parties are unable to resolve the matter within thirty (30) days, either party may, at its option, immediately terminate this Agreement.

d. *Immediate Termination.* Facility may immediately terminate this Agreement upon the occurrence of any of the following events: (i) loss or suspension of any license of Contractor required for the provision of Services pursuant to this Agreement or the imposition of any sanction against Contractor under federal or state fraud and abuse laws and regulations or any other federal or state laws or regulations relating to Contractor's participation in the Medicare or state Medicaid programs; (ii) appointment of a receiver for Contractor's assets, an assignment by Contractor for the benefit of its creditors or any relief taken or suffered by Contractor under any bankruptcy or insolvency act; or (iii) any jeopardy to the health or safety of residents of the Facility.

---

[1] Name of corporate subsidiary
[2] Name of facility

e. *Automatic Termination.* This Agreement shall automatically terminate in the event either party is excluded from participation in any federally funded health care program, including Medicare or Medicaid, as of the effective date of such exclusion.

**5. General Terms and Conditions.** The General Terms and Conditions set forth on Exhibit B attached hereto are incorporated herein by reference as though fully set forth herein. Facility and Contractor shall comply with the General Terms and Conditions as part of this Agreement.

**6. Entire Agreement.** This Agreement, including the Exhibits attached hereto and referenced herein, contains the sole and entire agreement between the parties regarding the subject matter hereof and supersedes any and all prior written or oral agreements between the parties.

**IN WITNESS WHEREOF,** the parties by their duly authorized representatives have entered into this Agreement as of the _____ day of _____, 2004.

**FACILITY:**
Beverly Health and Rehabilitation Services, Inc.[1]
d/b/a Northwest Health Care Center[2]

By: _____
Executive Director

Accepted By: _____
Director of Operations

Address for Notices:
Northwest Health Care Center

3333 Wisconsin Avenue, NW

Washington, D.C. 20016

Facsimile: 202-244-7110

Copy to:
Beverly Health and Rehabilitation Services, Inc.
c/o Beverly Enterprises, Inc.
Law Department
One Thousand Beverly Way
Fort Smith, Arkansas 72919

**CONTRACTOR:**
Capitol Dialysis, LLC

By: _____

Name: Joseph A. Carluci

Title: C.O.O.

Address for Notices:
Capitol Dialysis, LLC

140 Q Street, NW

Washington, D.C.

Facsimile: _____

---

[1] Name of corporate subsidiary
[2] Name of facility

<u>Exhibit A</u>

<u>Outpatient Dialysis Services and Compensation</u>

1. **Services.**

   a.   Contractor shall provide, on a non-exclusive basis, outpatient dialysis services to residents of the Facility with end-stage renal disease, pursuant and subject to the order(s) of such resident's physician and in accordance with each resident's plan of care. Services shall include, without limitation:

   i.   *Chronic* Acute hemodialysis treatments and the care and services customarily furnished or related to such treatments;

   ii.   Complete and appropriate documentation of each Service received by residents as well as any reaction to a Service received;

   iii.   Consulting with and updating Facility staff regarding the care, monitoring and treatment of residents receiving Services; and

   iv.   Scheduling and documentation of services.

   b.   The Services shall be provided at Contractor's outpatient facility (the "Dialysis Unit"), which is operated as a certified renal dialysis facility under the Medicare End Stage Renal Disease Program.   When a resident is transferred to Contractor for Services, Contractor shall provide Services promptly and in accordance with the medical needs of the residents.

   c.   Contractor will furnish all equipment, supplies and medications necessary to provide the Services and is solely responsible for waste handling as well as sterilization and disinfection of such equipment.  Contractor shall maintain its equipment in good operating condition and repair and in accordance with manufacturer's recommendations and applicable law.

   d.   Facility shall arrange for the transportation of residents receiving Services hereunder to and from the Dialysis Unit at no cost to Contractor.  When a resident is transferred to the Dialysis Unit for Services, the Facility shall:  (i) transmit resident information necessary for Contractor's delivery of Services and in accordance with applicable law; (ii) make resident records available to Contractor as necessary for the provision of Services and in accordance with applicable law; and (iii) provide Contractor with written orders for Services and/or prescriptions for treatment from residents' physicians or other person(s) authorized to place such orders on behalf of residents.

