IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CAPITOL DIALYSIS, LLC**<br><br>    **Plaintiff,**<br><br>v.<br><br>**BEVERLY ENTERPRISES - DISTRICT OF COLUMBIA, INC. et al.,**<br><br>    **Defendants.** | Civil Action No. 1:07cv1073 (PLF) |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Defendants Beverly Enterprises–District of Columbia, Inc. and Beverly Health and Rehabilitation Services, Inc. (collectively "Beverly"), respectfully submit this reply memorandum in support of their motion to dismiss the first amended complaint of Capitol Dialysis, LLC ("Capitol"). Capitol's claims should be dismissed with prejudice because the amended complaint ("complaint") fails to state a claim upon which relief can be granted.

**INTRODUCTION**

In its opposition, Capitol attempts to stave off dismissal by transforming the parties' Lease into a multi-purpose agreement with significant duties that were never discussed by the parties, much less memorialized in their written Lease. In this alternate reality, Beverly is not merely a landlord, but rather a referral source with a 20-year unbreakable obligation to supply patients for Capitol to treat. Capitol, for its part, purportedly is not a tenant but rather a joint venturer that committed to treat Beverly's residents exclusively. To complete the transformation, Capitol even gives a new name to the Lease, which the parties decided to entitle "Lease Agreement" when they signed it in 2001. The Lease is now the "On-Site Agreement."

Capitol argues that this transformation is possible because the Lease does not contain an integration clause, or at least not a "full" one. But the Lease assuredly does contain an integration clause. Moreover, a contract is fully integrated notwithstanding the absence of an integration clause when, as here, it fully addresses the subjects that it covers. The Lease comprehensively addresses all of the matters necessary to establish a landlord-tenant relationship. Although Capitol wishes that it had more than just a landlord-tenant relationship with Beverly, Capitol expressly acknowledged when it signed the Lease that "[n]othing contained in this Lease shall be deemed or construed to create . . . any other relationship between the parties hereto other than that of landlord and Tenant." Lease ¶ 19.3. The Lease simply leaves no room for the implied duties that Capitol now wishes it had bargained for, including the 20-year obligation to supply dialysis patients. Duties such as those are so substantial that they would have been included in the contract if an agreement had been reached—they cannot be written into the contract by implication. Accordingly, Capitol's claims for breach of contract and breach of the implied covenant of good faith are fatally flawed and should be dismissed.

Dismissal also is in order with respect to Capitol's remaining claims for breach of fiduciary duty and actual and constructive fraud. The fiduciary duty claim fails because the complaint does not plead a fiduciary relationship. Capitol argues that it was entitled to advance notice of Beverly's confidential business plans because Beverly purportedly held a seat on its Governing Body. But Capitol was unable to cite a single case recognizing this supposed duty, nor was it able to explain why it would be appropriate for the Beverly employee who allegedly attended Capitol's meetings to divulge Beverly's confidential information in violation of her duty of loyalty to Beverly. Therefore, Capitol's fiduciary duty claim should be dismissed, as should Capitol's fraud claims, which concededly depend on the existence of a fiduciary duty.

**ARGUMENT**

I. **COUNT I MUST BE DISMISSED BECAUSE IT DOES NOT STATE A CLAIM FOR BREACH OF CONTRACT.**

Capitol's breach of contract claim suffers from four flaws that Capitol was unable to remedy in its opposition. First, the complaint nowhere alleges a breach of an express provision in the Lease. Second, the plain language of the Lease and the integration clauses it contains preclude Capitol from supplementing the agreement with implied terms. Third, the existence of the Dialysis Agreement dispels any notion that Beverly was obligated to supply Capitol with patients through the duration of the Lease. Finally, the implied terms that Capitol imagines are barred by the statute of frauds. Count I therefore warrants dismissal.