   e.   The parties agree that emergencies involving residents receiving Services hereunder shall be handled as follows:

   i.   Facility and Contractor agree that, in the event of a medical emergency, the party that has custody of the resident will provide or make arrangements for the provision of emergency care and will also contact the resident's attending physician and responsible party.  The party who has custody of the resident during a medical emergency will make sure proper documentation of the medical emergency is made.

   ii.   In the event of a non-medical emergency, Facility and Contractor agree that the party who has custody of the resident will attempt to handle the problem.  If the problem affects the provision of Services to the resident, the party that has custody of the resident will contact the other party as well as the resident's attending physician and/or responsible party.  If the problem does not affect the provision of Services to the resident, then the party that has custody of the resident will contact the other party and inform them of the resolution of the problem.  The party that has custody of the resident will make sure that proper documentation of the non-medical emergency is made.

   f.   Contractor shall provide Facility information on all aspects of the management of the care of residents related to the Services provided to such residents hereunder, including without limitation, directions on bleeding/hemorrhage, infection/bacteria, and care and disinfection of dialysis access site.

2.  **Compensation.**  Contractor shall invoice the resident, the resident's responsible party, Medicare, Medicaid, a managed care organization or any other third party reimbursement source (collectively referred to as the

"Appropriate Payor") for all Services provided to residents of the Facility at rates not to exceed Contractor's reasonable and customary charges for Services and in accordance with applicable requirements of federal and state laws and regulations. Contractor agrees to accept payments from such Appropriate Payors as payment in full for Services rendered under this Agreement. Contractor shall not bill Facility for Services provided hereunder to residents, and Facility shall have no obligation to compensate Contractor for such Services.

**Exhibit B**

**General Terms and Conditions**

1.  **Incorporation by Reference.** These General Terms and Conditions are incorporated by reference into the Agreement to which they are attached. Capitalized terms not defined herein shall have the meaning set forth in the Agreement.

2.  **Licenses, Permits and Accreditations.** The Facility, in accordance with applicable law, is responsible for obtaining Services that meet professional standards and principles that apply to professionals providing such Services in the Facility and for the timeliness of the Services. Accordingly, Contractor hereby represents and warrants to the Facility that Contractor and each of its employees, agents and subcontractors who perform Services on behalf of Contractor pursuant to this Agreement (the "Contractor Personnel"): (a) are, and will remain at all times throughout the term of this Agreement, authorized to participate in the Medicare and state Medicaid programs and shall comply with all conditions of participation or other requirements applicable to participation in such programs; (b) have, and will maintain at all times throughout the term of this Agreement, all the necessary qualifications, certifications, licenses and/or accreditations required by federal, state and local laws and regulations to provide the Services covered by this Agreement (collectively, "Contractor Licenses"); (c) will provide the Services in accordance with the professional standards and principles applicable to their profession; and (d) are not, and at no time have been, excluded from participation in any federally funded health care program, including Medicare or Medicaid, or sanctioned under any applicable state or federal fraud and abuse statutes. Contractor will provide Facility with a copy of the Contractor Licenses upon request. Contractor shall provide prompt written notice to the Facility of any changes in the Contractor Licenses, including any temporary or permanent suspension or revocation of any Contractor License, or any sanction or proposed sanction or exclusion against Contractor, or any officer, director or owner of Contractor, in connection with participation in any federally funded health care program.

3.  **Compliance.** Contractor shall provide, and shall ensure that the Contractor Personnel provide, the Services to Facility's residents in accordance with (a) all applicable requirements of federal, state or local laws, rules and/or regulations, including official interpretations of those requirements by the entities charged with implementing and enforcing them, including, without limitation, nondiscrimination on the basis of race, color, national origin, handicap, age, or other protected class; (c) accepted professional standards of practice; and (c) all Facility policies and procedures and any revisions thereto that are applicable to the provision of Services to Facility residents, copies of which shall be provided to Contractor. Contractor shall participate, as reasonably requested, in quality monitoring programs established by Facility.