   A. **Capitol Has Not Identified Any Express Provision Of The Lease That Beverly Supposedly Breached.**

Capitol argues that Beverly's interpretation of the Lease is "pinched," and that a more robust reading reveals a variety of express obligations that typically are not found in a conventional commercial lease. Pl. Opp. 12. In particular, Capitol says that the Lease expressly required Beverly to provide Capitol with access to its patients for the 20-year term of the Lease (and thus, impliedly, to operate its nursing home for 20 years). In return, the Lease supposedly obligated Capitol to treat Beverly's patients exclusively for the duration of the Lease. These supposed duties, however, simply cannot be found in any of the Lease provisions that Capitol cites.

According to Capitol, the Lease "*repeatedly* refers to Beverly's obligation[] to provide Capitol access to its residents." Pl. Opp. 12 (emphasis added). The first supposed reference is in paragraph 1, which states that Capitol's dialysis stations shall be located in the south end of the main floor of the premises. See id. But neither that statement nor any other language in

paragraph 1 requires Beverly to provide Capitol with access to nursing home residents (or to continue operating the nursing home). Next, Capitol notes that, pursuant to paragraph 4, its obligation to pay rent began on the date that the first dialysis patient is dialyized on the premises. See id. But again, nothing in paragraph 4 states that Beverly must supply Capitol with patients. Finally, Capitol cites paragraph 5, which allows Capitol to use the premises for "office and medical use." See Lease ¶ 5. Capitol does not explain how a provision allowing it to use the premises for office and medical purposes imposes a duty on Beverly to supply it with patients.[1]

Capitol also was unable to find any textual support in the Lease for the duty it supposedly assumed in exchange for Beverly's alleged promise to supply patients: A commitment to use the premises for the sole purpose of treating Beverly's residents. Pl. Opp. 12-13. In its brief, Capitol implies that this duty can be found in paragraph 5, which states in pertinent part:

> The Premises shall be used and occupied by the Tenant only for office and medical use, including, without limitation, use as kidney dialysis stations under the business name of Capitol Dialysis, LLC or the name of any successor or assign, and for no other use.

Lease ¶ 5. But paragraph 5 does not, as Capitol contends, "preclude[] Capitol from treating patients other than Beverly residents." Pl. Opp. 12. Nor does it preclude Capitol from using the space for a different type of medical practice altogether, such as a podiatrist's office. To the contrary, the Lease expressly states that "office and medical use" includes "***without limitation***" use as a kidney dialysis center. Lease ¶ 5 (emphasis added). The phrase "without limitation" means that a dialysis center merely is one example of an appropriate type of "office and medical

---

[1] Even if the Lease had expressly stated that the premises could only be used as a dialysis center—something it simply does not say—it would be illogical to suggest that such a limitation burdened Beverly as landlord with a duty to supply patients. A commercial landlord can specify the manner in which the leased premises may be used without becoming the equivalent of a guarantor who is obligated to furnish the tenant with enough customers to support the designated use. No one would suggest, for example, that a landlord who permits the premises to be used only as a restaurant has a duty to ensure that every table is filled during business hours.

use." See United States v. Philip Morris USA, Inc., 396 F.3d 1190, 1200 (D.C. Cir. 2005) ("The words 'including, but not limited to' introduce a non-exhaustive list that sets out specific examples of a general principle.").

As a fallback, Capitol asserts that the Certificate of Need it obtained from the government "limited Capitol's services to Beverly's residents." Pl. Opp. 12. The document on which Capitol relies, Exhibit B to its opposition, actually is a 2007 Certificate of Need allowing Capitol to provide services to patients at the Washington Center for Aging Services, and has nothing to do with this case. In any event, Capitol's Certificates of Need are irrelevant because the Lease is fully integrated and does not incorporate by reference a Certificate of Need. Moreover, Capitol does not contend that a Certificate of Need precluded it from using the premises for an "office and medical use" other than a dialysis center. Therefore, Capitol's Certificates of Need do not alter the parties' respective rights and obligations under the Lease.

In short, the duties that supposedly transformed the parties' relationship into something more than that of landlord and tenant simply cannot be found anywhere in the Lease. That omission was deliberate. Indeed, the Lease memorializes the parties' mutual intention that "[n]othing contained in this Lease shall be deemed or construed to create . . . any other relationship between the parties hereto other than that of landlord and Tenant." Lease ¶ 19.3.