4.  **Corporate Compliance Program.**

    a.  Contractor acknowledges Facility's Corporate Compliance Program and receipt of Facility's Code of Conduct, including its mechanism for reporting suspected fraud, abuse or other illegal or unethical activities (Hotline (800) 572-9981). If Contractor has its own compliance program, Contractor represents and warrants that the Contractor Personnel who provide billing services or patient care services with respect to federal health care program beneficiaries at Facility shall read and understand Contractor's integrity brochure, which includes its standards of conduct, prior to commencement of Services under this Agreement. To the extent that Contractor's standards of conduct and integrity program differ in any material respect affecting ethical conduct from the compliance information and requirements contained in the Facility's Code of Conduct, Contractor shall inform the Contractor Personnel of such additional information and requirements and that Facility has a mechanism for reporting misconduct. Contractor agrees to obtain and retain a signed certification from each of the Contractor Personnel providing Services to the Facility that they have received, read and understand Contractor's integrity program, including its standards of conduct and any additional information provided by Contractor's Compliance Officer relating to Facility's Code of Conduct and agree to abide by such requirements therein. Such certification shall be obtained prior to commencement of Services under this Agreement, shall be maintained by Contractor and shall be made available for review by Facility or Facility's agents upon reasonable request.

    b.  If Contractor does not maintain a compliance program Contractor represents and warrants that each of the Contractor Personnel who provide billing services or patient care services with respect to federal health care program beneficiaries at Facility shall read and review Facility's Code of Conduct prior to commencement of Services under this Agreement. Contractor agrees to obtain and retain a signed certification from each of the

Contractor Personnel providing Services to the Facility that they have received, read and understand Facility's Code of Conduct and agree to abide by the requirements of Facility's Corporate Compliance Program. Such certification shall be obtained prior to commencement of Services under this Agreement, shall be maintained by Contractor and shall be made available for review by Facility or Facility's agents upon reasonable request.

**5.  Patient Records.**  Facility and Contractor shall each prepare and maintain records concerning Facility's residents receiving Services under this Agreement, in accordance with applicable federal and state laws, regulations and program guidelines. Contractor shall provide to Facility documentation of the Services provided to, and any other relevant information regarding Contractor's contact with, Facility residents hereunder. If the Services are provided on the Facility premises, such documentation shall be made in the residents' medical record or chart, which shall be and remain the property of the Facility. If the Services are provided off of the Facility premises, such documentation shall be on the forms and in the format required by Facility policies and procedures in accordance with applicable laws, regulations and program guidelines. Contractor hereby agrees to maintain the confidentiality of all information and records relating to Facility's residents which it acquires in the course of performing the Services and to assure that such confidentiality is maintained by each of the Contractor Personnel providing Services pursuant to this Agreement.

**6.  HIPAA Compliance.**  For purposes of compliance with the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E (the "Privacy Rule"), *only if and to the extent that* Contractor is acting as a business associate (as defined by the Privacy Rule) of Facility, this Section shall apply.

a.  Capitalized terms used, but not otherwise defined in this Agreement, shall have the same meaning as those terms in the HIPAA regulations, and the following capitalized terms shall be given the following meanings:

i.  "Disclose" and "Disclosure" mean, with respect to Protected Health Information, the release, transfer, provision of access to, or divulging in any other manner of Protected Health Information outside Contractor's internal operations or to other than its employees.

ii.  "Protected Health Information" or "PHI" means information, including demographic information that (A) relates to the past, present or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present or future payment for the provision of health care to an individual; (B) identifies the individual (or for which there is a reasonable basis for believing that the information can be used to identify the individual); and (C) is received by Contractor from or on behalf of Facility, or is created by Contractor for Facility, or is made accessible to Contractor by Facility.

iii.  "Use" or "Uses" mean, with respect to Protected Health Information, the sharing, employment, application, utilization, examination or analysis of such Protected Health Information within Contractor's internal operations.

b.  Insofar as Contractor has access to, has been provided with, or will be creating PHI of Facility's residents, Contractor agrees as follows:

i.  Contractor shall not Use or Disclose PHI other than as permitted or required by this Agreement or as required by law.

ii.  Contractor agrees to use appropriate safeguards to prevent the Use or Disclosure of PHI in any manner other than as provided for by this Agreement. Such safeguards shall include administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of any electronic PHI that it creates, receives, maintains, or transmits on behalf of Facility.

iii.  Contractor agrees to notify Facility of any Use or Disclosure of PHI not provided for by this Agreement of which it becomes aware. This reporting obligation includes, without limitation, the obligation to report any Security Incident, as that term is defined in 45 C.F.R. § 164.304.