    **B.    The Lease Is A Fully Integrated Agreement That Leaves No Room For The Implied Duties Imagined By Capitol.**

Unable to cite any express provision in the Lease that obligates Beverly to provide Capitol with dialysis patients, Capitol attempts to fashion implied duties from Beverly's purported "prior representations" and "subsequent course of conduct." Pl. Opp. 15. Capitol argues that these implied duties can be read into the Lease because it does not contain an integration clause, or at least not a "full" one. Id. Capitol is mistaken. As we explain below, the

- 5 -

Lease does contain full integration clauses, and in any event, a fully integrated contract like the Lease cannot be supplemented with implied duties whether there is an integration clause or not. Rather, as Capitol itself points out, "[w]hen parties have executed a completely integrated written agreement, that agreement supersedes all other understandings and agreements with respect to the subject matter of the agreement between the parties." Id.

As a threshold matter, the Lease actually contains not one but two integration clauses. The first one, set forth in paragraph 19.3, provides as follows:

> No Partnership. Nothing contained in this Lease shall be deemed or construed to create a partnership or joint venture between Landlord and Tenant, or create any other relationship between the parties hereto other than that of landlord and Tenant.

In light of this clause, no one reading the Lease could reasonably conclude that, by entering into the Lease, Capitol became Beverly's partner, joint venturer, subcontractor, employee, internet service provider, or any other type of service provider. Capitol does not suggest that there is anything ambiguous about paragraph 19.3's exclusion of any relationship other than that of landlord and tenant.

The second integration clause can be found in paragraph 19.4 of the Lease. Having disclaimed any relationship other than that of landlord and tenant in the paragraph that immediately precedes it, paragraph 19.4 clarifies that all aspects of the parties' landlord-tenant relationship have been memorialized in the Lease:

> No Representations by Landlord. Neither Landlord nor any agent, representative or employee of Landlord has made any representation or promise with respect to the Premises or the Facility except as herein expressly set forth, and no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressly set forth.

Lease ¶ 19.4. Capitol argues that paragraph 19.4 disclaims any representation or promise "with respect to the Premises or the Facility," but does not disclaim other sorts of promises, such as a

- 6 -

promise to refer patients to Capitol for the next twenty years. Pl. Opp. 17. This argument ignores the linkage between paragraphs 19.3 and 19.4—it was unnecessary for paragraph 19.4 to disclaim promises related to a relationship in which Beverly was referring patients to Capitol because the parties had disclaimed the relationship itself in paragraph 19.3.

Capitol's implied contract claims are precluded even when one reads paragraph 19.4 in isolation, as Capitol is inclined to do. When quoting this paragraph in its brief (at 17), Capitol finds it convenient to omit the portion that states "no rights, privileges, easements or licenses are granted to or acquired by Tenant except as herein expressly set forth." Lease ¶ 19.4. The complaint alleges that Capitol had the right to "treat [Beverly's] patients for the full 20-year term." Cmplt. ¶ 57. Capitol also claims it has the right to require that Beverly continue operating its nursing home through the duration of the Lease because, if Beverly did not continue to operate the nursing home, there would be no Beverly residents for Capitol to treat. But these rights cannot be rooted in the Lease because they are not "expressly set forth" in the agreement, as paragraph 19.4 unambiguously requires.

Although the parties took the precaution of including integration clauses in the Lease, Capitol's implied contract claims would not have more traction if those clauses had been omitted. Capitol mistakenly assumes that parties have free rein to insert implied terms into contracts that lack an integration clause. See Pl. Opp. 14-15 & n.4. In fact, courts in the District of Columbia and elsewhere consistently have held that fully integrated agreements cannot be supplemented with implied terms whether an integration clause is present or not. See, e.g., Stamenich v. Markovic, 462 A.2d 452, 456 (D.C. 1983); Chas. H. Tompkins Co. v. Lumbermans Mut. Cas. Co., 732 F. Supp. 1368, 1375-76 (E.D. Va. 1990).