iv.    Contractor agrees to make its internal practices, books and records relating to the Use and Disclosure of PHI available to the Secretary of the Department of Health and Human Services for purposes of determining Facility's compliance with HIPAA.

v.    If Contractor maintains PHI in a Designated Record Set, Contractor shall: (A) make PHI specified by Facility available to the individual(s) identified by Facility as being entitled to access and copy that PHI in order for Facility to comply with its obligations under HIPAA and (B) make any amendments to PHI as directed by Facility.

vi.    Contractor shall provide to Facility upon Facility's request (or to an Individual or Personal Representative, upon his/her request) an accounting of each Disclosure of PHI by Contractor or its employees, agents, representatives or subcontractors, which was made for purposes other than those listed in 45 C.F.R. § 164.528(a)(1).  Any accounting provided by Contractor under this subsection shall include:  (A) the date of the Disclosure; (B) the name, and address if known, of the entity or person who received the PHI; (C) a brief description of PHI disclosed; and (D) a brief statement of the purpose of the Disclosure.  For each Disclosure that could require an accounting under this subsection, Contractor shall document the information specified in (A) through (D), above, and shall securely retain this documentation for six (6) years from the date of the Disclosure.

vii.    Upon termination or expiration of this Agreement, Contractor shall return or destroy, if feasible, all PHI.  However, if neither return nor destruction of PHI is feasible, Contractor may retain PHI provided that Contractor: (A) continues to comply with the applicable provisions of this Section for as long as it retains PHI and (B) limits further Uses and Disclosures of PHI to those purposes that make the return or destruction of PHI infeasible.

viii.    Contractor agrees to ensure that each of its agents and subcontractors who receive PHI from Contractor hereunder and who are not a party to this Agreement agrees to the same restrictions and conditions in this Section with respect to such PHI.

c.    Contractor's obligations under this Section shall survive the expiration or termination of this Agreement to the extent required in order to comply with applicable law.

**7.    Record Retention Requirements.**

a.    All records created by Contractor in connection with the provision of Services pursuant to this Agreement, including patient records and records related to billing and payment, shall be retained by Facility and Contractor for a period of seven (7) years from the date the Service was provided or such greater time period as may be required by applicable law.  Facility shall be permitted to inspect and/or duplicate any patient record, chart or other record of Contractor relating to the provision of Services hereunder by Contractor for any business purpose, including, without limitation, determining Contractor's compliance with the terms of this Agreement; ensuring safe, dependable and efficient patient care; satisfying Facility's obligations to any patient; or defending any allegation of malpractice or other liability against Facility.

b.    To the extent the value or cost of Services furnished under this Agreement is $10,000 or more over a twelve month period, then Contractor, for a period of four (4) years after the furnishing of such Services, shall retain and shall make available upon written request by the Secretary of the Department of Health and Human Services, the Comptroller General, or their authorized representatives, a copy of this Agreement and all books, documents and records that are necessary to certify the nature and extent of the costs incurred by Facility under this Agreement.  Contractor further agrees that in the event Contractor carries out any of its duties under this Agreement through a permitted subcontract with a related organization with a value or cost of $10,000 or more over a twelve month period, such subcontract shall contain a provision requiring the related organization, for a period of four (4) years after the furnishing of such Services, to retain and to make available upon written request by the Secretary of the Department of Health and Human Services, the Comptroller General, or their authorized representatives, a copy of such subcontract and all books, documents and records of such organization that are necessary to verify the nature and extent of such costs.  Contractor agrees to notify the Facility promptly of the nature and scope of any governmental request for access to books and records related to this Agreement and to provide to the Facility, or make available, copies of any books, records or documents proposed to be provided.  Any disclosure under this paragraph shall not be construed as a waiver of any other legal rights to which such party may be entitled.

c.    This Section shall survive the expiration or termination of this Agreement.