An agreement is fully integrated, and cannot be supplemented with implied terms, when it is comprehensive as to the subjects it discusses. See Stamenich, 462 A.2d at 456. Here, the Lease is a full integration because it comprehensively sets out Beverly's duties as landlord and Capitol's duties as tenant. The presence of the integration clauses in paragraphs 19.3 and 19.4 is further evidence that the parties intended the Lease to be a full integration. See Hercules & Co. v. Shama Rest. Corp., 613 A.2d 916, 928 n.17 (D.C. 1992). This is true whether the integration clauses are partial, as Capitol contends, or complete, as Beverly submits. See id. (holding that even a "wimpy" or partial integration clause is sufficient to render an agreement "completely, and not partially, integrated").[2]

It is well settled that a fully integrated agreement leaves no room for implied duties, particularly when those duties are substantial enough that the parties would not have left them to the vagaries of implication. See Bev. Br. at 8-9. Courts routinely reject contract claims involving implied duties that are substantial in nature. For example, in Duke v. American University, 675 A.2d 26 (D.C. 1996), the court held that a university did not impliedly relinquish its right to build in a commercial zone. In Stamenich, the court held that a right to assign a commercial lease could not be read into a contract by implication. 462 A.2d at 456. And in

---

[2] There is no merit to Capitol's suggestion that whether the Lease is fully integrated is a "factual matter requiring discovery." Pl. Opp. 15. The District of Columbia Court of Appeals has held that when the contractual "language in question is unambiguous, its interpretation is a question of law for the court." Independence Mgmt. Co. v. Anderson & Summers, LLC, 874 A.2d 862, 867 (D.C. 2005). The Court can readily determine from the Lease itself that the duties of the landlord and of the tenant are described in detail and are unambiguous—the hallmarks of a fully integrated contract. The Court also can discern, despite Capitol's protestations to the contrary, that paragraphs 19.3 and 19.4 are in fact integration clauses. Thus, this is a case where the task of determining whether an agreement is a full integration begins and ends "with an examination of the contract itself." Klayman v. Judicial Watch, Inc., Civ. Action No. 06-670, 2007 WL 1034937, at *8 (D.D.C. Apr. 3, 2007); see also Hercules & Co., 613 A.2d at 927 ("[W]e have no difficulty in ascertaining the parties' intent from the terms of the agreement they executed.").

Chas. H. Tompkins Co., the court held that a bid bond did not impliedly encompass the more substantial duties associated with a payment and performance bond. 732 F. Supp. at 1375-76. The duties that Capitol wants to read into the Lease in this case—including a duty to operate the nursing home and to supply Capitol with patients for 20 years—are far more substantial than any of the implied duties that the courts refused to indulge in the cases discussed above. Hence, Count I fails to plead a breach of contract claim and should be dismissed with prejudice.

### C. Capitol Cannot Reconcile Its Implied Contract Claim With The Plain Language Of The Dialysis Agreement.

The Dialysis Agreement, which Capitol rechristens the "Outpatient Agreement" in its brief, affirmatively shows that, as of 2004, when the Agreement was signed, Beverly did not have any obligation to supply Capitol with a patient base through the end of the Lease. Instead, Beverly was free to terminate the Dialysis Agreement at any time and for any reason. See Bev. Br. Ex. B, ¶ 4(a). According to Capitol, however, the Dialysis Agreement is inapplicable because it only "covers the transportation of Beverly's residents to Capitol's separate out-patient facility." Pl. Opp. at 2; see also id. at 8, 18-19. In Capitol's eyes, the Dialysis Agreement is more of a transportation agreement than an agreement requiring the provision of dialysis services. These contentions do not hold any water.