**8. Background Checks; Substance Abuse.**

a.    Contractor, at its sole cost and expense, shall conduct criminal background checks on the Contractor Personnel that provide Services on behalf of the Facility.  Such background checks (i) shall cover the previous seven (7) years; (ii) shall be conducted in accordance with applicable state law; and (iii) must be based on information provided by the appropriate state or local law enforcement agency, if so required by applicable state law.  Contractor shall not assign to the Facility any Contractor Personnel who have been convicted of or have pled guilty to the following crimes: theft; sexually deviant behavior, assault and/or battery; abuse of the elderly, children or vulnerable individuals; health care fraud; or other criminal conviction related to the Services being provided to the Facility.

b.    Contractor, at its sole cost and expense, shall conduct substance abuse testing and testing pertaining to bloodborne pathogens on the Contractor Personnel that provide Services on behalf of the Facility.  Such substance abuse testing shall be conducted by an independent laboratory that is certified by the Department of Health and Human Services.  Contractor shall not assign to the Facility any Contractor Personnel who are determined, after appropriate testing, to be engaged in substance abuse.

**9. Insurance.**  Contractor shall, at its sole cost and expense, procure, keep and maintain throughout the term of this Agreement, insurance coverage in the minimum amount of one million dollars ($1,000,000) per occurrence and two million dollars ($2,000,000) annual aggregate, for professional liability, negligence, errors and omissions, and commercial general liability and applicable state statutory limits for workers compensation.  Said insurance policies shall cover all services Contractor, its directors, officers, employees, agents and/or contractors provide.  Contractor shall provide Facility with evidence of such insurance promptly upon request.  In the event Contractor procures a "claims made" policy to meet the insurance requirements herein, Contractor agrees to purchase "tail" coverage upon the termination of any such policy providing for an indefinite reporting period.

**10. Indemnification.**  Each party shall indemnify, defend, and hold the other party harmless from and against any and all losses, claims, suits, damages, liabilities and expenses (including, without limitation, reasonable attorneys' fees) of any nature or kind whatsoever arising out of or resulting from, directly or indirectly: (a) a party's breach of this Agreement, including, without limitation, breach of any representation, warranty, or covenant of such party in this Agreement; and (b) any alleged negligent or intentional acts or omissions of a party, its agents or employees, based upon, arising out of or attributable to the performance or non-performance of their respective obligations under this Agreement.  Upon notice, the other party shall resist and defend, at its own expense, any such claim or action.  Said indemnity is in addition to any other rights the indemnified party may have against the indemnifying party.  This Section shall survive the expiration or termination of this Agreement.

**11. Independent Contractor.**  In carrying out its duties hereunder, Contractor shall be an independent contractor with respect to the Facility, and shall not be subject to any right of control, or any control in fact, by Facility over the methods by which Contractor carries out its duties.  Neither this Agreement nor the exercise of any of the authority granted to Facility hereunder shall be deemed to create any partnership, joint venture, association or other relationship between Facility and Contractor other than that of an independent contractor relationship.

**12. Arbitration.**  Any dispute or controversy arising under this Agreement or any amendment hereof or the breach hereof shall be settled by arbitration in the county in which the Facility is located, in accordance with the rules of the American Health Lawyers Association Alternative Dispute Resolution Service and applying the laws of the State in which the Facility is located.  Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction.  During the pendency of any such arbitration and until final judgment thereon has been entered, this Agreement shall remain in full force and effect unless otherwise terminated as provided in this Agreement.  Notwithstanding anything to the contrary in this Section, any party may seek a temporary restraining order or other interim injunctive or provisional relief from a court of proper jurisdiction without first resorting to the arbitration procedures set forth in this Section.  If any such relief is obtained the arbitrator(s) shall address the continuance, modification or termination of such relief in the order and the parties agree to abide by the arbitrator's decision regarding such relief.  This Section shall survive the expiration or termination of this Agreement.

**13. Cumulation of Remedies; No Waiver.**  The various rights, options, elections, powers, and remedies of the respective parties as provided in this Agreement are in addition to any others that said parties may be entitled to by law, shall be construed as cumulative, and no one of them is exclusive of any of the others, or of any right or priority

allowed by law. The failure of a party to exercise any of its rights or to give any notice with respect to any default by the other party or otherwise to insist upon the strict performance of the other party's obligations hereunder shall not be deemed a waiver of such party's right with respect thereto in the future.

**14. Attorney's Fees.** If Contractor or Facility brings any action to interpret or enforce this Agreement, or for damages for any alleged breach hereof, whether by arbitration or otherwise, the prevailing party in any such action shall be entitled to reasonable attorneys' fees and costs as awarded by the arbitrator in addition to all other recovery, damages and costs. This Section shall survive the expiration or termination of this Agreement.