By its terms, the Dialysis Agreement covers Capitol's provision of dialysis services to *all* "residents of the Facility," Bev. Br. Ex. B, (Exhibit A thereto) ¶ 1, whether treatment is provided on-site or off-site. Seizing upon a provision requiring that the dialysis services be "provided at Contractor's outpatient facility," Capitol attempts to create a diversion by implying that the term "outpatient" is synonymous with "off-site." Pl. Opp. 8, 18. Thus, Capitol would have the Court believe that the Dialysis Agreement applies to residents who are treated at "Capitol's out-patient facility located at 140 Q Street," whereas some other unwritten dialysis agreement applies to the

patients who are treated at the leased premises. But the fact of the matter is that "outpatient" and "off-site" are not synonyms. The Medicare statute recognizes two types of dialysis services: inpatient, which involves treatment in a hospital, and outpatient, which does not. See 42 C.F.R. § 405.2102. Because Capitol was not treating *any* "residents of the Facility" in a hospital, *all* of the treatment it provided was by definition on an outpatient basis, and therefore the Dialysis Agreement encompassed all of the dialysis services that Capitol provided.

Furthermore, the applicable Medicare interpretive guidelines implementing nursing home regulations in effect as of 2004 required the parties to have an agreement covering the provision of dialysis services to Beverly's residents, whether those services were performed in the nursing home itself, in the space that Capitol leased, or at a location off-site. See State Operations Manual, Appendix P - Survey Protocol for Long Term Care Facilities - Part I (Rev. 26, Aug. 17, 2007) ("When dialysis is provided in the facility by an outside entity, or the resident leaves the facility to obtain dialysis, the nursing home must have an agreement or arrangement with the entity in accordance with 42 CFR § 483.75 (h). This agreement/arrangement should include all aspects of how the resident's care is to be managed."). The Dialysis Agreement, by its plain terms, was that agreement.

Notably, Capitol does not suggest there was some other contract covering the outpatient services it provided on-site to Beverly's residents. Thus, the termination clause in the Dialysis Agreement forecloses Capitol's claim that Beverly had a 20-year unbreakable obligation to provide it with patients to treat.

> D. **Capitol Cannot Rely On The Partial Performance Doctrine To Avoid The Dismissal Of Count I Under The Statute Of Frauds.**

Beverly demonstrated in its opening brief (at 11-12) that Count I should be dismissed for the independent reason that Capitol's implied contract claims are barred by the statute of frauds.

Capitol attempts to avoid the application of the statute of frauds by asserting that it has partially performed its implied contract with Beverly. See Pl. Opp. 19-20. The partial performance exception to the statute of frauds is no help to Capitol, however.

The statute of frauds deters fraud by preventing the enforcement of certain alleged promises—including those than cannot fully be performed within a year—when the promise is not evidenced by a writing. The rationale behind the exception is that one party's partial performance may constitute evidence, equivalent to a writing, that an agreement in fact existed. See Hackes v. Hackes, 446 A.2d 396, 401 n.9 (D.C. 1982); Kaufmann v. Adalman, 47 A.2d 755, 761 (Md. 1946) (cited with approval in Hackes). The exception applies only when the acts of partial performance "constitute unequivocal evidence of the alleged agreement." Hackes, 446 A.2d at 401 n.9; Kaufmann, 47 A.2d at 761. In other words, the acts of part performance must be "inconsistent with any other reasonable theory or hypothesis than that the acts were pursuant to such contract." Hackes, 446 A.2d at 401 n.9 (internal quotation marks omitted).

The case on which Capitol chiefly relies, Fitzgerald v. Hunter Concessions, Inc., 710 A.2d 863 (D.C. 1998), illustrates the application of the exception. There, an employee demonstrated that he had reported for work over a five-year period, and that the defendant had paid him wages over this same period. See id. at 864-65. Those facts tended to show the existence of an employment agreement because, absent such an agreement, there were would have been no reason for the plaintiff to labor on behalf of the company, nor would there have been a reason for the company to pay money to the plaintiff each year.