**15. Governing Law; Statutory References.** This Agreement shall be governed by and construed in accordance with the laws of the State in which the Facility is located, without regard to the conflict of laws rules of such State. Any reference in this Agreement to any statute, regulation, ruling, or administrative order or decree shall include and be a reference to any successor statute, regulation ruling, or administrative order or decree.

**16. Force Majeure.** Neither party hereto shall be liable for any delay or failure in the performance of any obligation under this Agreement or for any loss or damage (including indirect or consequential damage) to the extent that such nonperformance, delay, loss or damage results from any contingency which is beyond the control of such party, provided such contingency is not caused by the fault or negligence of such party. A contingency for the purposes of this Agreement shall include Acts of God, fires, floods, earthquakes, explosions, storms, wars, hostilities, blockades, public disorders, quarantine restrictions, embargoes, strikes or other labor disturbances, and compliance with any law, order or control of, or insistence by any governmental or military authority.

**17. Confidentiality.** The parties hereto shall hold in confidence the information contained in this Agreement or other information about a party, and each of them hereby acknowledges and agrees that all information related to this Agreement or other information about a party, not otherwise known to the public, is confidential and proprietary and is not to be disclosed to third persons without the prior written consent of each of the parties except (a) to the extent necessary to comply with any law, rule or regulation, including, without limitation, any rule or regulation promulgated by the SEC, or the valid order of any governmental agency or any court of competent jurisdiction; (b) to its auditors and its attorneys as part of its normal reporting or review procedure; (c) to its insurance agent to the extent necessary to obtain appropriate insurance; or (d) as necessary to enforce its rights and perform its agreements and obligations under this Agreement. This Section shall survive the expiration or termination of this Agreement.

**18. Miscellaneous.** This Agreement may not be modified, amended or supplemented, nor may any term or condition be waived, except by an agreement in writing signed by both parties. Neither this Agreement nor any of the duties or obligations of Contractor hereunder shall be assigned or delegated by Contractor without prior written consent of Facility. Subject to the restrictions against transfer or assignment as herein set forth, the provisions of this Agreement shall inure to the benefit of, and shall be binding on, the heirs, assigns, successors, personal representatives, estates and legatees of each of the parties hereto. This Agreement shall constitute the entire agreement between the parties hereto with respect to the transactions contemplated hereby and shall supersede all prior or contemporaneous negotiations, understandings, and agreements. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement that are not fully expressed herein. If any provision of this Agreement is found to be invalid or unenforceable by any court or other lawful forum, such provision shall be ineffective only to the extent that it is in contravention of applicable laws without invalidating the remaining provisions of this Agreement, unless such invalidity or unenforceability would defeat an essential business purpose of this Agreement.

**19. Survival.** Except as otherwise expressly provided in this Agreement, all covenants, agreements, representations and warranties, express and implied, shall survive the execution of this Agreement.

**20. Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement. Facsimile signatures shall be acceptable as originals. Any individual signing this Agreement on behalf of an entity hereby represents and warrants in his individual capacity that he has full authority to do so on behalf of such entity; provided, however, that Contractor acknowledges and agrees that this Agreement is not binding on the Facility until accepted by the Facility's Director of Operations as evidenced by his or her signature on the Agreement.

10-64282.1                                          B-5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| **CAPITOL DIALYSIS LLC** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )      **Case No. 07-1073 (PLF)** |
| | ) |
| **BEVERLY ENTERPRISES -** | ) |
| **DISTRICT OF COLUMBIA, INC.** | ) |
| **et al.,** | ) |
| | ) |
| **Defendants.** | ) |

_____)

**PROPOSED ORDER DENYING DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

The Court having considered the Motion to Dismiss the First Amended

Complaint of Defendants Beverly Enterprises – District of Columbia, Inc. d/b/a

Northwest Health Care Center and Beverly Health and Rehabilitation Services,

Inc. d/b/a Northwest Health Care Center's (docket entry 12), the Opposition thereto,

any Reply and having heard oral argument,

IT IS HEREBY ORDERED THAT the Defendants' motion to dismiss is

DENIED.

_____
United States District Judge

ENTERED THIS _____ day of _____, 2007