Capitol argues that its situation is analogous because "[l]ike Fitzgerald, Capitol has made payments to Beverly for more than five years and has detrimentally relied upon Beverly's representations…." Pl. Opp. 20. The analogy fails, however, because Capitol's payments do not

constitute unequivocal evidence of Beverly's alleged promise to "provide Capitol access to its residents for the twenty-year term." Id. at 21. Instead, the complaint alleges that "[p]ursuant to the Lease, Capitol pays [Beverly] One Thousand Fifty Dollars ($1,050.00) monthly *for rental of the Premises*." Cmplt. ¶ 22 (emphasis added). Because the express terms of the Lease required Capitol to make monthly rental payments, the fact that Capitol paid its rent in no way suggests that there was an unwritten agreement requiring Beverly to refer patients to Capitol. What it suggests is that Capitol was complying with its written obligation to pay "for rental of the Premises." Id. ¶ 22. Therefore, the partial performance exception is not available to Capitol, and Count I should be dismissed under the statute of frauds.[3]

## II. CAPITOL CANNOT REMEDY THE DEFECTS IN THE GOOD FAITH AND FAIR DEALING CLAIM IT ATTEMPTS TO ASSERT IN COUNT II.

Beverly explained in its opening brief (at 12-13) that Capitol's claim for breach of the implied duty of good faith and fair dealing is defective as a matter of law because the complaint does not allege a breach of any of the express provisions of the Lease. Capitol argues that it has fulfilled this prerequisite by alleging that "Beverly breached its obligation under the [Lease] to provide Capitol access to its residents for a twenty-year term." Pl. Opp. 23. But as Beverly demonstrated above in Part I, and in its opening brief (at 6-12), the Lease does not contain an

---

[3]   If Capitol were making payments to Beverly in exchange for the referral of nursing home residents—something that Beverly strenuously denies—the alleged agreement would be unenforceable for yet another reason. The Federal Health Care Anti-Kickback statute criminalizes the payment of "any remuneration" in exchange for the referral of an individual for the provision of services that will be reimbursed under a federal health care program, such as Medicare or Medicaid. 42 U.S.C. § 1320a-7b(b)(1) (2006). "[I]t is a well-settled rule of interpretation that where a contract is fairly open to two constructions, by one of which it would be lawful and the other unlawful, the former must be adopted." Manning v. Ellicott, 9 App. D.C. 71, 1896 WL 14846 at *6 (June 1, 1896) (citing Hobbs v. McLean, 117 U.S. 567, 576 (1886)). Here, the Court easily can avoid an illegal construction of the Lease by holding, in accordance with the plain language of the agreement, that Capitol's payments were for rent rather than the referral of dialysis patients.

express provision requiring Beverly to provide Capitol with patients. Count II therefore fails to state a claim for breach of the implied covenant of good faith and fair dealing.

Dismissal of this claim is warranted for the additional reason that the allegation of bad faith underlying Count II—Beverly's alleged failure to provide advance notice that the nursing home would be closed—is identical to the allegation of bad faith underlying Capitol's fiduciary duty and fraud claims. See Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n.2 (D.D.C. 2002) (holding that a claim for breach of an implied duty of good faith cannot be maintained "where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action'"). Capitol argues that Count II differs from the fiduciary duty claim (Count III) because Count II arises from the Lease, whereas Count III arises from Beverly's alleged fiduciary relationship with Capitol. See Pl. Opp. 24. Capitol misses the point completely. The alleged bad faith—again, Beverly's alleged failure to provide notice—is the same under both Counts (compare ¶¶ 62, 63, with ¶ 71). Thus, Count II is duplicative and should be dismissed.

### III. COUNT III FAILS BECAUSE CAPITOL CANNOT POINT TO ANYTHING IN THE COMPLAINT SUGGESTING THAT A FIDUCIARY RELATIONSHIP EXISTED BETWEEN THE PARTIES.

Capitol concedes that commercial leases do not give rise to fiduciary duties. See Pl. Opp. 21. It also concedes that fiduciary duties do not exist between two companies merely because they share a common director. See id. Despite these concessions, Capitol maintains that Beverly owed it fiduciary duties because a Beverly employee allegedly served on Capitol's Governing Body. See id. at 22. According to Capitol, the "board" seat was held by Beverly itself, rather than by the Beverly employee who purportedly showed up for meetings. See id. By virtue of its "corporate" appointment to the Governing Body, Beverly supposedly assumed a fiduciary duty to disclose its confidential business information to Capitol. See id.

Tellingly, Capitol is unable to cite a single case that supports any part of this legal theory. It cites no case supporting the notion that the fiduciary duties assumed by an individual board member are vicarious, such that the board member's employer becomes bound by the same duties. Nor does Capitol have a case holding that when a corporation sends a representative to attend another company's board meetings, the corporation and its representative assume a fiduciary duty to disclose the corporation's business information to the other company's board. Distilled to its essence, the argument seems to be that, by sending an employee to attend the meetings of Capitol's Governing Body, Beverly effectively agreed to allow a Capitol employee to attend **Beverly's** board meetings. That theory is illogical and unsupported by any authority. If Capitol wanted to be privy to Beverly's confidential decisionmaking processes, it should have nominated one of its principals for a seat on Beverly's board. Absent such an appointment, Capitol, like any other member of the public, had no right to advance notice of business decisions that Beverly was contemplating.[4]

Beverly explained in its opening brief that instead of having a duty to disclose Beverly's secrets to Capitol, the Beverly employee who allegedly attended Capitol's meetings owed a duty of loyalty to **Beverly** requiring that Beverly's confidences be maintained. See Bev. Br. 16 n.4 (citing Riggs Inv. Mgmt. Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1265 (D.D.C. 1997)). Capitol offers no reason why the duty of loyalty would not apply in this context. Because the complaint does not plead a fiduciary relationship, Count III should be dismissed.

---

[4] The right of access that Capitol imagines would elevate Capitol's status above that of Beverly's own shareholders, who "do not have unfettered access to corporate confidences and secrets." Am. Jur. 2d. Corp. § 332 (2007) (citing Nat'l Football League Props., Inc. v. Superior Court, 75 Cal. Rptr. 2d 893 (6th Dist. 1998); O'Neal v. Home Town Bank of Villa Rica, 514 S.E.2d 669 (Ga. 1999)).

**IV.   COUNTS IV AND V SHOULD BE DISMISSED BECAUSE NEITHER STATES A CLAIM FOR FRAUD.**

The parties agree that the fraud claims set forth in Counts IV and V rise or fall with Capitol's breach of fiduciary duty claim because, absent the existence of a recognized fiduciary duty, Beverly was under no obligation to disclose that it intended to close its nursing home. See Pl. Opp. 26.  For the reasons discussed above in Part III, Capitol has not pleaded facts that would create a fiduciary duty between the parties.  As a result, Capitol's fraud claims also warrant dismissal with prejudice.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Beverly's opening brief, the motion to dismiss the complaint should be granted, and all of Capitol's claims should be dismissed with prejudice.

Respectfully Submitted,

      /s/ Andrew A. Nicely
Gary A. Winters (D.C. Bar No. 439376)
Andrew A. Nicely (D.C. Bar No. 458805)
MAYER BROWN, LLP
1909 K Street, N.W.
Washington, D.C.  20006
(202) 263-3000
anicely@mayerbrown.com

*Counsel for defendants Beverly Enterprises-District of Columbia, Inc. and Beverly Health Rehabilitation Services, Inc.*

October 4, 2007

## CERTIFICATE OF SERVICE

I, Andrew A. Nicely, hereby certify that, on this 4th day of October, 2007, I caused a true and correct copy of the Defendants' Reply Brief in Support of Motion to Dismiss to be served through the Court's ECF system upon:

> Jeffrey L. Poston, Esq.
> Crowell & Moring, LLP
> 1001 Pennsylvania Avenue, N.W.
> Suite 200
> Washington, D.C. 20004
>
> *Counsel for plaintiff*

        /s/ Andrew A. Nicely
        Andrew A. Nicely